1  KINSELA WEITZMAN ISER KUMP HOLLEY LLP
   Shawn Holley (Cal. Bar No. 136811)
2  808 Wilshire Boulevard., 3rd Floor
   Santa Monica, CA 90401
3  Tel: (310) 566-9800
   Fax: (310) 566-9873
4  sholley@kwikhlaw.com

5  ZUCKERMAN SPAEDER LLP
   Blair G. Brown (admitted *pro hac vice*)
6  Jon R. Fetterolf (admitted *pro hac vice*)
   1800 M Street, N.W., Suite 1000
7  Washington, D.C. 20036
   Tel: (202) 778-1800
8  Fax: (202) 882-8106
   bbrown@zuckerman.com
9  jfetterolf@zuckerman.com

10  *Attorneys for Plaintiff*

11              UNITED STATES DISTRICT COURT
12              CENTRAL DISTRICT OF CALIFORNIA
                     WESTERN DIVISION
13

14  TREVOR BAUER,

15              Plaintiff,                    Case No. 2:22-cv-02062-MWF-AGR
                                              Assigned for all purposes to the Hon.
16       v.                                   Michael W. Fitzgerald

17  THE ATHLETIC MEDIA
    COMPANY and MOLLY KNIGHT,                 **MEMORANDUM OF POINTS AND
18                                            AUTHORITIES IN OPPOSITION TO
                                              DEFENDANTS' MOTION TO
19              Defendants.                   STRIKE PLAINTIFF'S COMPLAINT**

20                                            Hearing Date: August 29, 2022
                                              Hearing Time: 10:00 a.m.
21                                            Department: 5A

22                                            Action Filed: March 29, 2022

23

24

25

26

27

28

# TABLE OF CONTENTS

II.   ISSUE TO BE DECIDED ..................................................................................2

III.  STATEMENT OF FACTS...............................................................................2

A.   *The Athletic* Publishes A Slew Of Articles Impugning Mr. Bauer Before The Defamatory Article In An Effort To End His Baseball Career. ...............2

B.   Mr. Bauer Is Falsely Accused Of Sexual Assault. ...........................................3

C.   *The Athletic* Is Quick To Report Falsehoods Related To The Accusation Without Even Minimal Diligence. ......................................................................3

D.   Ms. Knight, A Reporter for *The Athletic*, Takes To Twitter To Double Down On *The Athletic*'s False Reporting. ........................................................4

E.   After Multiple Demands From Mr. Bauer's Counsel, *The Athletic* Publishes an Insufficient And Inaccurate Correction. ........................................................5

F.   A California Court Absolves Mr. Bauer Of Any Wrongdoing And The Los Angeles District Attorney Declines To Charge Mr. Bauer With Any Crime. ...............................................................................................................6

G.   Mr. Bauer Files This Lawsuit And Defendants Move To Strike. ....................7

IV.  THE ANTI-SLAPP STATUTE ........................................................................7

V.   MR. BAUER'S COUNT I DEFAMATION CLAIM AGAINST *THE ATHLETIC* EASILY MEETS THE REQUIREMENT THAT IT HAVE AT LEAST "MINIMAL MERIT." ....................................................................9

A.   Mr. Bauer Has Pled Compliance With California's Retraction Statute.........10

B.   The Article Is The Opposite Of A Fair And True Report Of L.H.'s Petition..............................................................................................................12

C.   Mr. Bauer's Defamation by Implication Claim Has More Than "Minimal Merit." .............................................................................................................15

     1.   The Article is reasonably susceptible to a defamatory implication............15

     2.   The assertions of fact in the Article are provably false. .............................16

i

3.   Mr. Bauer has alleged facts that plead actual malice .................................. 18

VI.   MR. BAUER'S COUNT II DEFAMATION CLAIM AGAINST *THE ATHLETIC* AND MS. KNIGHT EASILY MEETS THE REQUIREMENT THAT IT HAVE AT LEAST "MINIMAL MERIT." ................................. 20

A.   The Tweets Imply False Assertions Of Fact. .................................................. 20

1.   The General Tenor of the Entire Work ......................................... 21

2.   The Specific Language Used Reinforces Rather Than Negates That The Tweets Imply Mr. Bauer Fractured L.H.'s Skull ........................................ 23

3.   Susceptibility of Being Proved True or False ............................................. 24

B.   The Assertions Of Fact In The Tweets Are Provably False. ......................... 25

C.   Mr. Bauer Has Alleged Facts That Plead Actual Malice. .............................. 25

VII.   CONCLUSION ............................................................................................... 25

ii

1

# TABLE OF AUTHORITIES

2

3

**Cases**

4

*Albertini v. Schaefer*,
　159 Cal. Rptr. 98 (Ct. App. 1979)..................................................................12

5

6

*Argentieri v. Zuckerberg*,
　214 Cal. Rptr. 3d 358 (2017) .........................................................................15

7

8

*Barnes-Hind, Inc. v. Superior Ct.*,
　226 Cal. Rptr. 354 (Ct. App. 1986)............................................................9, 25

9

10

*BDO USA, LLP v. EverGlade Glob., Inc.*,
　2022 WL 41416 (Del. Ch. Jan. 5, 2022)........................................................21

11

12

*Boulger v. Woods*,
　917 F.3d 471 (6th Cir. 2019)..........................................................................21

13

14

*Cahill v. Edalat*,
　2017 WL 2608857 (C.D. Cal. Feb. 15, 2017)................................................23

15

16

*Carbone v. Cable News Network, Inc.*,
　910 F.3d 1345 (11th Cir. 2018)........................................................................7

17

18

*Christian Rsch. Inst. v. Alnor*,
　55 Cal. Rptr. 3d 600 (2007) ...........................................................................19

19

*City of Cotati v. Cashman*,
　29 Cal. App. 4th 69 (2002)...............................................................................8

20

21

*Condit v. Nat'l Enquirer, Inc.*,
　248 F. Supp. 2d 945 (E.D. Cal. 2002)............................................................16

22

23

*Corinna Warm & Studio Warm LLC v. Innermost Ltd.*,
　2022 WL 1585753 (C.D. Cal. Apr. 6, 2022) ...................................................8

24

25

*Crane v. Arizona Republic*,
　972 F.2d 1511 (9th Cir. 1992).............................................................12, 13, 15

26

27

*Curtis Publishing Co. v. Butts*,
　388 U.S. 130 (1967) ........................................................................................18

28

*Fawcett v. Altieri*,
  960 N.Y.S.2d 592 (Sup. Ct. 2013) ..........................................................21

*Gallagher v. Philipps*,
  563 F. Supp. 3d 1048 (S.D. Cal. 2021) ...........................................14, 15

*Gilbert v. Sykes*,
  53 Cal. Rptr. 3d 752 (2007) .................................................................17

*Greenspan v. Qazi*,
  2021 WL 2577526 (N.D. Cal. June 23, 2021) ......................................22

*Grenier v. Taylor*,
  183 Cal. Rptr. 3d 867 (2015) ...............................................................23

*Grewal v. Jammu*,
  119 Cal. Rptr. 3d 835 (2011) .................................................................9

*Heller v. NBCUniversal, Inc.*,
  2016 WL 6583048 (C.D. Cal. June 29, 2016) ......................................15

*Info. Control Corp. v. Genesis One Computer Corp.*,
  611 F.2d 781 (9th Cir. 1980) ................................................................22

*Jackson v. Mayweather*,
  217 Cal. Rptr. 3d 234 (2017) ...............................................................17

*Jezzini v. Adolf*,
  2019 WL 4668008 (Cal. Ct. App. Sept. 25, 2019) ...............................14

*Kaelin v. Globe Commc'ns Corp.*,
  162 F.3d 1036 (9th Cir. 1998) ........................................................15, 16

*Kapellas v. Kofman*,
  1 Cal. 3d 20 (1969) ..............................................................................11

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) ..............................................................11

*Makaeff v. Trump Univ., LLC*,
  736 F.3d 1180 (9th Cir. 2013) ..........................................................8, 18

*Manzari v. Associated Newspapers Ltd.*,
  830 F.3d 881 (9th Cir. 2016) .............................................................2, 18

iv

*Masson v. New Yorker Mag., Inc.*,
    501 U.S. 496 (1991) ....................................................................................17

*Med. Marijuana, Inc. v. ProjectCBD.com*,
    260 Cal. Rptr. 3d 237 (2020) ......................................................................8

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ........................................................................20, 22, 23

*Murray v. Bailey*,
    613 F. Supp. 1276 (N.D. Cal. 1985) ..........................................................18

*Navellier v. Sletten*,
    29 Cal.4th 82, 89 (2002) ..............................................................................9

*Oasis W. Realty, LLC v. Goldman*,
    51 Cal. 4th 811 (2011) ................................................................................8

*Obsidian Fin. Grp., LLC v. Cox*,
    812 F. Supp. 2d 1220 (D. Or. 2011), *aff'd*, 740 F.3d 1284 (9th Cir. 2014) .........22

*Overhill Farms, Inc. v. Lopez*,
    119 Cal. Rptr. 3d 127 (2010) ....................................................................13

*Overstock.com, Inc. v. Gradient Analytics, Inc.*,
    151 Cal.App.4th 688, 699 (2007) ................................................................9

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
    890 F.3d 828 (9th Cir. 2018)........................................................................9

*Resolute Forest Prod., Inc. v. Greenpeace Int'l*,
    302 F. Supp. 3d 1005 (N.D. Cal. 2017) ....................................................19

*Shahid Buttar for Cong. Comm. v. Hearst Commc'ns, Inc.*,
    2022 WL 1215307 (N.D. Cal. Apr. 25, 2022) ............................................11

*Summit Bank v. Rogers*,
    206 Cal. App. 4th 669 (2012) ....................................................................22

*Travelers Cas. Ins. Co. of Am. v. Hirsh*,
    831 F.3d 1179 (9th Cir. 2016)......................................................................7

*Unelko Corp. v. Rooney*,
    912 F.2d 1049 (9th Cir. 1990)....................................................................23

OPP'N TO MOT. TO STRIKE

*Unsworth v. Musk,*
  2019 WL 4543110 (C.D. Cal. May 10, 2019) ................................................21, 22

*Weinberg v. Feisel,*
  2 Cal. Rptr. 3d 385 (2003) ...................................................................................12

*Wynn v. Chanos,*
  75 F. Supp. 3d 1228 (N.D. Cal. 2014) .................................................................16

*ZL Techs., Inc. v. Does 1-7,*
  220 Cal. Rptr. 3d 569 (2017) ...............................................................................20

**Other Authorities**

53 C.J.S. Libel and Slander; Injurious Falsehood § 215 .........................................12

https://www.mollyknight.com/ .................................................................................24

**Rules**

Cal. Civ. Code § 48a(a) ...........................................................................................10

OPP'N TO MOT. TO STRIKE

## I.    INTRODUCTION

This is a simple case of defamation per se. In mid-2021, L.H. falsely accused Plaintiff Trevor Bauer of sexual assault. She filed a petition for a domestic violence restraining order that contained her declaration and her medical records. Two days later, Defendant *The Athletic* published an article about L.H.'s petition, where it accused Mr. Bauer of fracturing L.H.'s skull during the sexual encounter, despite the medical records attached to L.H.'s petition showing this was false. Defendant Molly Knight, an employee of *The Athletic*, tweeted the same false accusation. A false accusation of a crime is textbook defamation per se. It is *that* simple.

Rather than addressing Mr. Bauer's claim head-on, Defendants' motion to strike ("Mot.") is largely a baseless character assassination of Mr. Bauer. Their argument goes like this: because Defendants believe that Mr. Bauer is morally reprehensible due to L.H.'s false accusations, it does not matter that the article and tweets were inaccurate because the average reader would share their bias that Mr. Bauer was a bad actor whether or not he fractured L.H.'s skull. But that is not something that could possibly be resolved as a matter of law on the face of the pleadings. The Complaint alleges that the defamatory article and tweets materially altered the narrative around Mr. Bauer by accusing him of a different crime (a violent physical assault) on top of what L.H. accused him of (a sexual assault). At a minimum, Mr. Bauer's allegation that the average reader would understand the article and tweets to mean that Mr. Bauer fractured L.H.'s skull—a different crime than what he was accused of in L.H.'s petition—is just as (if not more) plausible than Defendants' proffered interpretation. Courts in this Circuit have consistently held that the effect on the reader is a question for a jury.

The rest of Defendants' motion fares no better. Defendants consistently misstate the law, omit controlling authority, and selectively quote from cases that do not support them. What Defendants lack in legal reasoning, they make up for in bombast. Better suited for an opening statement to a jury, Defendants wildly claim

OPP'N TO MOT. TO STRIKE

that Mr. Bauer "does not deny that he…violently and repeatedly punched [L.H.] in the head, vagina, and buttocks" (Mot. 1), and that Mr. Bauer "admits that for sexual pleasure, he battered a woman so badly that it left her with extensive, serious injuries" (Mot. 18). Mr. Bauer has never made any such "admissions." The Court should not be swayed by Defendants' unscrupulous attacks, which are particularly inappropriate against a man who was wrongfully accused. Indeed, a California state court judge denied L.H.'s petition, finding that it was materially misleading and that L.H. consented to rough sex, thus absolving Mr. Bauer of any wrongdoing.

At bottom, when Defendants' motion is stripped of its mudslinging, what's left is that Defendants falsely and knowingly accused Mr. Bauer of a serious crime even though they possessed an objective medical report debunking their accusation. They took an already traumatic experience in Mr. Bauer's life—being falsely accused of sexual assault—and added insult to injury by knowingly reporting false facts that were worse than what was in L.H.'s petition. Defendants effectively ensured that Mr. Bauer was convicted by the court of public opinion before he had his day in a court of law. This constitutes defamation per se under California law.

## II.    ISSUE TO BE DECIDED

Whether there is a minimal probability that Mr. Bauer will prevail on the merits of his defamation per se claims, a showing that has been described as "not high" and only requiring a "minimum level of legal sufficiency and triability." *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 887 (9th Cir. 2016).

## III.   STATEMENT OF FACTS

### A. *The Athletic* Publishes A Slew Of Articles Impugning Mr. Bauer Before The Defamatory Article In An Effort To End His Baseball Career.

*The Athletic*'s defamatory article ("Article") was one of many articles *The Athletic* has published over the years impugning Mr. Bauer. Compl. ¶¶ 15–33. When Mr. Bauer was a free agent in late 2020, *The Athletic* published a slew of articles to dissuade teams from signing him. *Id*. ¶ 16. One article was titled "Trevor

Bauer could help the Blue Jays. But is his total package worth the risk?" *Id*. ¶ 17. The article stated that Mr. Bauer had "been a part of some ugly [Twitter] interactions, including one in 2019 when a young woman said she felt harassed by Bauer and his followers." *Id*. Although that article recognized that Mr. Bauer "acknowledged the situation and asked his followers to stop," it characterized him as "polarizing" and displaying "poor judgment." *Id*. The article did not identify other "problematic interactions" *Id*. ¶ 18. Other articles warned the Blue Jays and the Mets against signing him. *Id*. ¶ 20–21. Despite *The Athletic*'s harassment campaign, Mr. Bauer signed with the Los Angeles Dodgers. *Id*. ¶ 22. In response, *The Athletic* continued to malign Mr. Bauer, calling the situation "bewildering," among other things. *Id*. ¶ 23. *The Athletic* also published more unsupported accusations of Mr. Bauer harassing people online. *Id*. ¶ 32. Other articles continued to paint Mr. Bauer in a negative light, referring to him as an "irritant" and a "brash free-agent acquisition." *Id*. ¶ 33. *The Athletic*'s prior coverage establishes a motive for publishing false allegations against Mr. Bauer either knowingly or recklessly.

**B. Mr. Bauer Is Falsely Accused Of Sexual Assault.**

In June 2021, Mr. Bauer was falsely accused of sexual assault by L.H. *Id*. ¶ 1. On June 28, 2021, L.H. filed a petition for a restraining order against Mr. Bauer based on her false allegations. *Id*. ¶ 34. The petition contained a declaration from L.H. alleging that she was given a CT scan because of "signs of a basilar skull fracture." *Id*. However, her medical records conclusively found from the CT scans that she did not suffer a skull fracture. *Id*. These medical records were both attached to her petition and publicly available on the Los Angeles Superior Court docket. *Id*. A California judge would later confirm that L.H.'s petition was "materially misleading" and her allegations of sexual assault were unfounded because the encounter was consensual. *Id*. ¶¶ 34, 75.

**C. *The Athletic* Is Quick To Report Falsehoods Related To The Accusation Without Even Minimal Diligence.**

On June 30, 2021, two days after L.H. filed the petition, *The Athletic* published the Article about it titled "Graphic details, photos emerge in restraining order filed against Dodger pitcher Trevor Bauer." *Id*. ¶ 35. The Article, written by *The Athletic*'s employees Brittany Ghiroli and Katie Strang (the "Journalists"), stated that *The Athletic* had obtained a copy of L.H.'s "67-page ex parte document." *Id*. This included L.H.'s declaration and exhibits with copies of her medical records, including CT scan results. *Id*. L.H.'s declaration made clear that the CT scan results were part of her petition. *Id*. ¶ 38. The declaration explained that the medical records were attached as Exhibit 6 and Exhibit 12, which contained an "after visit summary" of an appointment where she had an MRI and a neurological exam. *Id*. Exhibit 12 also contained CT scan records showing no fractures. *Id*.

Nevertheless, in the second paragraph of the Article, *The Athletic* reported that L.H.'s declaration stated that "medical notes" stated "that there were signs of a basilar skull fracture" following her sexual encounter with Mr. Bauer. *Id*. ¶ 36. As stated above, however, the CT scan results, which were included in the medical records and attached to the petition, definitively concluded that L.H. had "no acute fracture." *Id*. ¶ 37. *The Athletic* did not refer to the CT scan results in the Article, although it possessed them. *Id*. ¶ 39. Moreover, *The Athletic* and the Journalists knew that L.H. had CT scans on her head, neck, and face because the Article *said so*. *Id*. ¶ 40. Nonetheless, the Article omitted the results of those scans that clearly stated L.H. suffered "no acute fracture." *Id*. By ignoring the negative results of the CT scan, the Article gave the clear—but false—impression that Mr. Bauer had fractured L.H.'s skull. *Id*. ¶ 41.

### D. Ms. Knight, A Reporter for *The Athletic*, Takes To Twitter To Double Down On *The Athletic*'s False Reporting.

Ms. Knight was a reporter for *The Athletic* at the time the Article was published. *Id*. ¶ 11. Ms. Knight has made no effort to mask her malice towards Mr. Bauer over the years, maligning him in both her written articles and on her social

media. *Id*. ¶¶ 25–26. She has been described as "egg[ing]" on Mr. Bauer on social media. *Id*. ¶ 25. She wrote an article for *The Athletic* titled "Trevor Bauer isn't worth the headache, so why would the Dodgers want him?" *Id*. ¶ 26. She has accused Mr. Bauer of "harbor[ing] prehistoric cultural opinions" and having "questionable judgment and immaturity," among other baseless insults. *Id*. Ms. Knight also falsely claimed that another writer endured death threats and Holocaust jokes for months after Mr. Bauer told his followers to go after her. *Id*. ¶ 27. Ms. Knight's attacks on Mr. Bauer did not stop there. She has publicly speculated that he harassed women who worked for Mr. Bauer's prior teams without any evidence, and falsely proclaimed to her followers that he has a "well known history of harassing women online." *Id*. ¶¶ 29–30. Ms. Knight has alluded to "two highly publicized incidents" in which young women were harassed by Mr. Bauer, but she did not specify any such incidents at all. *Id*. ¶ 31.

Ms. Knight's smear campaign against Mr. Bauer culminated in the defamatory tweets at issue in this case. *Id*. ¶¶ 43–48. After *The Athletic* published the Article, Ms. Knight issued three tweets to her over one hundred thousand followers amplifying the false accusation that Mr. Bauer fractured L.H.'s skull. *Id*. ¶¶ 43–45. Specifically, in response to a Twitter thread about Mr. Bauer, she tweeted that it is "[n]ot possible to consent to a fractured skull." *Id*. ¶ 44. She then tweeted: "There seems to be some confusion surrounding the issue of consent but here is some clarity: it's not possible to consent to a cracked skull." *Id*. ¶ 45. Next, she tweeted: "Saying you'd like to engage in rough sex that involves slapping or choking does not equal consent to a cracked skull." *Id*. These tweets illustrate that the Article conveyed the false assertion of fact that Mr. Bauer fractured L.H.'s skull. *Id*. ¶ 46. The tweets themselves were also false statements of fact. *Id*. ¶ 47.

**E. After Multiple Demands From Mr. Bauer's Counsel, *The Athletic* Publishes an Insufficient And Inaccurate Correction.**

After the Article was published, Mr. Bauer's representatives promptly contacted *The Athletic*, explaining that L.H.'s own medical records attached to her declaration showed no skull fracture. *Id*. ¶ 56; Brown Decl., Ex. A. *The Athletic* refused the request to correct the Article, stating: "we believe our story is accurate as currently phrased." Compl. ¶ 57. Mr. Bauer's counsel then sent *The Athletic* a demand letter. *Id*. ¶ 58; Brown Decl., Ex. B. In response, *The Athletic* issued a meager revision to the Article that added the following parenthetical: "(Update: After publication, Trevor Bauer's representatives emphasized that medical records showed that while the woman was initially diagnosed with signs of a basilar skull fracture, a subsequent CT scan found no acute fracture.)" Compl. ¶ 58. This correction in response to the demand letter was insufficient and inaccurate because there was no "diagnos[is]" of signs of a skull fracture. *Id*. ¶ 59. In response to the demand letter from Mr. Bauer's counsel, Ms. Knight deleted the tweets but did not issue a corrective tweet. *Id*. ¶ 65. Despite Mr. Bauer's counsel's efforts to curb *The Athletic*'s false reporting, *The Athletic* continued to trumpet L.H.'s false allegations to attack Mr. Bauer and harm his career in subsequent articles. *Id*. ¶ 67–69. Ms. Knight also continued to denounce Mr. Bauer on Twitter. *Id*. ¶ 71.

**F. A California Court Absolves Mr. Bauer Of Any Wrongdoing And The Los Angeles District Attorney Declines To Charge Mr. Bauer With Any Crime.**

On August 19, 2021, the Los Angeles Superior Court denied L.H.'s request for a domestic violence restraining order. *Id*. ¶ 73. Judge Dianna Gould-Saltman found that L.H. consented to her acts with Mr. Bauer and concluded that Mr. Bauer had not assaulted or abused L.H. *Id*. The Judge further explained that L.H. "has the right to engage in any kind of sex as a consenting adult…[and] [s]he was not ambiguous about wanting rough sex in the parties' first encounter and wanting rougher sex in the second encounter." *Id*. ¶ 74. The Judge also found that L.H.'s declaration was "materially misleading" and that her allegations lacked credibility.

1  *Id.* ¶ 75. Despite these findings, *The Athletic* continued to repeat L.H.'s false

2  allegations without mention of the Court's contrary finding. *Id.* ¶¶ 77–80. When

3  *The Athletic* did reference the Court's decision, it misrepresented the legal standard

4  and the Court's findings. *Id.* ¶¶ 81–87.

5  On February 8, 2022, the Los Angeles District Attorney stated publicly that

6  his office would not charge Mr. Bauer with a crime because "[a]fter a thorough

7  review of the available evidence…the People are unable to prove the relevant

8  charges beyond a reasonable doubt." *Id.* ¶ 90. The District Attorney also explained

9  that the standard of proof in the restraining order proceeding was "very low" and

10  even under that low standard, the allegations could not be proven. *Id.* ¶ 91.

11  **G. Mr. Bauer Files This Lawsuit And Defendants Move To Strike.**

12  On March 29, 2022, Mr. Bauer filed this lawsuit against *The Athletic* and Ms.

13  Knight for defamation per se based on the Article and the tweets. ECF No. 1. By

14  falsely accusing Mr. Bauer of fracturing L.H.'s skull, Defendants effectively

15  accused Mr. Bauer of a serious crime that they knew he did not commit. As a result

16  of the false accusation, Mr. Bauer was maligned in his profession, suffered financial

17  loss, and suffered severe damage to his reputation both professionally and

18  personally. Compl. ¶ 110.

19  On May 31, 2022, Defendants filed the instant motion to strike under

20  California's anti-SLAPP statute, contending that Mr. Bauer's claims fail as a matter

21  of law. ECF No. 20.

22  **IV.   THE ANTI-SLAPP STATUTE**

23  As explained by several judges on the Ninth Circuit and other federal courts,

24  "an anti-SLAPP motion has no proper place in federal court" at all. *Travelers Cas.*

25  *Ins. Co. of Am. v. Hirsh*, 831 F.3d 1179, 1186 (9th Cir. 2016) (Gould, J.,

26  concurring) (expressing regret for joining the Ninth Circuit's opinion in *Batzel v.*

27  *Smith*). *See also Carbone v. Cable News Network, Inc*., 910 F.3d 1345, 1356 (11th

28  Cir. 2018) (discussing entrenched circuit split on issue); *Makaeff v. Trump Univ.,*

OPP'N TO MOT. TO STRIKE

*LLC*, 736 F.3d 1180, 1188 (9th Cir. 2013) (Watford, J., dissenting from denial of rehearing en banc) (explaining why Ninth Circuit was wrong to conclude that anti-SLAPP statute applied at all in federal court). This Court has expressed similar reservations regarding the application of California's anti-SLAPP statute in federal court. *Corinna Warm & Studio Warm LLC v. Innermost Ltd.*, 2022 WL 1585753, at *4 (C.D. Cal. Apr. 6, 2022) (Fitzgerald, J.) (noting that "the applicability of the anti-SLAPP statute in federal court has been questioned" and citing case stating that "[f]ederal courts have no business applying exotic state procedural rules"). To preserve this point in view of the division of opinion within the Ninth Circuit and a split in the Circuits, Defendants cannot invoke the California anti-SLAPP statute because it conflicts with the Federal Rules.[1]

The anti-SLAPP statute is designed to permit a defendant to move to dismiss "certain unmeritorious claims that are brought to thwart constitutionally protected speech or petitioning activity." *Med. Marijuana, Inc. v. ProjectCBD.com*, 260 Cal. Rptr. 3d 237, 247 (2020). The statute "requires that a court engage in a two-step process when determining whether a defendant's anti-SLAPP motion should be granted." *City of Cotati v. Cashman*, 29 Cal. App. 4th 69, 76 (2002). "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 819 (2011). Second, "[i]f the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." *Id.* at 819–20. Where, as here, an anti-SLAPP motion brought in federal court is founded purely on legal arguments, the court must analyze the probability of prevailing under a 12(b)(6) standard. *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890

---

[1] As the Ninth Circuit's mistakes can only be rectified by an en banc panel of that Court, or by the Supreme Court, Mr. Bauer raises this issue for preservation.

OPP'N TO MOT. TO STRIKE

F.3d 828, 833–35 (9th Cir. 2018). Mr. Bauer's "burden of establishing a probability of prevailing is not high." *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 699 (2007). "<u>Only a cause of action that lacks 'even minimal merit'</u> <u>constitutes a SLAPP</u>." *Id.* at 700 (emphasis added). *See also Grewal v. Jammu*, 119 Cal. Rptr. 3d 835, 845 (2011) ("plaintiff need show only a 'minimum level of legal sufficiency and triability'"); *Manzari*, 830 F.3d at 887 ("[T]he second step of the anti-SLAPP inquiry is often called the minimal merit prong."). "A plaintiff is not required 'to *prove* the specified claim to the trial court'; rather, so as to not deprive the plaintiff of a jury trial, the appropriate inquiry is whether the plaintiff has stated and substantiated a legally sufficient claim." *Manzari*, 830 F.3d at 887.

Defendants' motion should be denied because it fails to satisfy the second step of the anti-SLAPP analysis. Defendants fail to establish that Mr. Bauer's claims lack "even minimal merit." Mr. Bauer's defamation per se claims have considerable merit and a high probability of success. Were the Court to hold otherwise, its decision would grant journalists the unfettered right to knowingly publish false accusations of criminal conduct against public figures under the pretext of free speech and damage reputations and careers with impunity. The anti-SLAPP standard and common sense urge the Court to deny the instant motion.

### V. MR. BAUER'S COUNT I DEFAMATION CLAIM AGAINST *THE ATHLETIC* EASILY MEETS THE REQUIREMENT THAT IT HAVE AT LEAST "MINIMAL MERIT."

Mr. Bauer's Count I defamation per se claim alleges that *The Athletic* published the Article accusing Mr. Bauer of the serious crime of fracturing L.H.'s skull despite knowing the accusation was false. Compl. ¶¶ 92–111. Faced with this textbook defamation per se claim, *see Barnes-Hind, Inc. v. Superior Ct.*, 226 Cal. Rptr. 354, 358 (1986) ("[p]erhaps the clearest example of libel per se is an accusation of crime"), *The Athletic* cobbles together a patchwork of meritless arguments to avoid litigating the merits. First, it reads strict requirements into

California's Retraction Statute that do not exist. Second, it hides behind the fair and true report privilege even though the Article stated the exact opposite of what the medical records in the petition stated. Third, it boldly proclaims that the Article does not imply that Mr. Bauer fractured L.H.'s skull, and even if it did, the accusation is substantially true, *despite the medical records to the contrary*. Finally, *The Athletic* disavows any actual malice by ignoring its documented crusade against Mr. Bauer and the Journalists' deliberate omission of medical records in their possession. Especially under the low standard that Mr. Bauer only need show that his claim has "minimal merit," these arguments easily fail.

### A. Mr. Bauer Has Pled Compliance With California's Retraction Statute.

California's retraction statute requires that a plaintiff "serve upon the publisher at the place of publication…a written notice specifying the statements claimed to be libelous and demanding that the same be corrected" within 20 days after knowledge of the publication. Cal. Civ. Code § 48a(a). That is exactly what Mr. Bauer did. *See* Compl. ¶¶ 56–57. Mr. Bauer alleges that "[a]fter the Article was published, Mr. Bauer's representatives promptly contacted *The Athletic*, explaining that the Complainant's own medical records attached to the declaration showed no skull fracture." *Id*. ¶ 56. He further alleges: "After receiving this information, *The Athletic* **refused to correct the Article**," and "Emma Span from *The Athletic* stated that '[h]aving looked over the records, we believe our story is *accurate* as currently phrased.' (emphasis added)" *Id*. ¶ 57. After that, Mr. Bauer's counsel followed up with a demand letter. *Id*. ¶ 58. In response, *The Athletic* issued the insufficient and inaccurate revision. *Id*. ¶¶ 57–59.

*The Athletic* does not challenge the sufficiency of the demand letter or the request for correction, to which it responded by "refus[ing] to correct the Article." *Id*. ¶ 57. Instead, *The Athletic* urges the Court to dispose of the whole case based on its reading of a pleading requirement into § 48a that does not exist. Mot. 10–11. It

10

incorrectly argues that the law requires Mr. Bauer to allege verbatim the content and context of all correspondence between counsel and Defendants. *Id*. But the law does not contain any such requirement.[2] California courts have explicitly rejected *The Athletic*'s strict interpretation of the retraction statute. *See Kapellas v. Kofman*, 1 Cal. 3d 20, 30–31 (1969) (the purpose of the retraction statute is "to facilitate the publisher's investigative efforts in determining whether statements in the initial article contained error and should be corrected" and "[t]he crucial issue in evaluating the adequacy of the notice turns on whether the publisher should reasonably have comprehended which statements plaintiff protested and wished corrected"). Consistent with the legislative intent of § 48a, Mr. Bauer's request and demand letter to *The Athletic*, as described in paragraphs 56 through 59 of the Complaint, sufficiently put *The Athletic* on notice of the precise statements at issue and the corrections sought. This is evidenced by *The Athletic*'s stated refusal to correct. Compl. ¶ 57. For avoidance of doubt, Mr. Bauer attaches as exhibits the request to correct and demand letter, both of which comply with the notice requirements of § 48a. *See* Brown Decl., Exs. A, B. If the Court decides that Mr. Bauer did not describe these communications in enough detail in the Complaint, the proper remedy is leave to amend. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (courts should grant leave to amend unless pleading could not possibly be cured by allegations of other facts). Indeed, any omission cannot be a basis for striking under the anti-SLAPP statute because that would conflict with Mr. Bauer's right to amend under Fed. R. Civ. P. 15(a).

---

[2] *The Athletic* cites *Shahid Buttar for Cong. Comm. v. Hearst Commc'ns, Inc.*, 2022 WL 1215307, at *11 (N.D. Cal. Apr. 25, 2022) for the proposition that the retraction statute is strictly applied, but that case says nothing about pleading anything more than the fact of having sought retraction, which Mr. Bauer undisputedly did. In *Buttar*, the court unremarkably held that the plaintiff did not comply with § 48a because he did not plead *any* facts demonstrating compliance.

11

*The Athletic* next argues that Mr. Bauer's claim fails because he does not plead special damages. Mot. 11–12. Mr. Bauer will not spend much time on this legally unsound argument. *The Athletic* cites cases on defamation, not defamation per se, in support of it. *See* Mot. 11–12 (citing cases). But the law is crystal clear that for defamation per se claims, like those alleged here,[3] Mr. Bauer need not allege special damages. *See Albertini v. Schaefer*, 159 Cal. Rptr. 98, 102 (Ct. App. 1979); 53 C.J.S. Libel and Slander; Injurious Falsehood § 215 ("If the words are actionable per se, it is not necessary to allege special damages to state a claim.").

**B. The Article Is The Opposite Of A Fair And True Report Of L.H.'s Petition.**

Next, *The Athletic* invokes the fair and true report privilege, which protects fair and true reports of official proceedings, even though the Article reported *the exact opposite* of what the medical records in the petition say. Mot. 12. The Ninth Circuit has explained that a newspaper report is fair and true if it reflects "the substance, the gist, the sting of the libelous charge." *Crane v. Arizona Republic*, 972 F.2d 1511, 1519 (9th Cir. 1992). *The Athletic*'s reporting of an alleged skull fracture in L.H.'s petition does not fall within the privilege because it does not capture the "substance" or "gist" of the petition whatsoever. The petition, read as a whole, definitively concludes that Mr. Bauer *did not* fracture L.H.'s skull. *See* Palacios Ex. E at p. 73 (medical notes stating "no acute fracture"). But in the Article, *The Athletic* selectively quotes from a single sentence of L.H.'s filing to publish the false accusation that he did. *See* Palacios Ex. A at 9 (Article reporting that L.H.'s "medical notes state that…there were signs of a basilar skull fracture").

---

[3] Mr. Bauer's claims are defamation per se because Defendants falsely accused him of a crime different and more serious than what L.H. accused him of in the petition and maligned him in his profession. Compl. ¶ 109; *Weinberg v. Feisel*, 2 Cal. Rptr. 3d 385, 388 (2003) ("false accusations of crime are libel per se"). Defendants' false accusations maligned Mr. Bauer in his profession largely because *The Athletic* is a sports news website that sports followers rely on for accurate news updates about teams and players such as Mr. Bauer.

Any average reader (just like Ms. Knight in her tweet) would understand from the Article's language that Mr. Bauer fractured L.H.'s skull—a very serious criminal accusation—when, in truth, the petition itself confirms that this did not occur.

*The Athletic* also contends that because the statement at issue is a verbatim quote from L.H.'s petition, it is necessarily a fair and true report. Not so. A selective verbatim quote is not "fair and true" if it has an entirely different meaning when read in isolation than when read in the context of the entire court filing. *See Crane*, 972 F.2d at 1522–23 (reasonable jury could find article altered gist of underlying proceeding where it implied that two statements were contradictory by reporting on them faithfully but in a different order than they occurred). Here, *The Athletic* misleadingly used selective language from the petition to push its preferred narrative. This does not insulate it from liability for its choice to ignore other parts of the record (certainly not at this stage).

*The Athletic*'s related argument that it was not required to report on the CT scan results because they were in an exhibit attached to the petition, Mot. 13, fares no better. *The Athletic* possessed the exhibits and they were specifically referenced in the petition. Compl. ¶¶ 35–39. Implying that Mr. Bauer committed a crime, while omitting facts to the contrary in the same filing is not privileged conduct. *See Overhill Farms, Inc. v. Lopez*, 119 Cal. Rptr. 3d 127, 141 (2010) (finding no protected opinion for "statements [that] do not fully and accurately disclose the facts" or tell the "full story").

*The Athletic* alternatively contends that the actual results of the CT scan do not matter because L.H. alleged in her petition an acute head injury and manual strangulation, which is close enough. But those injuries are much less serious than a skull fracture. The force required to *crack a human skull* is leagues beyond the injuries L.H. alleged. A skull fracture is not materially similar to, for example, facial bruising. Indeed, that was precisely the point of one of Ms. Knight's tweets: "Saying you'd like to engage in rough sex that involves slapping or choking does

OPP'N TO MOT. TO STRIKE

not equal consent to a cracked skull." Compl. ¶¶ 45, 118. The state court judge similarly found when denying L.H.'s petition, that those less serious injuries can result from consensual rough sex. *Id*. ¶¶ 73–80. In a comparable case, a court declined to apply the privilege where an article falsely stated that the plaintiff was arrested and charged with 10 counts of financial felonies when, in fact, the plaintiff had paid $500,000 through a civil forfeiture consent judgment. *Jezzini v. Adolf*, 2019 WL 4668008, at *6 (Cal. Ct. App. Sept. 25, 2019). The court reasoned: "We simply cannot conclude, as a matter of law, that the forfeiture of $500,000 has the same effect on the reader as a prosecution for ten counts of felony money structuring and money laundering." *Id*.[4] The same is true here. This Court cannot conclude now as a matter of law that bruising and choking-related marks resulting from consensual rough sex have the same effect on a reader as a skull fracture.

Finally, *The Athletic* takes a cheap shot at Mr. Bauer, arguing that it was not required to report the results of the CT scan because it would not make a difference to the story that Mr. Bauer is a villain who committed a violent assault. Mot. 14. This defies all logic. The story paints Mr. Bauer as committing a violent assault *by* falsely accusing him of fracturing L.H.'s skull. If *The Athletic* had reported on the petition faithfully, its readers may have understood, as the judge who denied the petition did, that the bruises resulted from consensual rough sex. Compl. ¶¶ 73–80. By falsely accusing Mr. Bauer of the skull fracture, *The Athletic* led the charge in convicting Mr. Bauer in the court of public opinion despite his later exoneration in a court of law.[5] At bottom, *The Athletic*'s invocation of the fair and true report

---

[4] *See also Gallagher v. Philipps*, 563 F. Supp. 3d 1048, 1088 (S.D. Cal. 2021) (declining to apply the privilege because firing "a firearm ... at noncombatants" could have a different effect on the average reader than "spraying civilian neighborhoods in Iraq with rockets and heavy machine gun fire").

[5] Defendants conveniently ignore the state court judge's denial of L.H.'s petition and the district attorney's decision not to prosecute. Compl. ¶¶ 73–76, 89–91. But these are important. They support Mr. Bauer's position that it is *plausible* that a fair report of the petition would have produced an effect on the average reader that was more akin to the effect it had on the judge and the district attorney.

privilege fails because whether the Article captures the "gist" of the petition cannot be resolved at this stage and is a question for the jury. While the privilege will be denied if the deviation is of a "substantial character" that "produces a different effect on the reader," *Crane*, 972 F.2d at 1519, the effect on the average reader "is a question of fact for the jury." *Gallagher*, 563 F. Supp. 3d 1048, 1083; *Argentieri v. Zuckerberg*, 214 Cal. Rptr. 3d 358, 375 (2017) (same). As it is plausible that a jury could find that the false accusation of the skull fracture has a different effect on the average reader than a faithful report of the petition would have, Mr. Bauer's defamation claim cannot be dismissed on this basis.

### C. Mr. Bauer's Defamation by Implication Claim Has More Than "Minimal Merit."

For a defamation by implication claim, Mr. Bauer must show that his interpretation is reasonably susceptible to a defamatory implication, the implication is of a defamatory fact that can be proven false, and the defamatory implication is not substantially true. *Heller v. NBCUniversal, Inc.*, 2016 WL 6583048, at *4 (C.D. Cal. June 29, 2016) (Fitzgerald, J.).

#### 1. The Article is reasonably susceptible to a defamatory implication.

*The Athletic* turns this Circuit's legal standard for maintaining a defamation by implication claim on its head. Mot. 15. It suggests that Mr. Bauer may not read a defamatory interpretation into the Article if there are other innocent interpretations. *Id*. The Ninth Circuit has squarely held the opposite: "Even assuming that [an innocent] reading is reasonably possible, … [s]o long as the publication is reasonably susceptible of a defamatory meaning, a factual question for the jury exists." *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040 (9th Cir. 1998). Here, the Article states that L.H. "had signs of a basilar skull fracture" and that she had received CT scans, but it omits the clear results of those scans. Compl. ¶¶ 95–98. One reasonable interpretation is the defamatory implication that Mr. Bauer

OPP'N TO MOT. TO STRIKE

fractured L.H.'s skull. Surely, as this interpretation was also tweeted by *The Athletic*'s own reporter, it qualifies as a reasonable interpretation. And susceptibility to just one defamatory meaning is all that is required at the pleading stage. *See Condit v. Nat'l Enquirer, Inc.*, 248 F. Supp. 2d 945, 965 (E.D. Cal. 2002) ("Even assuming, arguendo, there are non-defamatory readings…, all that the law requires is that the headline is reasonably susceptible to one defamatory meaning.").

While *The Athletic* cautions the Court against conducting a "hair-splitting analysis" to find a defamatory meaning, it is *The Athletic* who does just that to derive an *innocent* meaning. Mot. 15. It argues that "signs of a basilar skull fracture" does not technically mean an actual skull fracture, and that because the reference to the CT scan occurs nineteen paragraphs later, the Article does not imply anything about the skull fracture. Mot. 16. However, "California courts … have emphasized that the 'publication is to be measured, not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader.'" *Kaelin*, 162 F.3d at 1040. *The Athletic*'s counsel's parsing of words from their trained legal eye does little to rebut the very simple conclusion that "signs of a basilar skull fracture" is reasonably susceptible to the interpretation that Mr. Bauer fractured L.H.'s skull. Indeed, Ms. Knight apparently understood the Article to mean that. Compl. ¶ 99. *The Athletic*'s alternate interpretation only confirms that this is a factual question for a jury and not ripe for review at this stage. *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1233 (N.D. Cal. 2014) ("if 'the statement is susceptible of both an innocent and a libelous meaning,' the question should be presented to the trier of fact").

### 2.  The assertions of fact in the Article are provably false.

*The Athletic* then contends that even if the Article does falsely imply that Mr. Bauer fractured L.H.'s skull, it is at most a "minor inaccuracy." Mot. 16–18. What *The Athletic* dismisses as a "minor inaccuracy," is a false accusation of a serious crime—an accusation that is debunked by the very petition that the Article purports

to describe. *Cf. Gilbert v. Sykes*, 53 Cal. Rptr. 3d 752, 765 (2007) (slight discrepancy in timeframe is a "minor inaccuracy"). In determining substantial truth, the inquiry is whether the defamatory statement would have a different effect on the reader from the effect the truth would have produced. *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991).[6] *The Athletic* argues that, as a matter of law, the defamatory statement would not have had a different effect because either way Mr. Bauer had been violent. *The Athletic* cites nothing in support of this conjecture. Instead, it departs on a scathing rant against Mr. Bauer, falsely claiming that the Complaint "admits that for sexual pleasure, he battered a woman so badly that it left her with extensive, serious injuries", Mot. 18, among other mischaracterizations.[7] The use of inflammatory rhetoric contributes nothing to the *The Athletic*'s argument that the effect on the reader can be resolved at the pleading stage. It cannot.

It is at least plausible that the gist of the Article would have had a different effect on the average reader if *The Athletic* had not falsely accused Mr. Bauer of a major crime, and instead had reported on L.H.'s petition accurately, for at least two reasons. First, in denying the petition, the state court judge ruled that the bruising and other marks alleged in the petition were the product of consensual rough sex. Compl. ¶¶ 73–76. Those alleged injuries are vastly different than a skull fracture. If the Article had reported on the petition accurately, it is plausible that an average

---

[6] *The Athletic*'s reliance on *Jackson v. Mayweather*, 217 Cal. Rptr. 3d 234, 254 (2017) is inapposite. There, the court dismissed a defamation claim based on the false statement that plaintiff had plastic surgery on her face and body, when she only had it on her body, because plaintiff presented no evidence, expert or otherwise, that the statement could have a different effect on the reader. Here, Defendants' motion is reviewed under a 12(b)(6) standard. Mr. Bauer does not need to make any evidentiary showing; he need only show plausibility. If the *Jackson* court had used a 12(b)(6) standard, it would have ruled the other way. *See id.* at 255 (stating "[i]t is certainly conceivable that surgical enhancement of the face is different for the reputation of an actress or model from the augmentation or sculpting of other parts of her body. But Jackson presented no evidence [of that]").

[7] Tellingly, Defendants do not cite to any paragraph in the Complaint, or any evidence at all, to support their argument that Mr. Bauer "admitted" anything. Mr. Bauer has always denied the allegations. Compl. ¶ 68.

OPP'N TO MOT. TO STRIKE

reader could have understood what the judge ultimately did. Second, Ms. Knight's Twitter exchange, *see infra* § VI.A, also confirms this point. There, a Twitter user wrote that "bruises and black eyes" are "part and parcel of rough sex." Palacios, Ex. B. This is a prime example of the effect the Article could have had on the average reader absent the defamatory statement. Ms. Knight's response to that tweet—that it is "[n]ot possible to consent to a fractured skull"—is proof in itself that even she understood that "bruises and black eyes" have a very different effect on a reader than a "fractured skull" does. But again, the question of the effect on the average reader is one for the jury that cannot be resolved here. *See supra* § V.B.

### 3. Mr. Bauer has alleged actual malice.

The Supreme Court has held that public figures must prove actual malice to recover in a defamation action. *Curtis Publishing Co. v. Butts,* 388 U.S. 130 (1967). Mr. Bauer does not dispute that he is a public figure.

*The Athletic* points to a clear and convincing pleading standard for proving actual malice. Mot. 19. But at the pleading stage, Mr. Bauer only needs to "establish a *probability* that he [] can produce such clear and convincing evidence." *Manzari*, 830 F.3d at 889; *Makaeff*, 715 F.3d at 271 (same). He easily establishes such probability. Actual malice requires one of two things: knowledge of falsity or reckless disregard for the truth. *Manzari*, 830 F.3d at 892. Mr. Bauer's allegations to this effect are very simple: the Journalists unequivocally had evidence that Mr. Bauer did not fracture L.H.'s skull because in the Article, they *admitted* they possessed a copy of the whole 67-page petition, including the medical records. Compl. ¶¶ 35, 52–53. The truth was at their fingertips. But the Journalists ignored this hard evidence from a reliable source, and instead, they implied in the Article that Mr. Bauer *had* committed the crime of fracturing L.H.'s skull. *Murray v. Bailey,* 613 F. Supp. 1276, 1285 (N.D. Cal. 1985) (where author had seen "hard evidence" rebutting his allegations, question of malice could be submitted to jury).

A defamation plaintiff may also rely on inferences drawn from circumstantial evidence to show actual malice. *Christian Rsch. Inst. v. Alnor*, 55 Cal. Rptr. 3d 600, 612 (2007). "A failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable, or known to be biased against the plaintiff—such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." *Id*. This inquiry is not necessary here because Mr. Bauer has already made a clear and convincing showing that the Journalists definitively ***knew*** the publication was false. Compl. ¶¶ 52–54. But the circumstantial evidence also supports Mr. Bauer. Both *The Athletic*'s and the Journalists' anger and hostility towards him and bias against him are abundantly clear from past articles and the Article itself. Compl. ¶¶ 15–33, 67–88. When this is combined with the Journalist's undisputed knowledge of the falsehood, Mr. Bauer has easily met the clear and convincing pleading standard.

Finally, *The Athletic*'s argument about the state of mind of the Journalists is utterly incomprehensible. Mot. 19. It says that it is not enough to plead that the Journalists knew Mr. Bauer had not fractured L.H.'s skull but that they implied it anyway. But, as *The Athletic* acknowledges in its following sentence, that is exactly what is required to show actual malice. *See supra* p. 18 (actual malice requires knowledge of falsity). And the case it cites supports Mr. Bauer. In *Resolute Forest Prod., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1018 (N.D. Cal. 2017), the court found that plaintiff did not plead actual malice where it simply recited the elements of the cause of action with no details. *Id*. The court went on to recognize that "[s]tates of mind may be pleaded generally, but a plaintiff still must point to details sufficient to render a claim plausible." *Id*. As to the Journalists' states of mind, Mr. Bauer meets this plausibility standard. Compl. ¶¶ 52–53 (alleging that the Journalists obtained the 67-page petition, including medical records showing no skull fracture, but ignored the medical records and published the Article anyway).

OPP'N TO MOT. TO STRIKE

## VI.   MR. BAUER'S COUNT II DEFAMATION CLAIM AGAINST *THE ATHLETIC* AND MS. KNIGHT EASILY MEETS THE REQUIREMENT THAT IT HAVE AT LEAST "MINIMAL MERIT."

Mr. Bauer's Count II defamation claim alleges that Ms. Knight's three tweets conveyed the false assertion of fact that Mr. Bauer fractured L.H.'s skull. Compl. ¶¶ 43–48. Defendants hide behind the shroud of Twitter as a medium to argue that the average reader would understand Ms. Knight's tweets to be opinion in the course of "ordinary Twitter debate" rather than fact. But the Court cannot make that determination as a matter of law based on the facts as alleged. First, the reality of Twitter is that it is a platform that millions of people use to obtain news. *See infra* § VI.A.1. This is even more true when the tweets are from a sports journalist known for covering baseball, not an anonymous user. Second, nothing in the language of Ms. Knight's tweets suggests that she was engaged in non-literal commentary. In this context, it is at least plausible that the average reader would understand the tweets to imply the false assertion of fact that Mr. Bauer fractured L.H.'s skull.

### A. The Tweets Contain False Assertions Of Fact.

There is no way to read Ms. Knight's tweets except as assertions that Mr. Bauer did fracture L.H.'s skull. Ms. Knight cannot seek refuge from liability for a false statement of fact by claiming her tweets were entirely matters of "opinion." As Defendants note, because a defamatory statement must contain a provable falsehood, courts distinguish between statements of fact and opinion for purposes of defamation liability. Mot. 20–21. However, Defendants' analysis oversimplifies the distinction between fact and opinion. *See ZL Techs., Inc. v. Does 1-7*, 220 Cal. Rptr. 3d 569, 589 (2017) ( "[t]he key is not parsing whether a published statement is fact or opinion, but whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact."); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990) ("[s]imply couching such statements

OPP'N TO MOT. TO STRIKE

in terms of opinion does not dispel [the false, defamatory] implications" because a speaker may still imply "a knowledge of facts which lead to the [defamatory] conclusion" and while "pure" opinions are protected by the First Amendment, a statement that "may [] imply a false assertion of fact" is actionable).

The Ninth Circuit employs a three-part test to resolve if a statement implies an objective fact: "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates the impression, and (3) whether the statement in question is susceptible of being proved true or false." *Unsworth v. Musk*, 2019 WL 4543110, at *3 (C.D. Cal. May 10, 2019).

### 1. The General Tenor of the Entire Work

Defendants focus primarily on one aspect of the general tenor: Twitter as a medium. Their argument is that Twitter is a forum where readers expect to see opinions, rather than facts. Mot. 21–22. From that, they seem to conclude that Twitter is a defamation-free zone in which any falsehood about anybody must be permissible. At least one court in this district has squarely rejected that argument, stating: "Of course, Twitter is replete with opinions—but it also is an important source for facts." *Unsworth*, 2019 WL 4543110, at *5. Indeed, in today's increasingly digital landscape, social media is assuming news functions that were previously the exclusive domain of newspapers, radio, and television. *See, e.g.*, *BDO USA, LLP v. EverGlade Glob., Inc.*, 2022 WL 41416, at *4 (Del. Ch. Jan. 5, 2022) ("[S]ocial media platforms like Twitter…are being used increasingly as a news source and people expect that at least some of what they encounter on the site is factual."); *Boulger v. Woods*, 917 F.3d 471, 482 (6th Cir. 2019) ("Twitter can be used to disseminate both factual accounts and assertions, as well as commentary and opinion."); *Fawcett v. Altieri*, 960 N.Y.S.2d 592, 595 n.7 (Sup. Ct. 2013) ("Twitter is also used not just by individuals but also as an outlet for news sources").

Defendants' case law regarding Twitter as a medium does not help them. They cite *Greenspan v. Qazi*, 2021 WL 2577526, at *6 (N.D. Cal. June 23, 2021) as holding that readers expect to see strongly worded opinions on social media, but in that case, the parties engaged in name-calling back and forth and no objective facts were even implied. Moreover, the *Greenspan* case derived its general proposition about social media from a case entitled *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 696 (2012), but in that case, the speech was made on a Craigslist page tellingly titled "Rants and Raves." Next, Defendants misleadingly cite *Obsidian Fin. Grp., LLC v. Cox*, 812 F. Supp. 2d 1220, 1223 (D. Or. 2011), *aff'd*, 740 F.3d 1284 (9th Cir. 2014) as holding that *all social media* inherently suggests that statements are opinion rather than fact, but that is not what that case held. That case supports Mr. Bauer because it clarified that "online speech stands on the same footing as other speech;" however, "*blogs* are a subspecies of online speech which inherently suggest that statements made there are not likely provable assertions of fact." *Id.* at 1223 (emphasis added) (collecting cases that statements on *blogs* are likely opinion). Other courts in this Circuit have also appreciated the distinction between blogs and other forms of internet speech. *Unsworth*, 2019 WL 4543110, at *4.

Defendants also argue that the tweets were in the context of a public debate "about the Petition and Bauer's response" and Bauer's "conduct towards women." Mot. 22. They cite *Info. Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980) to argue that "use of epithets, fiery rhetoric or hyperbole" in public debate is unlikely to be viewed as fact. But that case was decided ten years before the Supreme Court clarified in *Milkovich* that opinions can be defamatory if there is an underlying assertion of fact. 497 U.S. at 18 ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth."). In any event, *Info. Control Corp.* is inapposite because it involved an attorney explaining his client's opinion on a lawsuit against it, which was held protected speech. Here, while Ms. Knight may

OPP'N TO MOT. TO STRIKE

have been expressing her views in a debate about consent, the underlying factual assertion is quite literally that Mr. Bauer fractured L.H.'s skull. There is no other way to read the tweets. *See Milkovich*, 497 U.S. at 21 (general tenor of sports column did not "negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury").

### 2. The Specific Language Used Reinforces Rather Than Negates That The Tweets Imply Mr. Bauer Fractured L.H.'s Skull.

As for the content of the tweets, Defendants argue that the "us[e of] incomplete sentences and short pithy phrases," Mot. 23, somehow militates that the tweets reflected opinion only. The precise language of the tweets is instructive here: Ms. Knight tweeted it is "[n]ot possible to consent to a fractured skull." Compl. ¶ 44. "This is not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that [Mr. Bauer had fractured the woman's skull]." *Milkovich.*, 497 U.S. at 21; *Grenier v. Taylor*, 183 Cal. Rptr. 3d 867, 878 (2015) (holding that defamation claim based on online comments had at least minimal merit where language was not loose hyperbole and could be reasonably construed as accusing plaintiff of child abuse). To the contrary, this accusation is subject to only one interpretation: that Mr. Bauer fractured L.H.'s skull. Ms. Knight does not employ any figurative or hyperbolic language whatsoever. Quite the opposite. *Cf. Unelko Corp. v. Rooney*, 912 F.2d 1049, 1054 (9th Cir. 1990) (statement on CBS's "60 Minutes" stated actual facts despite the "humorous and satirical nature of [the] segment" because the statement "was presented as fact"). Moreover, Ms. Knight reaffirmed her accusation on Twitter *three separate times*. Compl. ¶¶ 44–46. Yet Defendants ask this Court to rule as a matter of law that a reasonable reader would have known that Ms. Knight did not mean what she said about a "fractured skull" because she used incomplete sentences and punchy language. That is nonsensical. *See Cahill v. Edalat*, 2017 WL 2608857, at *4 (C.D. Cal. Feb. 15, 2017) (denying motion to dismiss where tweet

OPP'N TO MOT. TO STRIKE

accused plaintiff of stealing a computer and manufacturing illegal drugs, despite tweet's grammatically incorrect language).

Defendants also contend that because the tweets were in the context of an exchange between Ms. Knight and another Twitter user, they were less likely to be viewed as facts. Mot. 23. But Defendants turn the nature of the exchange upside down and ignore key aspects of the context, which confirms that Ms. Knight was asserting a fact (that Mr. Bauer fractured L.H.'s skull) not just an opinion (that such injury must be non-consensual). The context is that an anonymous Twitter user posted: "If indeed he has text messages from her agreeing to rough sex, I don't know how they have a case. Of course she's going to have bruises and black eyes. That's part and parcel of rough sex." Palacios Decl., Ex. B. Ms. Knight responded: it is "[n]ot possible to consent to a fractured skull." Compl. ¶ 44. The context here is two-fold. First, Ms. Knight is a sports journalist who covers baseball and has written regularly about the Dodgers and Mr. Bauer for years.[8] Ms. Knight's 100,000 Twitter followers undoubtedly know that she is a reporter, and expect her tweets about subject matters on which she reports—primarily baseball—to be based on truthful factual predicates. It is in her capacity as a known journalist with inside baseball scoop that Ms. Knight responded to the anonymous Twitter user. Second, Ms. Knight's response was *to correct him* about the nature of L.H.'s injuries, i.e., that it was not "bruises and black eyes," but actually a "fractured skull." Ms. Knight disagreed with the other Twitter user about the historical facts, not about opinion.

### 3.  Susceptibility of Being Proved True or False

Defendants then pivot to the incredible position that the tweets do not refer to Mr. Bauer at all, but to a larger debate on consent. Mot. 24. The Court should easily dispose of this. Just a few pages prior, they admit that the tweets were about "the

---

[8] She even wrote a book on the Dodgers. *See* https://www.mollyknight.com/ (Ms. Knight's personal website advertising her book "The Best Team Money Can Buy: The Los Angeles Dodgers' Wild Struggle to Build a Baseball Powerhouse").

1    Petition and Bauer's response." Mot. 22. Moreover, the tweets were directly in

2    response to another individual's tweet about Mr. Bauer. Palacios Decl., Ex. B.  Of

3    course, the tweets were in direct reference to Mr. Bauer.

4         Regardless of whether the tweets were in part about Ms. Knight's views on

5    consent, the underlying assertion of fact is that Mr. Bauer fractured L.H.'s skull—a

6    fact that is easily susceptible of being proved true or false. Direct accusations of

7    criminal misconduct are unanimously recognized as implying objective facts. *See*

8    *Barnes-Hind*, 226 Cal. Rptr. at 358. The criminal act either occurred or it did not.

9    **B.  The Assertions Of Fact In The Tweets Are Provably False.**

10        After arguing that the tweets cannot be proven true or false, Defendants then

11   turn around and argue that they are true. The Court should not entertain this "head I

12   win, tails you lose" sleight of hand. In any event, Defendants are wrong. The tweets

13   are not "substantially true." *See supra* § V.C.2.

14   **C. Mr. Bauer Has Alleged Actual Malice.**

15        Mr. Bauer has clearly alleged facts that establish a probability that he can

16   produce clear and convincing evidence that Ms. Knight acted with the requisite

17   actual malice. *Supra* § V.C.3. As a baseball journalist regularly covering Mr. Bauer,

18   Ms. Knight either read the 67-page petition and knew her claims about the skull

19   fracture were false, or had a reckless disregard for the truth by posting publicly

20   about the petition without actually reading it. Compl. ¶ 61. Either way, there is at

21   least a probability of actual malice that precludes dismissal at this stage.

22        Moreover, the Complaint is replete with allegations of other statements by

23   Ms. Knight that cast Mr. Bauer in a negative light. Compl. ¶¶ 25–31, 43–48, 62–

24   66. These statements give rise to an inference that Ms. Knight was motivated, not

25   by the truth, but by her personal feelings about Mr. Bauer. *See supra* § V.C.3

26   (circumstantial evidence can be used to show actual malice).

27   **VII.   CONCLUSION**

28        For the foregoing reasons, the Court should deny Defendants' motion.

25

1

2    Dated:        July 11, 2022                    _/s/ Blair G. Brown_____

3                                                 Blair G. Brown (admitted *pro hac vice*)
                                                  Jon R. Fetterolf (admitted *pro hac vice*)
4                                                 ZUCKERMAN SPAEDER LLP
                                                  1800 M Street, N.W., Suite 1000
5                                                 Washington, D.C. 20036
                                                  Tel: (202) 778-1800
6                                                 Fax: (202) 882-8106
                                                  bbrown@zuckerman.com
7                                                 jfetterolf@zuckerman.com

8                                                 Shawn Holley (Cal. Bar No. 136811)
                                                  KINSELA WEITZMAN ISER KUMP
9                                                 HOLLEY LLP
                                                  808 Wilshire Boulevard., 3rd Floor
10                                                Santa Monica, CA 90401
                                                  Tel: (310) 566-9800
11                                                Fax: (310) 566-9873
                                                  sholley@kwikhlaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPP'N TO MOT. TO STRIKE