Diana Palacios (State Bar No. 290923)
   dianapalacios@dwt.com
Eric H. Lamm (State Bar No. 324153)
   ericlamm@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa St., 24th Floor
Los Angeles, California 90017-2566
Telephone:   (213) 633-6800
Facsimile:    (213) 633-6899

Attorneys for Defendants
THE ATHLETIC MEDIA
COMPANY and MOLLY KNIGHT

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

|  |  |
|---|---|
| TREVOR BAUER,<br><br>                    Plaintiff,<br><br>       vs.<br><br>THE ATHLETIC MEDIA COMPANY and MOLLY KNIGHT,<br><br>                    Defendants. | Case No. 2:22-cv-02062-MWF-AGR<br>Assigned for all purposes to the Hon. Michael W. Fitzgerald<br><br>**SUPPLEMENTAL DECLARATION OF DIANA PALACIOS IN SUPPORT OF (A) DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT; AND (B) DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Date:      August 29, 2022<br>Time:      10:00 a.m.<br>Dept.:     5A<br><br>Action Filed:  March 29, 2022 |

I, Diana Palacios, declare:

1.      I am a duly licensed attorney in the State of California and a partner at Davis Wright Tremaine LLP, counsel for Defendants The Athletic Media Company and Molly Knight in this matter. I have personal knowledge of the following facts and, if called and sworn as a witness, could and would competently testify thereto under oath.

**Transcript of Hearing in *L.H. v. Bauer***

2.      Attached hereto as **Exhibit W** is a true and correct copy of a document titled Reporter's Transcript of Proceedings, dated August 19, 2021, of a hearing in the Los Angeles Superior Court matter captioned *[L.H.] v. Bauer*, Case No. 21STRO03198. This document was filed as Exhibit 3 to Defendant Naranjan Fred Thiagarajah's Request for Judicial Notice in support of Special Motion to Strike, document number 33-3 in the currently pending case captioned *Bauer v. [L.H.]*, *et al.*, 8:22-cv-00868-JVS-ADS (C.D. Cal.). A true and correct copy of this document was retrieved at my direction from the Court's website on August 2, 2022.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on this 15th day of August, 2022, at Altadena, California.

_____
Diana Palacios

2

# EXHIBIT W

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                  FOR THE COUNTY OF LOS ANGELES

 3         HON. DIANNA GOULD-SALTMAN, JUDGE      DEPARTMENT 35

 4

 5
      LINDSEY HILL,                        )
 6                                         )
                          PETITIONER,      )
 7              VS.                        )      NO. 21STRO03198
                                           )
 8                                         )
      TREVOR BAUER,                        )
 9                                         )
                          RESPONDENT.      )
10    _____)

11              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                         AUGUST 19, 2021
12
      APPEARANCES:
13    FOR THE PETITIONER:   MEYER, OLSON, LOWY & MEYERS, LLP
                            BY:  LISA HELFEND MEYER, ESQ.
14                               DOREEN MARIE OLSON, ESQ.
                                 MARC H. GARELICK, ESQ.
15                          10100 SANTA MONICA BOULEVARD
                            SUITE 1425
16                          LOS ANGELES, CA 90067

17                          RIGHT CHOICE LAW
                            BY:  FRED THIAGARAJAH, ESQ.
18                          5015 BIRCH STREET
                            SUITE 107
19                          NEWPORT BEACH, CA 92660

20    FOR THE RESPONDENT:   KINSELLA WEITZMAN ISER KUMP HOLLEY
                            BY:  SHAWN HOLLEY, ESQ.
21                               KATE MANGELS, ESQ.
                            808 WILSHIRE BOULEVARD
22                          3RD FLOOR
                            SANTA MONICA, CA 90401
23
                            ZUCKERMAN SPAEDER
24                          BY:  JON R. FETTEROLF, ESQ.
                                 (PRO HAC VICE)
25                          1800 M STREET NW
                            SUITE 1000
26                          WASHINGTON, DC 20036

27
                            JACQUELINE M. CAIRE, CSR #9599, RPR
28                          OFFICIAL REPORTER
```

| | |
|---|---|
| 1 | CASE NUMBER:               21STRO03198 |
| 2 | CASE NAME:                 LINDSEY HILL VS. |
| 3 |                            TREVOR BAUER |
| 4 | LOS ANGELES, CALIFORNIA  THURSDAY, AUGUST 19, 2021 |
| 5 | DEPARTMENT 35              HON. DIANNA GOULD-SALTMAN, JUDGE |
| 6 | APPEARANCES:               (AS HERETOFORE NOTED.) |
| 7 | REPORTER:                  JACQUELINE CAIRE, CSR NO. 9599, RPR |
| 8 | TIME:                      8:42 A.M. |

10     THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.  ALL

11  RIGHT.  LET'S BEGIN WITH THE ISSUE OF MR. BAUER TESTIFYING.

12  I REVIEWED THE CASES THAT WERE CITED BY THE RESPONDENT.  AND

13  IT IS THE COURT'S TENTATIVE TO INQUIRE OF MS. MEYER WHAT

14  QUESTIONS SHE WOULD ASK MR. BAUER WHICH ARE BOTH RELEVANT TO

15  THE ISSUES BEFORE THIS COURT AND NOT LIKELY TO LEAD TO ANY

16  ANSWER THAT MIGHT INCRIMINATE HIM.

17     MS. MEYER:  OKAY.  YOUR HONOR, FIRST LET ME START BY

18  SAYING THAT I THINK THAT THE TWO CRITICAL ISSUES THAT THE

19  COURT HAS TO DECIDE IS WHETHER OR NOT THERE IS OR WAS A

20  DATING RELATIONSHIP UNDER THE FAMILY CODE.  AND, NUMBER TWO,

21  WHETHER OR NOT THE SEX OR THE SEXUAL ASSAULT WAS CONSENSUAL

22  OR NOT.  I THINK THOSE ARE THE TWO GENERAL AREAS THAT I

23  INTEND TO ASK HIM ABOUT.

24       SO WITHIN -- DO YOU WANT ME TO TELL YOU

25  SPECIFICALLY WHAT THOSE QUESTIONS ARE?

26     THE COURT:  THOSE TWO AREAS ARE ISSUES WHICH ARE

27  RELEVANT.  I CANNOT IMAGINE A QUESTION YOU COULD ASK HIM

28  WHICH -- TO WHICH HE WOULD NOT BE ADVISED TO TAKE THE

```
1   FIFTH.
2         MS. MEYER:  SO, FOR EXAMPLE, IF I ASKED HIM WHETHER OR
3   NOT HE USES INSTAGRAM TO MEET WOMEN SO HE COULD DATE THEM, I
4   DON'T SEE HOW THAT'S INCRIMINATING.  IF HE SAID IT IN AN
5   ARTICLE TO SPORTS ILLUSTRATED THAT HE HAS THESE THREE RULES
6   OF DATING AND HE PROVIDES THEM TO ANY WOMAN WHO HE IS
7   BEGINNING TO DATE, I THINK THAT'S RELEVANT.
8         ALSO, I THINK THAT'S A WAIVER IF HE HAS SAID IT IN
9   THE PAST TO SOMEBODY.
10        THE COURT:  I'M NOT SEEING THAT.
11        MS. MEYER:  WHAT AREN'T YOU SEEING?
12        THE COURT:  I'M NOT SEEING THAT THERE'S A WAIVER.  I'M
13  NOT SEEING THAT THOSE QUESTIONS WOULD BE ONES WHICH COULD NOT
14  INCRIMINATE HIM.
15        MS. MEYER:  WELL, I THINK IT'S HOW YOU VIEW IT.  I MEAN,
16  THERE'S SOME ATTORNEYS THAT TAKE THE POSITION THAT ANYTHING
17  OTHER THAN, AS MS. HOLLEY SAID YESTERDAY, WHAT IS YOUR NAME
18  AND WHAT IS YOUR OCCUPATION, ANYTHING BEYOND THAT CAN
19  INCRIMINATE YOU.  AND IN SOME INSTANCES, THOSE TWO QUESTIONS
20  COULD INCRIMINATE YOU.  SO IF THE COURT IS GOING TO ADOPT THE
21  BROAD VIEW OF ASSERTING THE FIFTH, THEN I GUESS ANYTHING IN
22  THE WORLD THAT I ASK HIM CAN BE USED TO INCRIMINATE HIM.
23        THE COURT:  ANYTHING THAT WOULD BE RELEVANT TO THIS CASE
24  WOULD BE RELEVANT TO A CRIMINAL INVESTIGATION OF THE SAME
25  FACTS AS THIS CASE.
26        MS. MEYER:  UNDER THE COURT'S INTERPRETATION -- BROAD
27  INTERPRETATION, YOU ARE CORRECT.
28        THE COURT:  SO I AM -- WELL, I GUESS I WOULD NEED TO ASK
```

1   MR. BAUER.

2           MR. BAUER, IF YOUR ATTORNEY ADVISES YOU TO TAKE THE

3   FIFTH, NOT ANSWERING QUESTIONS OTHER THAN YOUR NAME AND YOUR

4   OCCUPATION, IS IT YOUR INTENTION TO FOLLOW THAT ADVICE?

5       THE RESPONDENT:  YES, YOUR HONOR.

6       THE COURT:  THEN I DON'T THINK IT IS PRODUCTIVE TO HAVE

7   HIM EXAMINED UNDER 776 WHERE I SEE THERE TO BE A COMPLETE

8   CONFLUENCE OF THE RELEVANT ISSUES IN THIS CASE AND ANY

9   POTENTIAL INCRIMINATION IN A CRIMINAL CASE, WHICH THE COURT

10  IS INFORMED IS PRESENTLY UNDER INVESTIGATION.

11      MS. MEYER:  I UNDERSTAND THE COURT'S RULING.  HOWEVER,

12  FROM THE CASE LAW, IT APPEARS THAT IN A CIVIL CASE, AGAIN,

13  YOU HAVE TO DO IT QUESTION BY QUESTION.

14      THE COURT:  YOU DON'T HAVE TO DO IT QUESTION BY

15  QUESTION.  IT IS CERTAINLY -- IT IS CERTAINLY ACCEPTABLE TO

16  DO THAT.  BUT IT'S ALSO NOT REQUIRED TO DO THAT IF IT WOULD

17  BE AN EXERCISE IN FUTILITY, WHICH THE COURT IS CONVINCED IT

18  WOULD BE UNDER THESE CIRCUMSTANCES.

19      MS. MEYER:  AS LONG AS THE COURT MAKES THAT FINDING,

20  THEN WE WOULD SUBMIT.

21      THE COURT:  ALL RIGHT.  DOES THE PETITIONER HAVE ANY

22  ADDITIONAL WITNESSES?

23      MS. MEYER:  NO.

24      THE COURT:  ALL RIGHT.  DOES THE RESPONDENT HAVE ANY

25  ADDITIONAL WITNESSES?

26      MR. FETTEROLF:  NO, YOUR HONOR.

27      THE COURT:  ALL RIGHT.  PETITIONER RESTS --

28      MS. MEYER:  PETITIONER --

524

```
1        THE COURT:  -- OTHER THAN ARGUMENT?

2        MS. MEYER:  YES.

3        THE COURT:  RESPONDENT RESTS OTHER THAN ARGUMENT?

4        MS. HOLLEY:  YES.

5        THE COURT:  ARE COUNSEL PREPARED TO ARGUE?

6        MS. MEYER:  YES, YOUR HONOR.

7        THE COURT:  ALL RIGHT.  MS. MEYER.

8        MR. FETTEROLF:  YOUR HONOR, CAN I JUST ASK ONE

9   PROCEDURAL QUESTION?

10       THE COURT:  SURE.

11       MR. FETTEROLF:  ON THE ISSUE OF SPOLIATION, YOU HAD

12  MENTIONED YOU WERE RESERVING AND WE COULD RE-RAISE IT.  I

13  DON'T KNOW WHETHER YOU'D LIKE US TO DO THAT, WHICH WILL BE

14  ME.  AND MS. HOLLEY IS DOING OUR CLOSING.  WOULD YOU LIKE ME

15  TO DO THAT NOW OR AFTER THE CLOSING?

16       THE COURT:  I'LL LET YOU DO THAT AFTER.

17       MR. FETTEROLF:  AFTER THE CLOSING?

18       THE COURT:  YES.

19       MR. FETTEROLF:  OKAY.  THANK YOU.

20       THE COURT:  WHENEVER YOU'RE READY.

21       MS. MEYER:  THANK YOU, YOUR HONOR.

22           AS THE COURT IS AWARE, FINAL ARGUMENT IS THE LAST

23  OPPORTUNITY AN ATTORNEY HAS TO SET FORTH AND ARGUE THE

24  EVIDENCE AND THE LAW IN ORDER TO PERSUADE THE TRIER OF FACT

25  BY A PREPONDERANCE OF THE EVIDENCE THAT ABUSE AS DEFINED IN

26  THE D.V.P.A. WAS COMMITTED.  IT IS A RESPONSIBILITY THAT IS

27  NOT TAKEN LIGHTLY BY ME OR ANYONE ELSE.  AS ATTORNEYS, WE

28  WANT TO DO EVERYTHING WITHIN OUR LEGAL ABILITIES TO
```

```
 1   DEMONSTRATE TO THE COURT WHY OUR CLIENT IS DESERVING OF
 2   PROTECTION UNDER THE D.V.P.A.
 3           I AM PROUDLY ONE OF THE ATTORNEYS FOR LINDSEY HILL.
 4   I HAVE BEEN PRACTICING LAW FOR ALMOST 40 YEARS.  I HAVE HAD
 5   CASES AGAINST YOUR HONOR.  AND I HAVE PRACTICED EXCLUSIVELY
 6   IN THE AREA OF FAMILY LAW.  I HANDLE COMPLEX, DIFFICULT,
 7   ACRIMONIOUS, AND HEART-WRENCHING CASES.  I ROUTINELY
 8   PROSECUTE AND DEFEND D.V. CASES.
 9           I AM ALSO A DAUGHTER, A SISTER, A WIFE, A MOTHER,
10   AND GRANDMOTHER.  I HAVE FOUR BEAUTIFUL GRANDCHILDREN.  I AM
11   THE MOTHER OF A BEAUTIFUL ADULT DAUGHTER WITH SPECIAL NEEDS
12   WHO I PROTECT WITH EVERY OUNCE OF MY BEING.  IF SOMEONE DID
13   TO MY DAUGHTER WHAT TREVOR BAUER, THAT MAN, HAD DONE TO MY
14   DAUGHTER, I DON'T KNOW WHAT I WOULD HAVE BEEN CAPABLE OF
15   DOING TO HIM.
16           I AM ALSO FORTUNATE TO BE THE MOTHER OF AN ADULT
17   SON.  AND, HONESTLY, I COULD NOT SIT THROUGH A TRIAL WHERE MY
18   SON WAS ACCUSED OF SUCH HEINOUS AND ATROCIOUS BEHAVIOR.  I
19   DECIDED IN PREPARING THIS ARGUMENT LATE LAST NIGHT TO LAY IT
20   OUT ON THE LINE TODAY.  NO-HOLDS-BARRED WAS MY MANTRA.  AND
21   THAT'S WHAT I TOLD MY HUSBAND.  I WILL NOT HOLD BACK ON
22   DISCUSSING THE EVIDENCE OR HOW I PERCEIVE THE EVIDENCE THAT
23   WAS PRESENTED IN THIS CASE BY NOT ONLY OUR SIDE, BUT BY THE
24   OTHER SIDE AS WELL.
25           IT IS MY OBLIGATION AS AN ATTORNEY TO LINDSEY AND
26   TO THE OATH THAT I TOOK AS AN ATTORNEY ALMOST FOUR DECADES
27   AGO.  IN THE SIMPLEST TERMS -- AND I WILL LAY IT OUT FOR THE
28   COURT NOW -- TREVOR BAUER IS A MONSTER.  HE WAS AGGRESSIVELY
```

```
 1    ABUSED AS A CHILD.  AS AN ADULT HE BECAME THE ABUSER.

 2         MS. HOLLEY:  OBJECTION.

 3         THE COURT:  THERE IS NO EVIDENCE OF THAT, COUNSEL.

 4         MS. MEYER:  HE STALKS HIS VICTIMS THROUGH THE

 5    INTERNET.

 6         MS. HOLLEY:  OBJECTION.

 7         THE COURT:  COUNSEL, THAT WAS -- THAT'S NUMBER TWO,

 8    ADDRESSING SOMETHING WHICH IS NOT IN EVIDENCE.  IF I HEAR A

 9    THIRD, YOUR ARGUMENT IS OVER.

10         MS. MEYER:  THIS IS ARGUMENT, YOUR HONOR.

11         THE COURT:  YOUR ARGUMENT IS LIMITED TO THE EVIDENCE

12    BEFORE THE COURT.  YOU HAVE NOW RAISED TWO ISSUES FOR WHICH

13    THERE WAS NO EVIDENCE BEFORE THE COURT.  IF I HEAR A THIRD

14    REFERENCE TO EVIDENCE WHICH WAS NOT BEFORE THE COURT, YOUR

15    OPPORTUNITY TO ARGUE THE CASE IS OVER.

16         MS. MEYER:  THEN LET ME PROCEED.

17             BY NOW WE KNOW OF LINDSEY'S HISTORY.  SEVERE

18    ALCOHOL ABUSE SINCE HER MID-TEENS.  MULTIPLE

19    HOSPITALIZATIONS.  POSSIBLE SELF-INJURIOUS BEHAVIOR.

20    EXTREMELY LOW-SELF ESTEEM COUPLED WITH TRANSPARENT EFFORTS TO

21    APPEAR CONFIDENT AND IN CONTROL.  A PEOPLE PLEASER.  AND

22    EXTREMELY EMOTIONALLY INSECURE.

23             SOBER, YES.  EMOTIONALLY STABLE, NO.  I WILL NEVER

24    FORGET HER HAUNTING WORDS SHE REPEATED TO HERSELF BEFORE SHE

25    WAS STRANGLED BY TREVOR ON MAY 15.  SHE SAID TO HERSELF --

26    AND I AM NOT QUOTING.  I'M PARAPHRASING -- IT'S NOT THAT BAD

27    BEING STRANGLED.  IF I COUNT TO THREE OR FOUR, THEN IT WILL

28    BE OVER AND I WILL BECOME CONSCIOUS AGAIN.  AND THEN SHE
```

Case 2:22-cv-00868-WBS-AC Document 33-30 Filed 07/08/22 Page 11 of 72 Page ID #:962

1   COUNTED ON HER HANDS ONE, TWO, THREE, FOUR.

2           TREVOR FOUND LINDSEY ON INSTAGRAM.  AFTER SEEING

3   HER PROFILE, HE CALLED HER WITHIN TEN MINUTES AFTER THE GAME.

4   HE ADMITTED TO HER THAT HE RESEARCHED HER ON THE INTERNET.

5   AND BASED UPON LINDSEY'S ACCOUNT, HER DISTURBING AND SAD

6   HISTORY WAS AVAILABLE FOR ANYBODY TO READ.

7           TREVOR'S ATTORNEYS TRIED TO MAKE IT APPEAR AS IF

8   LINDSEY TOOK ADVANTAGE OF TREVOR.  THAT SHE TARGETED HIM FOR

9   PUBLICITY, TO SET HIM UP, GET HIS MONEY, OR RUIN HIS CAREER

10  FOR THE SAKE OF THE RIVALRY BETWEEN THE DODGERS AND THE

11  PADRES.  THEY CONFRONTED HER AND INTRODUCED INTO EVIDENCE

12  MULTIPLE TEXTS TO PORTRAY HER AS THE INSTIGATOR AND

13  MANIPULATOR WHO PRETENDED SHE WANTED A RELATIONSHIP WITH

14  TREVOR WHEN SHE REALLY HAD A COMPLETELY DIFFERENT AGENDA TO

15  EMBARRASS, RIDICULE, AND HUMILIATE TREVOR FOR HER OWN SELF

16  GAIN.

17          DOES TREVOR REALLY THINK ANY OF US ARE BUYING THIS

18  ARGUMENT?  FOR ALL OF LINDSEY'S BRAVADO AND BIG TALK, IN

19  REALITY, LINDSEY WAS, AND STILL IS, A YOUNG AND IMMATURE

20  WOMAN WHO WANTED DESPERATELY TO HAVE A RELATIONSHIP WITH

21  TREVOR BAUER, A BASEBALL STAR.

22          SHE PORTRAYED IT ONE WAY TO HER FRIENDS AND FAMILY

23  AND FELT VERY DIFFERENTLY INSIDE.  AND SHE TOLD US THAT OVER

24  AND OVER AGAIN.  SHE TESTIFIED THAT SHE WAS INTRIGUED BY HIM.

25  SHE THOUGHT HE WAS DIFFERENT LIKE HER, THAT HE WAS

26  MISUNDERSTOOD AND UNDERNEATH WANTED TO HAVE AN EMOTIONAL

27  CONNECTION DESPITE HIS WORDS TO THE CONTRARY.

28          HE LED LINDSEY TO BELIEVE HE WOULD ABANDON HIS

528

1   THREE RULES OF DATING FOR HER, THAT HE WOULD CHANGE INTO HER
2   PRINCE CHARMING LIKE ALL THE ROMANCE NOVELS WE ALL LIKE TO
3   READ AS GIRLS IN HIGH SCHOOL.  ON THEIR, QUOTE, "FIRST DATE,"
4   END QUOTE, THEY SPOKE FOR FOUR TO FIVE HOURS OF PERSONAL AND
5   INTIMATE DETAILS OF THEIR LIVES.  ALTHOUGH TREVOR SPOKE
6   MOSTLY ABOUT HIMSELF, ACCORDING TO LINDSEY, WHEN LINDSEY
7   SPOKE, HE WAS A GOOD LISTENER.

8           SHE LIKED THAT HE WAS TRANSPARENT, DIDN'T DO DRUGS
9   OR DRINK, WAS INTERESTED IN TALKING TO HER -- TALKING TO HER
10  WITHOUT PRESSURE OF SEX.  ALL THE WHILE, TREVOR KNEW EXACTLY
11  WHAT HE WAS DOING.  HE WAS CAUSING LINDSEY TO LET DOWN HER
12  GUARD TO TRUST HIM AND FEEL SAFE.  AND THAT'S WHAT LINDSEY
13  TOLD US.  HE TOLD LINDSEY THAT SHE WAS DIFFERENT THAN OTHER
14  WOMEN AND LINDSEY BELIEVED HIM.

15          THEY DISCUSSED ON THEIR FIRST DATE THE THREE RULES
16  OF DATING.  HIS DEFINITION OF DATING.  CLEARLY HE WOULDN'T
17  HAVE DISCUSSED IT WITH HER IF HE DIDN'T HAVE AN INTENTION TO
18  PURSUE DATING HER.  THAT FIRST NIGHT, WHICH WAS APRIL 21, HE
19  PROBABLY DID CROSS THE LINE, BASED UPON THE EVIDENCE THAT WE
20  HEARD, AND BASED UPON WHAT AN OBJECTIVE PERSON WOULD HAVE
21  FELT.  BUT SOMEONE WITH LINDSEY'S LOW SELF-ESTEEM DIDN'T SEE
22  IT THAT WAY.

23          WITHOUT HESITATION, LINDSEY ADMITTED UNDER OATH
24  THAT THE FIRST NIGHT WAS CONSENSUAL.  IN ORDER FOR LINDSEY TO
25  PROVE HER STRIPES TO TREVOR, SHE PUT UP WITH HIM STRANGLING
26  HER WITH HER OWN HAIR.  SHE PUT UP WITH HIM PUTTING HIS
27  FINGERS DOWN HER THROAT.  SHE PUT UP WITH ANAL SEX.  AND SHE
28  PUT UP WITH ROUGH SEX BECAUSE SHE THOUGHT THIS IS WHAT HE

529

1    LIKES, AND, THEREFORE, THIS IS WHAT SHE HAS TO DO.

2          SHE SWALLOWS THAT BITTER PILL -- SHE SWALLOWED THAT

3    BITTER PILL WHEN MOST WOMEN WOULD HAVE RUN FOR THE HILLS.  HE

4    NEVER EXPRESSED TO LINDSEY ANYTHING ABOUT HIS RULES OF ROUGH

5    SEX.  WHAT SHE WANTED.  WHAT HE LIKED.  NO EXPRESSED

6    DISCUSSION OF THOSE PERTINENT IMPORTANT FACTS.  EXCEPT TO SAY

7    THAT HE LIKES SEX ROUGHER THAN HER.  THAT IS NOT INFORMED

8    CONSENT.

9          INSTEAD OF LINDSEY GETTING ANGRY FOR ABUSING HER

10   WITHOUT HER EXPRESS CONSENT, SHE FELT EMBARRASSED.  YES, SHE

11   FELT EMBARRASSED FOR NOT BEING AS EXPERIENCED AS HE WAS IN

12   HAVING ROUGH SEX.  LIKE ALL OTHERS BEFORE HIM, TREVOR WAS NOT

13   EVIL.  HE WAS NOT ALL BAD.  AND NOBODY IS ALL BAD OR ALL

14   GOOD.  THERE WERE TIMES ON THAT FIRST OCCASION WHEN HE KISSED

15   HER LOVINGLY, STROKED HER HAIR, HER SKIN, CUDDLED HER,

16   WHISPERED SWEET AND SENTIMENTAL THINGS TO HER.

17         WE WILL NEVER KNOW, BECAUSE WE DIDN'T HEAR FROM

18   TREVOR, WHETHER OR NOT HE SAID THOSE THINGS AND DID THOSE

19   THINGS BECAUSE HE CARES.  OR WAS HE TRYING TO MANIPULATE HER

20   INTO BELIEVING THAT HE WAS SOMEONE THAT HE IS NOT?

21         IN ANY EVENT, IT DOESN'T MATTER WHAT HIS INTENTIONS

22   WERE.  WHAT MATTERS IS THE EFFECT ON LINDSEY.  AND THE EFFECT

23   WAS SHE THOUGHT HE THOUGHT SHE -- SHE THOUGHT HE THOUGHT SHE

24   WAS SPECIAL.  LINDSEY RUMINATED OVER THAT FIRST NIGHT AND

25   APPEARS TO BLAME HERSELF FOR NOT BEING GOOD ENOUGH.  SHE

26   PROMISED HERSELF THE NEXT TIME SHE WILL MAKE IT BETTER FOR

27   TREVOR.

28         LINDSEY DID REACH OUT TO HIM.  AND THEY BEGAN TO

1   SPEAK AGAIN THROUGH DM ON INSTAGRAM.  COUNSEL MADE A POINT OF

2   THAT IN HER EXAMINATION OF LINDSEY.  IT WAS LINDSEY WHO DID

3   REACH OUT AFTER THE FIRST TIME.  I THINK THE EVIDENCE SHOWS

4   IT WAS A COUPLE OF DAYS LATER.

5       THEIR MESSAGES BETWEEN THEM AT THAT POINT ARE A

6   MIXTURE OF FLIRTATIONS, LOTS OF SEXUAL INNUENDO, AND DOUBLE

7   ENTENDRES, AND BASICALLY DOWN AND DIRTY SEXTING.  LINDSEY

8   TESTIFIED SHE DID IT BECAUSE SHE WANTED HIM TO KNOW SHE WAS

9   INTO IT.  SHE COULD HANG WITH THE BIG BOYS.  AND I'M

10  PARAPHRASING WHAT SHE SAID.

11      AS TOM HANKS SAID IN THE VERY FAMOUS MOVIE, A

12  LEAGUE OF THEIR OWN, "THERE IS NO CRYING IN BASEBALL."  AND

13  IT APPEARS THAT THAT'S WHAT LINDSEY WANTED TO SHOW TREVOR.

14  TREVOR HAS ACCUSED LINDSEY OF ASKING FOR IT.  THERE WAS A

15  QUESTION POSED TO LINDSEY ON CROSS EXAMINATION, DIDN'T SHE

16  GET ON TOP OF TREVOR FIRST?  SHE DENIED IT.

17      WE NEVER HEARD FROM TREVOR.  SO WE DON'T KNOW WHAT

18  HIS VERSION IS.  HOWEVER, THE BOTTOM-LINE IS TREVOR'S

19  POSITION IS THAT LINDSEY, 27-YEAR-OLD DAMAGED LINDSEY, WAS

20  THE AGGRESSOR WHO DUPED TREVOR BAUER AND SHE GOT WHAT SHE

21  DESERVED.  I DON'T UNDERSTAND IN THE YEAR 2021 HOW ANYONE CAN

22  MAKE THOSE KIND OF STATEMENTS AND USE THAT AS A DEFENSE WITH

23  A STRAIGHT FACE.

24      AFTER ME TOO AND ALL THE SCANDALS WHERE THERE WAS A

25  CLEAR IMBALANCE OF POWER BETWEEN CERTAIN MEN AND WOMEN, HOW

26  IS IT SOMEONE CAN BLAME A WOMAN IN LINDSEY'S SHOES?  DOES

27  ANYONE IN THIS ROOM REALLY THINK THAT LINDSEY TOOK ADVANTAGE

28  OF TREVOR AND TOOK HIM FOR A RIDE, THAT SHE PLAYED HIM?

```
 1   ISN'T BLAMING THE VICTIM OLD NEWS FROM MANY PEOPLE'S WORN OUT
 2   AND OUTDATED PLAYBOOKS?
 3             AFTER THE INCIDENT -- OR AFTER THE DATE ON APRIL
 4   21, LINDSEY IS REELED IN AGAIN BY TREVOR BY HIS MIXTURE OF
 5   CHARM, FALSE PROMISE, AND THE HOPE THAT SHE IS DIFFERENT.  IN
 6   THE TEXT MESSAGES WE SEE BETWEEN THEM, HE NOW REFERS TO HER
 7   AS "LINDS," "MAMI," AND SENDS HER LOTS OF HEART EMOJIS.
 8             HE INITIATES DM.  AND THEN TEXT MESSAGES AT SOME
 9   POINT TO HER IN WHICH HE SAYS HE IS THINKING OF HER.  HE SAYS
10   HE WANTS TO SEE HER AGAIN.  HE TAKES HER PHONE NUMBER.  THEY
11   CONTINUE TO DEVELOP AN EMOTIONAL CONNECTION.
12             THERE IS NO DOUBT THERE IS PROMISE AND EXPECTATION
13   OF FUTURE AFFECTION AND MORE.  AND THEN WE COME TO MAY 15,
14   2021, THE NIGHT OF THE ASSAULT.  IN HER HEART OF HEARTS,
15   LINDSEY MUST HAVE KNOWN THAT WHAT SHE WAS DOING THAT NIGHT
16   WAS WRONG, THAT SHE SHOULD NOT HAVE GONE TO TREVOR'S AFTER
17   WHAT HAPPENED THE FIRST NIGHT.  EVEN THOUGH LINDSEY WAS SOBER
18   AND NOT CONSUMING ALCOHOL, SHE WAS GOING DOWN A DANGEROUS
19   PATH.  SHE WAS EXHIBITING BEHAVIOR THAT SHE SHOULD NOT BE
20   DOING.
21             SHE LIED TO HER FRIENDS ABOUT SEEING TREVOR, BUT
22   YET SOMETHING PROPELLED HER TO GO TO HIS HOUSE AGAIN ON THAT
23   NIGHT.  MAYBE IT WAS HER HOPE THAT IT WOULD BE DIFFERENT THAT
24   NIGHT, THAT TREVOR WAS DEVELOPING REAL FEELINGS FOR HER
25   BECAUSE THEY WERE KINDRED SOULS AND BOTH BROKEN IN THEIR OWN
26   WAYS.  OR MAYBE BECAUSE SHE FELT THAT TREVOR AND WHAT HE DID
27   TO HER IS ALL SHE DESERVES AS A HUMAN BEING.
28             IN THE END, IT DOESN'T MATTER.  BECAUSE NO MATTER
```

1   WHAT LINDSEY'S INTENTIONS WERE, TREVOR HAD ABSOLUTELY NO

2   RIGHT TO ASSAULT AND ATTACK HER ON THAT NIGHT.  TO TREAT HER

3   LIKE, IN HER OWN WORDS, SHE WASN'T HUMAN ANYMORE.  SHE WASN'T

4   A HUMAN BEING.

5          WHEN LINDSEY ON DIRECT DESCRIBED WHAT HAPPENED THAT

6   NIGHT, THE WAY IN WHICH SHE TESTIFIED WAS VERY AUTHENTIC AND

7   VERY COMPELLING.  IF NOT, LINDSEY DESERVES AN ACADEMY AWARD

8   BECAUSE WHAT SHE SAID WAS HEARTFELT AND SINCERE AND PAIN FROM

9   DEEP WITHIN HER SOUL.  LINDSEY TESTIFIED THAT SHE FELT HER

10  SOUL HAD LEFT HER BODY.  SHE WAS SEVERELY DISORIENTED,

11  NAUSEATED, STRUGGLING TO BREATHE, HAD SEARING PAIN BEHIND HER

12  EARS, HER HEAD, AND AROUND HER VAGINAL AREA.

13         WHEN TREVOR PUNCHED HER IN THE VAGINA, HER BODY WAS

14  JERKED INTO THE AIR.  NOW, TREVOR'S EXPERT TESTIFIED THAT HER

15  INJURIES WERE NOT CONSISTENT WITH LINDSEY'S DESCRIPTION OF

16  WHAT HAPPENED.  SHE OFFERED ALL KINDS OF REALLY SILLY EXCUSES

17  THAT WERE NOT BASED ON MEDICAL REALITY.  WELL, SOMETIMES WHEN

18  THIN PEOPLE HAVE SEX, THEY GET BRUISED.  THAT'S A SILLY

19  COMMENT.  AND THERE WERE NO RESEARCH OR STUDIES TO SHOW THAT.

20         SHE TESTIFIED THAT LINDSEY'S INJURIES WERE NOT

21  CONSISTENT WITH LINDSEY'S DESCRIPTION OF WHAT HAPPENED.  BUT

22  HOW DOES SHE KNOW THAT?  REALLY WHAT SHE DOES IS SHE DISSECTS

23  BODIES FOR A LIVING, NOT HUMAN BEINGS.  SHE ALSO DIDN'T

24  EXPERIENCE WHAT LINDSEY EXPERIENCED THAT NIGHT.

25         DOES ANYONE BELIEVE THAT LINDSEY'S INJURIES WERE

26  SELF-INFLICTED BECAUSE IN THE PAST SHE MAY HAVE HAD

27  SELF-INJURIOUS BEHAVIOR?  AS WAS IMPLIED WHEN NURSE VALENCIA

28  WAS CROSS EXAMINED.  OR SOMEHOW WAS EXACERBATED BY HER USE OF

1    IBUPROFEN OR OTHER MEDICATIONS?  ALSO, ANOTHER LUDICROUS

2    IMPLICATION.

3            OR PERHAPS SHE SOMEHOW DOCTORED PHOTOS AND MADE HER

4    INJURIES LOOK WORSE BECAUSE HER PHOTOS WERE RED AND OTHERS

5    HAD A WHITER BACKGROUND.  WELL, APPARENTLY THEY DROPPED THAT

6    DEFENSE BECAUSE WE NEVER HEARD FROM THE EXPERT THAT THEY

7    INTENDED TO CALL.  THE ONLY PERSON THAT WE HEARD FROM ABOUT

8    WHAT HAPPENED ON THE NIGHT OF MAY 15 WAS LINDSEY, BECAUSE WE

9    DIDN'T HEAR TREVOR'S VERSION OF WHAT HAPPENED.

10           LINDSEY WAS CREDIBLE, AS I INDICATED, ABOUT --

11   TESTIFYING ABOUT THE ASSAULT.  HER DEMEANOR, WHICH THE COURT

12   IS ENTITLED TO TAKE INTO ACCOUNT, WAS CONSISTENT WITH A

13   DISTRAUGHT WOMAN WHO HAD SUFFERED AT THE HANDS OF HER

14   ATTACKER.  NURSE VALENCIA, SOMEONE WHO HAS NO SKIN IN THE

15   GAME OR DOG IN THE FIGHT, TESTIFIED IT WAS THE WORSE BRUISING

16   SHE HAD EVER SEEN.

17           IN CONTRAST, WE HAVE NO IDEA ABOUT TREVOR'S VERSION

18   OF THAT NIGHT.  BASED UPON THE EVIDENCE THAT THE COURT HAS

19   HEARD FROM LINDSEY AND OTHERS, THE EVIDENCE HAS SHOWN THAT

20   LINDSEY WAS PHYSICALLY AND SEXUALLY ASSAULTED BY TREVOR

21   BAUER, THAT THIS WAS NOT CONSENSUAL ROUGH SEX BETWEEN TWO

22   CONSENTING ADULTS.  A PERSON IN HER RIGHT MIND WOULD NEVER

23   HAVE CONSENTED TO WHAT TREVOR HAD DONE TO HER.

24           ALSO, AS A SIDE NOTE, WE WENT DOWN A WHOLE

25   DIVERSION OF INANE TEXTING THAT LINDSEY DID WITH FRIENDS AND

26   FAMILY.  AND COUNSEL'S QUIP TO THE COURT, WELL, I'M GLAD

27   LINDSEY WROTE THESE COMMENTS OR THESE TEXT MESSAGES, BECAUSE

28   I GET TO SAY -- I GET TO DROP THE "F" BOMB IN COURT.  WELL,

```
1    THE FACT THAT SHE ENGAGED IN THAT KIND OF TEXTING WITH HER
2    FRIENDS AND FAMILY, NUMBER ONE, SHE NEVER THOUGHT THEY WOULD
3    HIT THE LIGHT OF DAY.  THEY WERE CONFIDENTIAL AND PRIVATE
4    COMMUNICATIONS.  AND, NUMBER TWO, AND MOST IMPORTANTLY, THEY
5    DO NOT NEGATE THE TRUTH.  THEY DON'T NEGATE THE FACT THAT
6    THEY HAD A, QUOTE, "DATING RELATIONSHIP" AS DEFINED BY THE
7    FAMILY CODE.
8         NOR DOES IT NEGATE THE FACT THAT HE SEXUALLY
9    ASSAULTED HER.  SO NO MATTER WHAT COUNSEL IS GOING TO ARGUE,
10   AND NO MATTER HOW DISGUSTING THE WORDS WERE OR THE COMMENTS
11   THAT SHE MADE TO HER FRIENDS WERE, IT DOESN'T CHANGE THE
12   ULTIMATE FACTS IN THIS CASE.  ACTIONS SPEAK LOUDER THAN
13   WORDS.  AND THE ACTIONS OF LINDSEY AND THE ACTIONS OF TREVOR
14   THAT ARE BEFORE THIS COURT AS EVIDENCE IS ALL THE COURT
15   REALLY NEEDS TO KNOW IN ORDER TO MAKE ITS DETERMINATION.
16        AS I STATED IN MY OPENING, A PERSON WHO IS
17   UNCONSCIOUS CANNOT GIVE CONSENT.  AND MORE IMPORTANTLY, EVEN
18   IF GIVEN BEFOREHAND, CANNOT BE WITHDRAWN BECAUSE THEY'RE
19   UNCONSCIOUS.  THERE IS NO DOUBT THAT SEX WHEN SOMEONE IS
20   UNCONSCIOUS IS NOT CONSENSUAL -- IS NOT CONSENSUAL.  AND EVEN
21   IF A PERSON CANNOT CONSENT, AND EVEN IF IT WAS, A PERSON
22   CANNOT CONSENT TO BEING ASSAULTED.
23        I CITED THE CASE OF PEOPLE VS. SAMUEL.  IN MY
24   CLOSING, I WILL CITE THE CASE OF PEOPLE VS. MIRANDA, WHICH IS
25   A 2021 CASE AT 62 CAL.APP.5TH 162.  THE COURT ADDRESSED
26   SEXUAL CRIMES THAT INVOLVED AN ACT OF TOUCHING WHEN THE
27   VICTIM WAS UNCONSCIOUS.  THE COURT STATED THAT, QUOTE,
28   "FORMER SECTION 288A(F), NOW SECTION 287, CRIMINALIZES ORAL
```

1　COPULATION WHEN A, QUOTE, 'VICTIM' IS AT THE TIME UNCONSCIOUS

2　OF THE NATURE OF THE ACT AND THE PERPETRATOR IS AWARE OF THE

3　UNCONSCIOUSNESS."  SECTION 261(A)(4) DEFINES RAPE TO MEAN

4　SEXUAL INTERCOURSE UNDER THE SAME CIRCUMSTANCES.  AND SECTION

5　289(B) CRIMINALIZES SEXUAL PENETRATION UNDER THESE

6　CIRCUMSTANCES AS WELL.

7　　　　　THE COURT IN PEOPLE VS. MIRANDA EXPLAINED THAT,

8　QUOTE, "ORAL COPULATION OF AN UNCONSCIOUS PERSON REQUIRES

9　THAT THE VICTIM BE, QUOTE, 'UNCONSCIOUS' OF THE NATURE OF THE

10　ACT," END QUOTE.  THIS MEANS THAT THE VICTIM MUST BE

11　INCAPABLE OF RESISTING BECAUSE HE OR SHE WAS UNCONSCIOUS OR

12　ASLEEP, OR WAS NOT AWARE, KNOWING, PERCEIVING, OR COGNIZANT

13　THAT THE ACT OCCURRED, AMONG OTHERS.

14　　　　　THE COURT FURTHER STATED IT IS SETTLED THAT A

15　VICTIM NEED NOT BE TOTALLY PHYSICALLY UNCONSCIOUS.  MOREOVER,

16　THE COURT NOTED THAT ADVANCE CONSENT, WHEN A PERSON CONSENTS

17　IN ADVANCE TO BEING SEXUALLY VIOLATED WHILE UNCONSCIOUS,

18　WOULD STILL BE A BATTERY.  CONSENT OF THE VICTIM IS NOT

19　GENERALLY A DEFENSE TO ASSAULT OR BATTERY, EXCEPT IN A

20　SITUATION INVOLVING ORDINARY PHYSICAL CONDUCT OR BLOWS

21　INCIDENT TO SPORTS, SUCH AS FOOTBALL, BOXING, OR WRESTLING.

22　　　　　UNDER CALIFORNIA LAW, ADVANCE CONSENT TO RAPE DOES

23　NOT CONSTITUTE VALID LEGAL CONSENT, BECAUSE SUCH AN ADVANCE

24　DECISION ELIMINATES THE VICTIM'S ABILITY TO WITHDRAW FROM THE

25　SEXUAL ACTIVITY WHILE IT OCCURS.  AND THE COURT IN PEOPLE VS.

26　MIRANDA CITED A CASE BY THE NAME OF PEOPLE VS. DANCY, WHICH

27　IS A 2002 CASE AT 102 CAL.APP.4TH 21.

28　　　　　NOW, NOTABLY, MR. BAUER DOES NOT DENY THAT THE

536

1    CONDUCT, OR WHAT WE CALL ABUSE, TOOK PLACE.  THROUGHOUT ALL

2    THE WRITTEN COMMUNICATION, THE DIRECT MESSAGES, THE TEXTS, OR

3    THE VOICEMAIL MESSAGES THAT MR. BAUER LEFT HER, WHICH IS

4    EXHIBIT 5, DOES HE EVER DENY COMMITTING THE HEINOUS ACTS THAT

5    HE INFLICTED UPON LINDSEY ON THE NIGHT OF MAY 15.

6         HE RATIONALIZES HIS BEHAVIOR BY CLAIMING THAT

7    LINDSEY AGREED TO ENGAGE IN ROUGH SEX NOT ONLY THE FIRST

8    TIME, BUT THE SECOND TIME AS WELL.  HE THOUGHT IT WAS FINE TO

9    STRANGLE LINDSEY WITH HER OWN HAIR UNTIL THE POINT OF

10   UNCONSCIOUSNESS NOT ONCE, BUT TWO TIMES.  PUNCH HER IN THE

11   JAW WITH A CLOSED FIST CAUSING HER LIP TO BE SPLIT OPEN.

12   PUNCHING HER IN THE CHEEK AND IN HER HEAD.

13        SCRATCHING THE SIDE OF HER FACE.  THAT WAS NOT

14   ACNE.  PUNCHING HER IN THE BUTTOCKS.  AND BRUTALLY PUNCHING

15   HER IN THE VAGINA NUMEROUS TIMES CAUSING DARK PURPLE AND BLUE

16   BRUISING ON THE INSIDE AND OUTSIDE AREAS OF HER VAGINA.  I

17   WOULD ASK THE COURT TO LOOK CAREFULLY AT THE SART PHOTOGRAPHS

18   OF HER VAGINA DEPICTING THE BRUISING.  THAT IS NOT FROM

19   SKINNY PEOPLE HAVING SEX.

20        DESPITE MS. HILL'S TESTIMONY EXPLAINING HOW SHE

21   AWOKE EXTREMELY DISORIENTED -- DISORIENTATED, THEN WAS UNABLE

22   TO SPEAK OR MOVE HER BODY, TREVOR CONTINUED TO TRY TO HAVE

23   SEX WITH LINDSEY.  LINDSEY TOLD HIM SHE NEEDED A MOMENT, BUT

24   HE CONTINUED TO TRY TO REINSTITUTE SEX.

25        IN FACT, NOT ONLY DID TREVOR NOT DENY THAT THE

26   ABUSE TOOK PLACE, HE ADMITTED IT.  HE ADMITTED TO LINDSEY

27   THAT HE HIT HER ON THE BUTT AFTER THE SECOND INCIDENT ON MAY

28   15.  SHE TESTIFIED TO THAT.  AND LINDSEY TESTIFIED THAT

1  DURING THE COLD CALL THAT WAS RECORDED BY THE POLICE, HE ALSO

2  ADMITTED TO HITTING HER IN THE BUTT DURING THAT PHONE CALL.

3  AND THERE IS NO EVIDENCE TO CONTRADICT THAT.

4          I'D LIKE TO GO OVER FOR A SECOND THE QUANTITY OF

5  THE COMMUNICATIONS BETWEEN THE PARTIES, WHICH WE BELIEVE

6  FORMED PART OF THE BASIS FOR THE DATING RELATIONSHIP AS

7  DEFINED BY THE FAMILY CODE.  INTERESTINGLY, LINDSEY AND

8  TREVOR EXCHANGED A MINIMUM OF APPROXIMATELY 180 INSTAGRAM

9  DIRECT MESSAGES; WHEREAS, THE COURT CAN SEE IN EXHIBIT 2 THEY

10  DISCUSSED INTIMATE DETAILS ABOUT THEIR FAMILIES, THEIR

11  PERSONAL INTERESTS, CONSPIRACY THEORIES, HIS PROFESSIONAL

12  CAREER, AND LINDSEY'S SOBRIETY.

13          COUNSEL TRIED TO IMPLY THAT TREVOR TALKS TO PEOPLE

14  ALL THE TIME ABOUT THE FACT THAT HE WAS AGGRESSIVELY BULLIED

15  AT THE TIME.  AND WASN'T THAT, IN FACT, IN AN ARTICLE ABOUT

16  HIM THAT YOU HAD READ, WAS THE QUESTION POSED TO LINDSEY.  HE

17  WENT MUCH DEEPER THAN THAT.  AND I DON'T NEED TO BORE THE

18  COURT WITH ALL THE DETAILS ABOUT WHAT THEY DISCUSSED.  BUT IT

19  WASN'T JUST A CASUAL CONVERSATION OVER A CUP OF COFFEE AT

20  STARBUCKS.  TREVOR GAVE -- STRIKE THAT.

21          LINDSEY GAVE TREVOR HER CELL PHONE NUMBER ON MAY 8,

22  2021, WHEN THEY EXCHANGED APPROXIMATELY 163 TEXT MESSAGES,

23  INCLUDING SEVERAL PHOTOGRAPHS OF LINDSEY -- AND THIS IS ON A

24  GIF IMAGE OR FORMAT, WHICH I HAVE NO IDEA WHAT THAT MEANS.

25  BUT I WILL LET THE COURT KNOW THAT.  THEY EXCHANGED NUMEROUS

26  HEART EMOJIS, AT LEAST 12, AND KISSING FACE EMOJIS AT LEAST

27  30 TIMES.

28          LINDSEY TESTIFIED THAT ON AUGUST 29 BEFORE SHE MET

1   HIM IN PERSON FOR THE FIRST TIME, SHE WAS NERVOUS AND EXCITED

2   FOR THE TIME THAT SHE WAS GOING TO SPEND WITH TREVOR.  AND,

3   IN FACT, HAD POSSIBLY PLANNED ON SPENDING THE NIGHT THERE.

4   THAT IS BEHAVIOR THAT IS CONSISTENT WITH SEEING SOMEONE

5   BEFORE A FIRST DATE.

6        FROM APRIL 21 THROUGH MAY 15 THE PARTIES CONTINUED

7   COMMUNICATING FREQUENTLY THROUGH SOCIAL MEDIA AND TEXT

8   MESSAGING DESPITE THE FACT THAT TREVOR WAS NOT EVEN IN

9   LOS ANGELES.  DURING THAT PERIOD, THEY EXCHANGED

10  APPROXIMATELY 29 INSTAGRAM MESSAGES AND 99 TEXT MESSAGES.

11  AND THIS IS DURING A THREE WEEK TIME FRAME.

12       ON MAY 15, 2021, WE KNOW THAT TREVOR INVITED

13  LINDSEY TO HIS HOUSE AGAIN.  HE TOOK A SNAPCHAT PHOTO OF

14  LINDSEY.  SHOWED HER HOW TO SAVE IT, WHICH LINDSEY COMMENTED

15  UPON IN HER TESTIMONY THAT SHE FELT IT VIOLATED HIS VERY OWN

16  RULES OF DATING.  AND THAT SPECIFICALLY REFERRED TO THE ONE

17  ABOUT SOCIAL MEDIA AND NOT BEING ON SOCIAL MEDIA WITH HIM

18  WHEN THEY WERE DATING.

19       INTERESTINGLY, IT WAS TREVOR THAT FIRST -- THAT

20  FIRST GAVE THAT EXHIBIT TO THE COURT.  BUT THAT EXHIBIT --

21  THAT PHOTOGRAPH SUPPORTS OUR CASE, THAT IS, THAT THEY DID

22  HAVE A RELATIONSHIP.  MAYBE NOT THE RELATIONSHIP THAT I WOULD

23  WANT TO HAVE OR THAT I WOULD WANT MY CHILDREN OR

24  GRANDCHILDREN TO HAVE, BUT THAT WAS THE UNIQUENESS OF THEIR

25  RELATIONSHIP.

26       IN FACT, WHEN WE TALK ABOUT WHAT THEY SPOKE ABOUT

27  ON THAT SECOND OCCASION, THEY SPOKE -- TREVOR TOLD HER THE

28  STORY ABOUT HIS GIRLFRIEND AT UCLA WHO WAS A BASEBALL

1  PLAYER -- OR SOFTBALL PLAYER -- I APOLOGIZE -- WHO LEFT HIM
2  FOR ANOTHER WOMAN AND HOW DISTURBING THAT WAS TO HIM.
3  THERE'S NO EVIDENCE THAT HE REGULARLY GIVES INTERVIEWS WHERE
4  HE DISCLOSES OR REVEALS SUCH PRIVATE DETAILS OF HIS PERSONAL
5  LIFE.
6         HE ALSO TOLD LINDSEY THE STORY ABOUT HOW HE BROKE
7  THIS WOMAN'S NOSE.  AND, AGAIN, THERE'S NO EVIDENCE THAT HE
8  WALKS AROUND TALKING TO INTERVIEWERS OR ESPN ABOUT THOSE KIND
9  OF THINGS.  GOING BACK TO THE QUANTITY OF CONTACT AFTER THE
10 MAY 15 ASSAULT, TREVOR CALLED LINDSEY AT LEAST TWO TIMES TO
11 CHECK IN ON HER.  ON ONE OF THE TELEPHONE CONVERSATIONS THAT
12 TOOK PLACE WHILE LINDSEY WAS IN THE HOSPITAL, HE LEFT HER A
13 VOICEMAIL MESSAGE CHECKING IN ON HER AND ASKING HER TO CALL
14 HIM BACK.
15        AFTER MAY 15, TREVOR SENT LINDSEY APPROXIMATELY --
16 STRIKE THAT.  AFTER MAY 15, TREVOR TEXTED LINDSEY ON A DAILY
17 BASIS.  AND YOU CAN LOOK AT EXHIBIT 2 AND YOU CAN SEE DAY
18 AFTER DAY AFTER DAY HE IS REACHING OUT TO SEE HOW LINDSEY IS
19 DOING.  IF THIS IS NOT EVIDENCE OF THE EXISTENCE OF A
20 RELATIONSHIP, THEN I DON'T KNOW WHAT IS.
21        HE SAYS THINGS LIKE, "WORRIED ABOUT YOU LINDS.
22 THINKING OF YOU LINDS.  I NEVER WANT TO SEE YOU HURTING.
23 CHECKING ON YOU.  WHEN WILL THE INJURIES GO AWAY?  WISH I
24 COULD HOLD YOU."  TREVOR ALSO OFFERED TO SEND LINDSEY
25 GROCERIES AND DESSERT TO COMFORT HER.  AS IF FOOD COULD
26 COMFORT HER AT THAT TIME.
27        DURING THE COLD CALL, HE TOLD LINDSEY HE WANTED TO
28 SEE HER AGAIN.  HE TOLD LINDSEY THAT THINGS WOULD BE BETTER

1  NEXT TIME.  THE VOLUMINOUS DIRECT MESSAGES, TEXT MESSAGES,

2  ARE THE WAY IN WHICH INDIVIDUALS COMMUNICATE IN TODAY'S

3  WORLD.  WE KNOW FROM SEEING OUR CHILDREN AND GRANDCHILDREN,

4  AND EVEN THE PEOPLE AROUND US IN THE COURTROOM, PEOPLE ARE

5  CONSTANTLY ON THEIR PHONES.

6       THAT'S HOW WE CONNECT WITH PEOPLE TODAY.  AND WE'RE

7  NOT DISCUSSING TRIVIAL THINGS.  WE'RE DISCUSSING PERSONAL

8  THINGS BY TEXT, BY EMAIL, BY INSTAGRAM.  ALL THOSE METHODS.

9  THIS IS THE 21ST CENTURY.

10      IT DOESN'T MATTER, AS I SAID BEFORE, WHAT LINDSEY

11  SAID IN PRIVATE TEXT MESSAGES WITH HER COUSIN AND HER

12  FRIENDS.  THOSE TEXT MESSAGES WERE INTRODUCED TO TRY TO SHOW

13  THAT LINDSEY WAS NOT INTERESTED IN HAVING A RELATIONSHIP WITH

14  TREVOR BUT WAS PLOTTING TO GET IN HIS HEAD, DESTROY HIS

15  CAREER, AND GET MONEY FROM HIM.

16      HOW SAD.  WHEN LINDSEY TESTIFIED ABOUT WHAT

17  HAPPENED AFTER THE ASSAULT, FOR ME CEMENTED TO ME SOMETHING

18  THAT I ALWAYS INTUITIVELY KNEW.  THIS WAS A MODERN DAY DATING

19  RELATIONSHIP.  MAYBE NOT THE WAY THE REST OF US UNDERSTAND

20  IT, BUT IT WAS THE WAY IN WHICH TREVOR ROLLS.  NO EMOTIONS.

21  NO SOCIAL MEDIA.  AND HE IS NOT MONOGAMOUS AND WILL SLEEP

22  WITH OTHERS.  THOSE ARE TREVOR'S OWN RULES OF DATING FROM HIS

23  OWN MOUTH.

24      FOR WHATEVER REASON, LINDSEY WENT ALONG WITH IT.

25  WHEN TREVOR REALIZED THAT LINDSEY WAS HOSPITALIZED, HE

26  REPEATEDLY CALLED AND TEXTED HER, AS I JUST STATED.  WE WILL

27  NEVER KNOW THE REASON WHY HE WAS DOING THIS.  WERE HIS

28  FEELINGS FOR HER GENUINE AND HE HAD FELT BADLY ABOUT WHAT HE

541

1    DID?  OR WAS HE FEIGNING CONCERN BECAUSE HE WAS AFRAID

2    LINDSEY WAS GOING TO SPEAK TO THE AUTHORITIES AND HE WAS

3    GOING TO BE CAUGHT?

4         YOUR HONOR, WITH RESPECT TO THE LAW ON DOMESTIC

5    VIOLENCE, AS THE COURT IS AWARE, ONE OF THE SEMINAL CASES,

6    MARRIAGE OF NADKARNI, WHICH IS A 2009 CASE, AT 173

7    CAL.APP.4TH 1483, STATES THAT "THE TRIAL COURT IS AUTHORIZED

8    TO ISSUE A RESTRAINING ORDER FOR THE PURPOSE OF PREVENTING A

9    RECURRENCE OF DOMESTIC VIOLENCE AND ENSURING A PERIOD OF

10   SEPARATION OF THE PERSONS INVOLVED IF AN AFFIDAVIT SHOWS TO

11   THE SATISFACTION OF THE COURT REASONABLE PROOF OF A PAST ACT

12   OR ACTS OF ABUSE.  THIS STATUTE SHOULD BE BROADLY CONSTRUED

13   IN ORDER TO ACCOMPLISH ITS PURPOSE OF PREVENTING ACTS OF

14   DOMESTIC VIOLENCE."

15        AND THAT'S THE RECENT CASE OF MARRIAGE OF F.M. AND

16   M.M., WHICH IS A 2021 CASE, AT 65 CAL.APP.5TH 106.  "UNDER

17   THE D.V.P.A., THE FOCUS IS PLACED ON A FINDING OF REASONABLE

18   PROOF OF A PAST ACT OR ACTS OF ABUSE."  AND THAT'S FAMILY

19   CODE 6300.  I DON'T THINK THAT THERE IS ANY DOUBT THAT THERE

20   WAS SEXUAL ASSAULT COMMITTED BY TREVOR UPON LINDSEY AS

21   DEFINED BY THE D.V.P.A.

22        I'D LIKE TO SPEND A FEW MINUTES GOING THROUGH THE

23   LEGISLATIVE HISTORY AND THE D.V.P.A. AND HOW IT HAS CHANGED

24   ITS DEFINITION OF WHAT CONSTITUTES A DATING RELATIONSHIP OVER

25   TIME.  LIKELY BECAUSE IT NEEDED TO KEEP UP WITH MODERN TIMES.

26   THE D.V.P.A. EXTENDED PROTECTIONS TO PERSONS IN A DATING

27   RELATIONSHIP TO PROVIDE A REMEDY FOR VICTIMS OF DOMESTIC

28   VIOLENCE.  AS NOTED IN THE CASE OF PEOPLE VS. HOOVER, WHICH

542

1  IS A 2000 CASE, AT 77 CAL.APP.4TH 1020.  THERE IS A GREAT

2  LIKELIHOOD THAT ANYONE -- THAT ONE BATTERING EPISODE IS PART

3  OF A LARGER SCHEME OF DOMINANCE AND CONTROL.  THAT SCHEME

4  USUALLY ESCALATES IN FREQUENCY AND SEVERITY.

5       THE D.V.P.A. WAS ORIGINALLY ENACTED IN 1979.  AND

6  AT THAT TIME, WHEN INITIALLY ENACTED, PROVIDED PROTECTION

7  UNDER THE FAMILY LAW ACT.  HOWEVER, IT WAS INEFFECTIVE IN

8  DEALING WITH ALL SITUATIONS.  AND THERE WAS A CASE BY THE

9  NAME OF ORIOLA, ORIOLA VS. THALER, WHICH IS A 2000 CASE, AT

10 84 CAL.APP.4TH 397.  AND BECAUSE THAT CASE SO NARROWLY

11 CONSTRUED THE DEFINITION OF A DATING RELATIONSHIP, THE

12 LEGISLATURE TOOK IMMEDIATE ACTION AND CHANGED THE DEFINITION.

13 AND THAT WAS IN 1990.  THE STATUTE WAS AMENDED TO INCLUDE THE

14 PRESENT LANGUAGE OF, QUOTE, "DATING OR ENGAGEMENT

15 RELATIONSHIP" LANGUAGE.

16      AND THE INTENT BEHIND THE EXPANSION OF THE LANGUAGE

17 WAS INTENDED TO PROVIDE MORE PROTECTIONS TO A BROADER CLASS

18 OF VICTIMS OF DOMESTIC VIOLENCE, WHICH IS THE SITUATION IN

19 THIS CASE.  AND I'D LIKE TO CITE THE COURT TO A FEW RELEVANT

20 CASES ON THE COURT'S INTERPRETATION OF THE DEFINITION OF

21 DATING RELATIONSHIP, WHICH IS NOW PART OF OUR STATUTE.

22      THERE IS A CASE CALLED PEOPLE VS. RUCKER.  THAT'S A

23 2005 CASE, AT 126 CAL.APP.4TH 1107 -- IN WHICH THE COURT HELD

24 THAT THE DATING -- OR STATED "THE DEFINITION OF A DATING

25 RELATIONSHIP ADOPTED BY THE LEGISLATURE DOES NOT REQUIRE,

26 QUOTE, SERIOUS COURTSHIP, OR AN INCREASINGLY EXCLUSIVE

27 INTEREST, SHARED EXPECTATION OF GROWTH, OR THAT THE

28 RELATIONSHIP ENDURES FOR A LENGTH OF TIME."

```
 1         THE COURT STATED THAT THE STATUTORY DEFINITION
 2   REQUIRES, QUOTE, "FREQUENT, INTIMATE ASSOCIATIONS," A
 3   DEFINITION THAT DOES NOT PRECLUDE A NEW DATING RELATIONSHIP,
 4   WHICH THIS ONE WAS.  THE APPELLATE COURT FOUND THAT THE
 5   LEGISLATURE WAS ENTITLED TO CONCLUDE THAT DOMESTIC VIOLENCE
 6   STATUTES SHOULD APPLY TO A RANGE OF DATING RELATIONSHIPS.
 7   THE COURT FURTHER STATED THE LEGISLATURE COULD REASONABLY
 8   CONCLUDE DATING RELATIONSHIPS, EVEN WHEN NEW, HAVE UNIQUE
 9   EMOTIONAL AND PRIVACY ASPECTS THAT DO NOT EXIST IN ANY OTHER
10   SOCIAL OR BUSINESS RELATIONSHIPS.  AND THOSE ASPECTS MAY LEAD
11   TO DOMESTIC VIOLENCE EARLY IN A RELATIONSHIP.
12         NOW, BEFORE I GO ON TO PHILLIPS VS. CAMPBELL, I
13   WANT TO INTERJECT WHEN I WAS DRIVING TO COURT THIS MORNING
14   AND I WAS SPEAKING WITH MY BRILLIANT PARTNER, MS. OLSON, I
15   ANALOGIZED THE EXPANSION OF THE INTERPRETATION OF WHAT
16   CONSTITUTES A DATING RELATIONSHIP FOR PROTECTION UNDER THE
17   D.V.P.A. TO THE DIFFERENT KINDS OF RELATIONSHIPS THAT WE SEE
18   IN THE FAMILY LAW COURT.  AND WHEN I FIRST STARTED, SOMEBODY
19   NON-BIOLOGICALLY OR NOT RELATED BY MARRIAGE TO SOMEBODY COULD
20   RAISE A CHILD FROM BIRTH, AND THEN WHEN THEY SPLIT UP WITH
21   THEIR PARTNER, BECAUSE THEY HAD NO LEGAL RELATIONSHIP WITH
22   THAT CHILD, THEY COULD BE BANISHED FROM THAT CHILD'S LIFE.
23         AND BACK IN 1982 WHEN I WOULD TRY THOSE KIND OF
24   CASES, I WOULD THINK HOW SAD THAT SOMEBODY -- FOR BOTH THE
25   CHILD AND THE PARENTS THAT THEY HAD COME TO KNOW -- THAT THEY
26   COULD NO LONGER HAVE A RELATIONSHIP BECAUSE THEIR PARENTS HAD
27   SPLIT UP.  WELL, THE LAW HAS CHANGED GREATLY SINCE 1982, AS
28   WE KNOW.  NOW, THERE'S ALL KINDS OF RELATIONSHIPS THAT ARE
```

1 PROTECTED UNDER THE FAMILY CODE.  IT JUST DOESN'T HAVE TO BE
2 A HETEROSEXUAL RELATIONSHIP.  IT CAN BE A SAME SEX
3 RELATIONSHIP.

4         IT COULD BE SOMEBODY WHERE THERE'S NOT EVEN A
5 SEXUAL RELATIONSHIP WHO RAISES THE CHILD ALONG WITH THAT
6 CHILD'S PARENT.  IT COULD BE THREE PEOPLE INVOLVED SOMEHOW IN
7 A RELATIONSHIP.  AND I THINK THAT'S EXACTLY WHAT HAPPENED
8 WITH THE DEFINITION OF A DATING RELATIONSHIP.  THE OLD
9 DEFINITION DOESN'T APPLY TO OUR MODERN DAY, WHICH LEADS ME TO
10 THE CASE OF PHILLIPS VS. CAMPBELL.

11         AND THAT'S A 2016 CASE AT 2 CAL.APP.5TH 844.  AND I
12 DON'T LIKE TO READ A BUNCH OF LAW.  I FIND IT BORING.  BUT I
13 FOUND THIS CASE VERY INTERESTING, BECAUSE IN THIS CASE THE
14 MAN AND WOMAN HAD ONLY A PLATONIC RELATIONSHIP.  SHE WAS A
15 BICYCLIST, I THINK, FROM NEW ZEALAND.  AND HE WAS SOME GUY.
16 THEY MET EACH OTHER THROUGH BICYCLING AND NEVER HAD SEX.  I
17 THINK THEY STAYED AT EACH OTHER'S HOMES OR ONE OF THEIR HOMES
18 A COUPLE OF OCCASIONS.

19         SHE WAS VERY CLEAR WITH HIM THAT SHE WAS NOT
20 INTERESTED IN DATING THEM -- IN DATING HIM.  AND BOTH OF THEM
21 TESTIFIED AT TRIAL THAT THEY DID NOT HAVE A DATING
22 RELATIONSHIP.  SO WHAT WAS INTERESTING ABOUT THAT CASE IS THE
23 TRIAL COURT SAID TO THEM, I DON'T CARE HOW YOU DEFINE IT.
24 YOU GUYS HAD A DATING RELATIONSHIP.

25         THE COURT OF APPEAL, IN UPHOLDING THE TRIAL COURT'S
26 DECISION, FOUND THAT THE TRIAL COURT HAD THE POWER TO
27 FACTUALLY DETERMINE WHETHER A DATING RELATIONSHIP EXISTED
28 WITHIN THE MEANING OF THE D.V.P.A. EVEN WHERE THE PARTIES

1    CHARACTERIZE THEIR RELATIONSHIP AS A FRIENDSHIP AND DOES NOT

2    INVOLVE DATING AS THAT TERM IS COMMONLY UNDERSTOOD.  THE

3    COURT FOUND THAT A DATING RELATIONSHIP CAN BE ESTABLISHED

4    WHERE, QUOTE, "ALL OF THE EVIDENCE SHOWS THERE WAS AN

5    EXPECTATION OF AFFECTION OR DESIRE TO HAVE AFFECTION."

6         IT DID NOT MATTER WHAT THE PARTIES CALLED IT.

7    THERE ARE SEVERAL LAW REVIEW ARTICLES THAT I WOULD JUST LIKE

8    TO BRIEFLY ADDRESS WITH THE COURT THAT TALKS ABOUT --

9         THE COURT:  YOU'RE GOING TO HAVE ME READ LAW REVIEW

10   ARTICLES AFTER ARGUMENT?

11        MS. MEYER:  I'M SORRY?

12        THE COURT:  ARE YOU GOING TO HAVE ME READ LAW REVIEW

13   ARTICLES AFTER ARGUMENT?

14        MS. MEYER:  NOT UNLESS YOU DON'T WANT TO.  YOU DON'T

15   HAVE TO.  YOU PROBABLY HAVE NOTHING TO DO TODAY.  BUT

16   THERE'S -- SUFFICE IT TO SAY, THERE ARE LAW REVIEW ARTICLES

17   THAT TALK ABOUT THE EXPANSION OF THE DATING RELATIONSHIP IN

18   MODERN DAY TIMES.

19        THE BOTTOM-LINE IS, AND AT THE END OF THE DAY, NO

20   MATTER HOW LINDSEY CHARACTERIZED IT, OR HOW SHE CHARACTERIZED

21   IT TO HER FRIENDS AND TO HER COUSIN, THE EVIDENCE SHOWED THAT

22   NO MATTER HOW SHORT, HOW -- NO MATTER HOW TUMULTUOUS, NO

23   MATTER HOW EMOTIONAL, TREVOR AND LINDSEY HAD A MODERN DAY

24   RELATIONSHIP.

25        SO AT THE END OF THE DAY, I WANT TO SAY THAT I AM

26   GLAD I LIVE IN AMERICA AND NOT A COUNTRY LIKE AFGHANISTAN

27   WHERE WOMEN ARE BEING BEATEN SIMPLY BECAUSE THEY ARE WOMEN.

28   I AM GLAD MY DAD FORCED ME TO GO TO LAW SCHOOL WHEN I WOULD

1  HAVE PREFERRED PARTYING WITH MY FRIENDS.  I AM GLAD TO HAVE

2  THE SELF-CONFIDENCE AND CLARITY NOT TO DO WHAT LINDSEY

3  ALLOWED TREVOR TO DO TO HER.

4          HOWEVER, WITH THAT SAID, I APPLAUD LINDSEY THAT SHE

5  WAS ABLE TO STAND UP TO THIS MONSTER AND TO DO THE RIGHT

6  THING.  SHE DESERVES TO BE TREATED LIKE A HUMAN BEING AND

7  DESERVES TO BE PROTECTED UNDER THE D.V.P.A. FOR HERSELF AND

8  FOR OTHERS.  WHATEVER HAPPENS, LINDSEY HAS REVEALED WHO

9  TREVOR BAUER REALLY IS FOR ALL THE WORLD TO SEE.  HOPEFULLY

10  HE WILL GET HELP AND NOT DO THIS IN THE FUTURE UNDER THE

11  GUISE OF CONSENSUAL ROUGH SEX.

12          AS LINDSEY SAID IN HER LAST TEXT TO TREVOR,

13  "ALTHOUGH I APPRECIATE YOUR LAST MESSAGE, THE BEST THING YOU

14  CAN DO IS TO HELP ME TO NEVER DO WHAT YOU DID TO ME TO ANYONE

15  ELSE EVER AGAIN."  I THINK THAT THOSE WORDS WERE THE MOST

16  MATURE WORDS THAT WE READ OF ALL LINDSEY'S WRITTEN

17  COMMUNICATIONS.  AND DO I THINK SHE MEANT IT?  I THINK SHE

18  MEANT EVERY WORD OF IT.

19          THIS WAS NOT CONSENSUAL SEX BY ANY STRETCH OF THE

20  IMAGINATION.  IT WAS BRUTAL, INHUMANE, DISGUSTING, AND

21  VIOLENT.  BASED UPON THE EVIDENCE, WE WOULD ASK THAT THE

22  COURT ISSUE A FIVE YEAR RESTRAINING ORDER.  ALSO, ORDER

23  TREVOR INTO A 52 WEEK BATTERERS' PROGRAM.  AND ALSO MAKE

24  WHATEVER ORDERS THE COURT THINKS IS NECESSARY TO PROTECT

25  LINDSEY AND TO PROTECT OTHERS FROM FUTURE HARM.

26          ONE MORE POINT, YOUR HONOR -- AND I DON'T THINK

27  THIS IS A LARGE ONE -- BUT I JUST WANTED TO ADDRESS THE

28  COURT.  AS THE COURT IS AWARE, THERE IS NO NEED TO SHOW

1  FUTURE ABUSE.  AND THAT'S THE NEVAREZ VS. TONNA CASE, 227

2  CAL.APP.4TH 774.  THE FACT THAT LINDSEY WAITED FOR DAYS TO

3  FILE HER RESTRAINING ORDER, I THINK THE EVIDENCE SHOWED

4  LINDSEY WAS TRYING TO DO EVERYTHING THAT SHE COULD DO TO GET

5  THE POLICE'S ATTENTION.  SHE WENT TO HER SART EXAM.  SHE DID

6  HER FOLLOW-UP EXAM.  SHE COOPERATED WITH THE NURSE.

7          SHE COOPERATED WITH THE AUTHORITIES.  AND SHE

8  WASN'T GETTING WHAT SHE NEEDED FROM THE -- FROM LAW

9  ENFORCEMENT.  SO SHE DID WHAT SHE NEEDED TO DO.  AND, THAT

10  IS, SHE SOUGHT OUT A DOMESTIC VIOLENCE RESTRAINING ORDER

11  AFTER 45 DAYS.  IN OUR WORLD, I HAVE SEEN PEOPLE GET

12  RESTRAINING ORDERS AFTER SIX MONTHS OR LONGER.  SO IN MY

13  WORLD, I THINK 45 DAYS IS A VERY REASONABLE PERIOD OF TIME

14  GIVEN EVERYTHING THAT LINDSEY WAS TRYING TO DO DURING THAT

15  PERIOD OF TIME.

16          ALSO, IN TERMS OF LINDSEY'S HIDDEN AGENDA, SO TO

17  SPEAK, IN THIS CASE, LINDSEY INITIALLY DIDN'T WANT TO GO TO

18  THE HOSPITAL.  SHE DIDN'T WANT TO SEEK OUT ATTENTION.  WHEN

19  HER FRIEND MELY TOLD HER TO GO TO THE HOSPITAL, LINDSEY WAS

20  HESITANT AND DIDN'T GO TO THE HOSPITAL UNTIL THE NEXT

21  MORNING.  AND I WOULD REFER THE COURT TO EXHIBIT 12.

22          AND WHEN LINDSEY WENT TO THE HOSPITAL, SHE HAD TO

23  FIRST SPEAK TO A SOCIAL WORKER.  AND THAT SOCIAL WORKER HAD

24  TO CAJOLE HER INTO NAMING HER ABUSER, WHO SHE DID NOT WANT TO

25  NAME.  SO HER CONDUCT AGAIN IS NOT CONSISTENT WITH NEFARIOUS

26  CONDUCT.

27          AND WITH THAT, YOUR HONOR, I THANK YOU FOR YOUR

28  PATIENCE.  I THANK YOU FOR YOUR TIME.  AND I WOULD SUBMIT ON

1  THAT.

2      THE COURT:  THANK YOU.

3      MS. MEYER:  OH, YOUR HONOR, ONE OTHER THING.  WE

4  SUBMITTED A BRIEF.

5      THE COURT:  I READ THAT THIS MORNING.

6      MS. MEYER:  OKAY.  THANK YOU.

7      THE COURT:  MS. HOLLEY, IT'S A QUARTER UNTIL 10:00.  AND

8  I AM HAPPY TO HAVE YOU START.  I JUST WANT TO LET YOU KNOW

9  I'M GOING TO GIVE MY COURT REPORTER A BREAK FOR TEN OR

10  FIFTEEN MINUTES.  IF YOU'D LIKE TO BEGIN NOW AND THEN RESUME

11  AT 10:15 --

12      MS. HOLLEY:  CAN WE TAKE THE BREAK NOW?

13      THE COURT:  IF I DO, SHE'LL NEED ONE BEFORE NOON AGAIN.

14  I WANT TO MAKE SURE THAT SHE IS TAKEN CARE OF.

15      MS. HOLLEY:  WE'LL BE FINISHED BEFORE NOON FROM MY

16  STANDPOINT IF THAT'S --

17      THE COURT:  RIGHT.  BUT I GIVE HER A BREAK SOMETIME

18  BETWEEN 10:00 AND 10:30.  IF SHE TAKES ONE EARLY, SHE'LL NEED

19  ANOTHER ONE IN THE MIDDLE OF YOUR CLOSING.

20      MS. HOLLEY:  OKAY.  SO YOU WANT ME TO GO NOW?

21      THE COURT:  I SUGGEST YOU DO.

22      MS. HOLLEY:  SAY NO MORE.  GOOD MORNING.

23      THE COURT:  GOOD MORNING.

24      MS. HOLLEY:  LINDSEY HILL TOLD US OVER 12 HOURS OF

25  TESTIMONY, HUNDREDS OF TEXTS, DOZENS OF INSTAGRAM MESSAGES,

26  AND AT LEAST ONE TWEET WHO SHE IS.  SHE IS A 27-YEAR-OLD

27  BASEBALL FAN.  SHE IS A RECOVERING ALCOHOLIC.  SHE IS A

28  DAUGHTER, A COUSIN, A FRIEND.  SHE VERY OPENLY TOLD US THAT

1   SHE HAS PAST TRAUMA, LOW SELF-WORTH, CRIPPLING INSECURITY,

2   AND A NEED FOR ATTENTION, WHICH TENDS TO GET HER IN TROUBLE.

3            SHE SAYS THINGS THAT SHE DOESN'T MEAN.  AND SHE

4   PRETENDS TO BE SOMEONE THAT SHE IS NOT.  SHE TELLS LIES TO

5   IMPORTANT PEOPLE.  HER BEST FRIEND.  HER BOSS.  HER A.A.

6   SPONSOR.  AND WE'RE HERE TODAY BECAUSE OF THE LIES SHE TOLD

7   THE COURT IN HER PETITION -- DECLARATION, BECAUSE OF THE LIES

8   SHE TOLD TREVOR, AND ULTIMATELY BECAUSE OF THE LIES SHE TOLD

9   HERSELF.

10           LINDSEY LOVES BASEBALL AND SHE LOVES BASEBALL

11  PLAYERS.  SHE WAS INTRIGUED BY TREVOR.  SHE TOLD US THAT.

12  SHE TOLD HER FRIENDS THAT HE WAS HER CRUSH.  SHE TOLD HER MOM

13  THAT SHE LOVED HIM.  AND SHE STARTED TWEETING ABOUT HIM,

14  TAGGING HIM IN TWEETS.  SHE STARTED FOLLOWING HIM ON SOCIAL

15  MEDIA.  WATCHING HIS BASEBALL GAMES ON TV.

16           AND SO ON APRIL 18 WHEN SHE TAGGED HIM ON AN

17  INSTAGRAM STORY AND HE REPLIED, SHE WAS UNDERSTANDABLY VERY

18  EXCITED.  SO SHE TOLD HER FRIENDS ABOUT IT.  SHE TOOK

19  SCREENSHOTS OF THOSE DM'S -- DIRECT MESSAGES -- THAT SHE HAD

20  WITH TREVOR.  AND SHE SENT THOSE PRIVATE MESSAGES TO HER

21  FRIENDS OUT OF HER EXCITEMENT.

22           NOW, AS THE COURT WILL SEE, THE INSTAGRAM DM'S IN

23  THOSE EARLY DAYS BETWEEN THEM ARE REALLY VERY FUN TO READ.

24  LINDSEY HAS A GREAT KNOWLEDGE OF BASEBALL BY VIRTUE OF HER

25  GROWING UP WITH A DAD WHO IS A BASEBALL PLAYER AND COACH.

26  AND SO SHE IS ABLE TO, IN A VERY CLEVER WAY, MIX BASEBALL

27  BANTER WITH SORT OF SEXUAL INNUENDO AND FLIRTY IN A FUN WAY.

28  AND IN THOSE EARLY DM'S AND REALLY THROUGHOUT, SHE COMES

1  ACROSS AS EXTREMELY CONFIDENT, VERY SELF-ASSURED.

2       WITHIN TWO DAYS, SHE HAS MADE IT CLEAR IN

3  SELF-ASSURED CONFIDENT INSTAGRAM DM'S THAT SHE IS READY,

4  WILLING, AND ABLE TO DRIVE A 130 MILES FROM SAN DIEGO TO

5  PASADENA ON THE NIGHT OF APRIL 21ST TO SEE TREVOR AND SPEND

6  THE NIGHT AT HIS HOUSE.

7       SHE IS AWARE OF HIS DATING RULES.  NO FEELINGS.  NO

8  SOCIAL MEDIA.  AND HE IS GOING TO SLEEP WITH OTHER PEOPLE.

9  SO SHE TOLD US THAT TO REASSURE HIM THAT SHE UNDERSTOOD THESE

10 RULES.  SHE LET HIM KNOW THAT SHE WOULD HAVE HER NDA SIGNED

11 AND SEALED AND HER FEELINGS BUTTON SWITCHED OFF.  SHE TOLD

12 HIM NOT TO WORRY.

13      HE SAID, "YOU'RE SUCH A PRO.  THANK YOU."  BECAUSE

14 THAT'S WHAT SHE PORTRAYED HERSELF AS, A PRO.  SHE TOLD US

15 THAT, THAT THERE'S TWO SIDES.  THERE'S THE SIDE THAT SHE

16 PRESENTS TO THE WORLD, TO HER FRIENDS, EVEN HER CLOSE

17 FRIENDS, EVEN HER SPONSOR, CERTAINLY TO TREVOR, THAT SHE IS

18 THIS PRO.  THAT SHE IS TOUGH, SELF-ASSURED, AND CONFIDENT.

19 BUT SHE ALSO TOLD US THAT INSIDE SHE IS NONE OF THOSE THINGS.

20 SHE IS SCARED AND INSECURE AND SEEKING ATTENTION BUT SHE PUTS

21 ON A FRONT.  SHE PRETENDS.

22      IN CONTRAST, TREVOR IS EXACTLY WHO HE SAYS HE IS.

23 HE HAS STATED HIS RULES CLEARLY FOR THE ENTIRE WORLD TO SEE

24 IN SPORTS ILLUSTRATED, TO ALL THE READERS OF SPORTS

25 ILLUSTRATED.  AND APPARENTLY MS. HILL IS ONE OF THOSE

26 READERS.  SHE LET US KNOW SHE KNEW EXACTLY ABOUT THOSE RULES.

27 WHAT THEY WERE.

28      SO HE HAS MADE IT CLEAR TO THE WORLD, AND HE ALSO

551

1  MADE IT CLEAR TO HER.  SHE TESTIFIED THAT THEY TALKED ABOUT

2  IT.  SO SHE GOES TO HIS HOUSE THAT NIGHT, THE NIGHT OF APRIL

3  21ST, KNOWING WHO HE HAS HELD HIMSELF OUT TO BE.  WHO HE

4  TURNS OUT TO BE EXACTLY THAT.  SHE SAYS THAT SHE IS NERVOUS.

5  SHE WANTS TO IMPRESS HIM.  SHE IS INTIMIDATED.  SHE IS

6  SCARED, BECAUSE SHE KNOWS THERE'S THIS DUALITY.  SHE KNOWS

7  THAT INSIDE SHE IS NERVOUS AND SCARED, BUT OUTSIDE SHE SAID,

8  AND LET HIM KNOW, THAT SHE IS A PRO.

9        WHEN SHE GETS TO HIS HOUSE, HE IS VERY DIFFERENT

10 THAN SHE THOUGHT.  HE IS ON THE PHONE WHEN SHE COMES IN.  AND

11 HE KIND OF GIVES HER A ONE ARM GREETING.  AND THEN HE

12 CONTINUES ON THE PHONE CALL.  SHE'S TAKING A PICTURE OF

13 HERSELF THERE.  AND WHEN THEY SIT DOWN TO TALK, HE IS TALKING

14 ABOUT HIS CHILDHOOD, HIS PARENTS, ABOUT BEING BULLIED.

15 THINGS THAT HE HAS TALKED ABOUT IN SPORTS ILLUSTRATED HE IS

16 TALKING ABOUT TO HER.  HE IS NOT LOOKING AT HIS PHONE.  HE

17 DOESN'T DO DRUGS.  HE DOESN'T DRINK.

18       SHE SAYS HE IS KIND AND HE IS NOT JUDGMENTAL.  HE

19 IS A NICE GUY.  SHE WASN'T EXPECTING THAT.  SHE INTERPRETED

20 ALL OF THAT AS VULNERABILITY.  A VULNERABILITY SHE BELIEVED

21 WAS UNIQUE TO HER, THAT THIS INDICATED SOMETHING SPECIAL

22 ABOUT HER AND THIS RELATIONSHIP.  THE FACT THAT HE WAS

23 SHARING THESE THINGS WITH HER, SHE ATTACHED SIGNIFICANCE TO

24 THAT.  AND SHE BELIEVED THIS DEMONSTRATES THAT THERE IS AN

25 EMOTIONAL CONNECTION BETWEEN US.

26       SHE SAID SHE FELT AN EMOTIONAL CONNECTION FOR HIM.

27 NOW, SHE HAD TO ACKNOWLEDGE ON CROSS EXAMINATION THAT SHE

28 COULD NOT KNOW IF HE FELT AN EMOTIONAL CONNECTION TO HER.

552

1    BUT SHE BELIEVED THAT. SHE EITHER BELIEVED IT OR WANTED TO

2    BELIEVE IT, OR PERCEIVED IT, OR CONCOCTED IT. BUT THERE IS

3    NOTHING THAT TREVOR HAS DONE, WHICH SHOULD CAUSE HER TO

4    BELIEVE THAT. HE SIMPLY HAD A CONVERSATION WITH HER IN A WAY

5    THAT SHE WAS NOT EXPECTING, THAT SHE HAS NOW ATTACHED

6    SIGNIFICANCE TO AND CREATED AN EMOTIONAL CONNECTION THAT THEY

7    BOTH SHARE THAT WAS NOT THERE.

8         SHE ADMITTED THAT DURING THAT TIME OF TALKING HE

9    WAS NOT AFFECTIONATE WITH HER AT ALL. THEY SAT SIX FEET AWAY

10   FROM EACH OTHER ON THE COUCH. AND AFTER TALKING FOR SEVERAL

11   HOURS, IT'S 2:00 O'CLOCK IN THE MORNING. HE SAID, "I'M TIRED

12   AND I'M GOING TO BED. YOU'RE WELCOME TO STAY YOU CAN STAY IN

13   THE GUEST ROOM." SHE SAID, "I'D LIKE TO STAY IN THE

14   BEDROOM."

15        HE SAID, "THAT'S FINE. BUT I SLEEP NAKED." SHE

16   SAID, "THAT'S FINE WITH ME." AGAIN, PRESENTING HERSELF AS

17   THE PRO. THE TOUGH GIRL. LET'S GO. THEY'RE CUDDLING. THEY

18   BEGIN CONSENSUAL SEX. SHE NOTICES THAT HE GETS SLIGHTLY

19   AGGRESSIVE. SHE SEES THAT -- THIS IS EXACTLY WHAT SHE SAID.

20   "SLIGHTLY AGGRESSIVE." SHE SEES THAT HE APPEARS TO LIKE IT

21   ROUGH. AGGRESSIVE.

22        SO WHEN HE ASKED HER, "WHAT DO YOU LIKE? WHAT DO

23   YOU LIKE?" SHE TOLD HIM WHAT SHE THOUGHT HE LIKED. SHE TOLD

24   HIM WHAT SHE THOUGHT HE WANTED TO HEAR. SHE SAYS THAT

25   HERSELF ON THE STAND REPEATEDLY. "I TOLD HIM WHAT I THOUGHT

26   HE WANTED TO HEAR." SO SHE SAYS, "I LIKE IT A LITTLE ROUGH."

27   THAT'S NOT WHAT SHE MEANS. ON DIRECT EXAMINATION SHE SAYS,

28   "THAT'S NOT WHAT I MEANT, BUT I WANTED HIM TO THINK THAT."

1   HE DOESN'T KNOW HER.  SHE IS A 27-YEAR-OLD WOMAN.  HE IS A

2   30-YEAR-OLD MAN.  HE PRESUMES THAT SHE MEANS WHAT SHE SAYS.

3        SO WHEN SHE SAYS, "I LIKE IT A LITTLE ROUGH," HE

4   ACCEPTS THAT.  HE DOESN'T KNOW THERE'S SOME OTHER PERSON

5   HIDING INSIDE OF HER.  SO THEN SHE ASKED HIM WHAT HE LIKED,

6   BECAUSE THAT'S REALLY WHAT SHE CARES ABOUT.  WHAT HE LIKES.

7        AND HE TOLD HER, "I LIKE IT ROUGHER THAN YOU."

8   NOW, AT THAT POINT SHE DOESN'T SAY, WELL, I DON'T WANT IT

9   ROUGHER THAN I LIKE IT; OR I DON'T WANT IT TO BE ROUGH AT

10  ALL; OR I AM NOT COMFORTABLE WITH THAT; OR WHAT DO YOU MEAN?

11  SHE DOESN'T SAY ANY OF THOSE THINGS.

12       HE ASKS HER IF SHE HAD BEEN CHOKED DURING SEX.

13  NOW, SHE TELLS US THAT WHAT IN HER MIND SHE IS THINKING THAT

14  IN THE PAST SOMEBODY HAS LIGHTLY PUT THEIR HANDS ON HER NECK.

15  THAT'S WHAT SHE IS THINKING INSIDE.  SHE DOESN'T SAY THAT.

16  SHE DOESN'T SAY, I DON'T KNOW.  THIS HAPPENED BEFORE.  SHE

17  SAYS, "YES."  AND SHE SAYS "YES" BECAUSE SHE THINKS THAT'S

18  WHAT HE WOULD WANT TO HEAR.

19       SO SHE SAYS YES, BECAUSE SHE IS TRYING TO IMPRESS

20  HIM.  SHE SAYS SO REPEATEDLY ON DIRECT EXAMINATION.  THAT'S

21  WHY SHE IS SAYING THINGS SHE DOESN'T MEAN.  AGAIN, HE DOESN'T

22  KNOW HER.  SO WHY WOULD HE EXPECT THAT SHE SAID ANYTHING

23  OTHER THAN WHAT SHE MEANS WHEN HE IS ASKING HER DIRECTLY.

24       SHE DOESN'T QUALIFY IT.  SHE SAYS, "YES, I HAVE

25  BEEN CHOKED DURING SEX."  SHE DIDN'T SAY, I DON'T LIKE IT.  I

26  DIDN'T LIKE IT.  PLEASE DON'T DO IT.  I'M NOT INTO IT.  NONE

27  OF THAT.  SO AS THE SEX PROGRESSES, HE PUTS HIS FINGERS DOWN

28  HER THROAT.  SHE MOTIONS FOR HIM TO STOP.  AND HE IMMEDIATELY

1    STOPS.  IMMEDIATELY.

2            SO SHE NOW UNDERSTANDS THAT IF SHE SAYS OR MOTIONS

3    TO STOP, THAT'S APPARENTLY WHAT HE IS GOING TO DO.  HE IS

4    LISTENING TO HER.  HE IS DOING WHAT SHE ASKS OF HIM.  HE IS

5    STOPPING WHEN SHE WANTS HIM TO STOP.

6            HE WRAPS HER HAIR AROUND HER NECK AND SHE GOES

7    UNCONSCIOUS, SHE SAYS, FOR SEVERAL SECONDS.  NOW, AGAIN, HE

8    HAS ASKED HER BEFOREHAND, "WHAT DO YOU LIKE?  HAVE YOU BEEN

9    CHOKED?"  HE HAS GIVEN HER AN OPPORTUNITY TO TELL HIM WHAT

10   SHE DOES AND DOES NOT WANT.  SHE DOES NOT TAKE IT, BECAUSE

11   SHE WANTS TO SAY WHAT HE WANTS TO HEAR.

12           NOW, SHE SAYS THAT WHEN SHE COMES TO SECONDS LATER,

13   THAT HE IS HAVING ANAL SEX WITH HER WITHOUT LUBRICANT.  NOW,

14   THAT IS NOT BELIEVABLE TO ME.  IT IS NOT BELIEVABLE TO ME FOR

15   A COUPLE OF REASONS.  ONE, THAT LINDSEY HAS ADMITTED TO BEING

16   DISHONEST AND HAS DEMONSTRATED HER DISHONESTY ON MANY

17   OCCASIONS.  BUT THERE'S ALSO NO PHYSICAL CORROBORATION OF

18   THAT.  THERE'S NO CORROBORATION FROM ANYONE ELSE OF THAT.  IT

19   SEEMS IMPOSSIBLE.

20           SHE HAS A ZOOM CONVERSATION THERE IN THE MORNING.

21   IT DEFIES CREDULITY, IN MY VIEW.  LET'S TAKE HER AT HER WORD,

22   THAT HE WAS HAVING ANAL SEX WITH HER WHEN SHE CAME TO.  SHE

23   SAYS SHE SAID "STOP" AND HE STOPPED.  SO NOW IN HER

24   EXPERIENCE, A 100 PERCENT OF THE TIME THAT SHE SAYS DON'T DO

25   SOMETHING, STOP THAT, HE DOES IT.  HE STOPS IT.

26           SHE SAYS THAT SHE IS SHAKEN UP.  HE HOLDS HER.

27   ASKS HER IF SHE IS OKAY.  SHE SAYS SHE NEEDS A MINUTE.  SHE

28   SAYS HE GIVES HER TEN OR FIFTEEN MINUTES AND STARTS TO

555

1   REINITIATE SEX WITH HER, WHICH SHE AGREES TO.  NORMAL VAGINAL
2   SEX.  THEY RESUME.  AND THAT OCCURS.
3         SHE SAYS SHE WAS EMBARRASSED THAT SHE COULD NOT
4   LIVE UP TO WHAT HE WANTED AND DID NOT WANT TO THROW AWAY WHAT
5   HAD HAPPENED IN THE EARLIER PART OF THE EVENING.  SO SHE
6   PRETENDED THAT EVERYTHING WAS OKAY.  PRETENDING IS A LIE.
7   PRETENDING TO BE SOMETHING THAT YOU ARE NOT TO THIS PERSON
8   WHO DOES NOT KNOW YOU, AND ONLY KNOWS WHAT YOU ARE
9   PRESENTING, IS A LIE.
10        SHE WANTS TO IMPRESS HIM.  SHE STILL WANTS TO
11  IMPRESS HIM.  WHEN SHE LEAVES, SHE TELLS HER BEST FRIEND HE
12  IS AN AMAZING HUMAN.  AND SHE MEANT IT.  SHE SAID SHE MEANT
13  IT.  SHE FELT THAT.
14        NOW, PRIOR TO GOING TO HIS HOUSE ON APRIL 21ST, SHE
15  HAD TOLD DEREK DAWSON AND HER COUSIN KYLE SHE WOULD GET IN
16  HIS HEAD, THAT SHE JUST WANTS THE DICK.  AND, BY THE WAY,
17  JUST FOR MS. MEYER'S SAKE, I DON'T HAVE ANY JUDGMENT AT ALL
18  ABOUT ANY OF THE WORDS.  AND MY POINT IN SAYING I GET TO SAY
19  THEM WAS NOT I WAS SAYING ANYTHING JUDGMENTAL ABOUT LINDSEY'S
20  USE OF THOSE WORDS AT ALL.  SO PLEASE UNDERSTAND THAT.
21        SHE IS GOING TO GET IN HIS HEAD.  SHE JUST WANTS
22  THE DICK.  SHE KNOWS WHAT SHE IS DOING.  SHE IS GOING TO GET
23  HER HOOKS IN.  YOU KNOW HOW I ROLL.
24        NOW, WE HAVE ALL THIS COMMUNICATION BECAUSE DEREK
25  BROUGHT IT FORTH.  AND WHEN WE'RE READING IT, WE DON'T KNOW
26  WHAT IT MEANS.  IT LOOKS NEFARIOUS.  IT LOOKS SINISTER.  SHE
27  IS GOING TO GET IN HIS HEAD.  YOU KNOW HOW I ROLL.  I KNOW
28  WHAT I'M DOING.  I READ THAT, AND THAT SEEMS TO ME TO BE A

1  PLOT AND A PLAN.  I DON'T KNOW.

2          I DON'T GET TO KNOW UNTIL I QUESTION HER OR HEAR

3  WHAT SHE SAYS ABOUT THAT.  SO I -- AND, YOU KNOW, I STILL

4  DON'T KNOW.  I DON'T KNOW IF MS. HILL KNOWS EXACTLY WHAT SHE

5  WAS DOING.  SHE WAS DOING A LOT OF THINGS.  BUT I CANNOT

6  STAND HERE TODAY BEFORE THIS COURT AND SAY THAT I BELIEVE

7  THAT SHE HAD CONCOCTED SOME NEFARIOUS PLAN.  I DIDN'T KNOW.

8  I JUST KNOW THAT SHE IS SAYING TO HER FRIENDS AND TO HER

9  COUSIN, "I'M GOING TO GET IN HIS HEAD.  YOU KNOW HOW I ROLL.

10  I JUST WANT THE DICK."

11          IT'S ALSO HARD TO KNOW BECAUSE WHILE SHE IS HAVING

12  THIS COMMUNICATION WITH TREVOR ON DM, SHE IS MAKING FUN OF

13  HIM TO HER FRIENDS BEHIND HIS BACK.  SHE IS LAUGHING AT THE

14  FACT THAT HE HAS GOT A PLANT IN THE BACKGROUND OF THE SELFIE

15  SHE HAS TAKEN.  SHE IS CALLING IT AT SOME POINT A SOB STORY

16  WHEN HE IS SAYING THINGS TO HER.  SO IT'S HARD TO KNOW

17  EXACTLY WHAT SHE IS DOING.

18          BUT HERE IS WHAT WE DO KNOW -- BECAUSE SHE TOLD US

19  THIS ON THE STAND REPEATEDLY ON DIRECT, ON CROSS, THROUGHOUT

20  ALL OF THESE INSTAGRAMS AND TEXTS WITH TREVOR -- WE KNOW SHE

21  STILL WANTS TO BE WITH TREVOR AND SHE STILL WANTS TO IMPRESS

22  HIM.  SHE WANTS TO DATE HIM.  SHE WANTS TO FORGET THE SEX

23  PART, WHICH SHE CALLS DISASSOCIATION.  SHE STILL BELIEVES

24  THEY HAVE AN EMOTIONAL CONNECTION, EVEN THOUGH WHAT HAPPENED

25  IN BED WAS ANYTHING BUT.

26          SHE SAYS SHE CONSIDERED THAT A DATE.  THOUGH, THEY

27  ATE NO FOOD, HAD NOTHING TO DRINK, NO AFFECTION, NO EXCHANGE

28  OF PHONE NUMBERS.  SEX WAS ANYTHING OTHER THAN ROMANTIC.  BUT

1    BECAUSE SHE HAS, IN HER OWN MIND, DETERMINED THAT HIS

2    WILLINGNESS TO SPEAK ABOUT THINGS THAT SHE DIDN'T EXPECT HIM

3    TO SPEAK ABOUT MEANS THAT THERE IS AN EMOTIONAL CONNECTION

4    BETWEEN THEM.  AND THIS MUST BE A DATE.  AND THIS MUST MEAN

5    SOMETHING TO HIM, TOO.  EVEN THOUGH HE HAS MADE IT CLEAR, NO

6    FEELINGS.

7         I SAID, "DID HE EVER DISAVOW THAT?  DID HE EVER SAY

8    TO YOU THAT ONE IS NO LONGER APPLICABLE TO US?"  AND SHE

9    SAYS, "NO.  BUT I COULD TELL THAT IT WAS BECAUSE THE FACT

10   THAT HE OPENED UP AND WAS VULNERABLE.  SO I REALIZED THAT THE

11   NO FEELINGS DIDN'T APPLY TO ME.  DIDN'T APPLY TO US."

12        THE COURT:  OKAY.  IT'S ABOUT FIVE AFTER.  LET'S TAKE

13   OUR BREAK.  LET'S START BACK IN AT 20 AFTER.

14        MS. HOLLEY:  THANK YOU.

15        THE COURT:  THANK YOU.

16             (RECESS TAKEN.)

17        THE COURT:  ALL RIGHT.  MS. HOLLEY, YOU MAY RESUME.

18        MS. HOLLEY:  THANK YOU.

19        I THINK IT'S PROBABLY CLEAR, BUT I JUST WANT TO

20   MAKE IT CLEAR IN CASE IT ISN'T, THAT THE THREE RULES -- WE'LL

21   CALL IT THE THREE DATING RULES BY SPORTS ILLUSTRATED --

22   CERTAINLY WAS NOT TREVOR CHARACTERIZING HIS THREE RULES.

23        MS. MEYER:  OBJECTION, YOUR HONOR.  THERE'S NO

24   TESTIMONY.

25        THE COURT:  THAT IS NOT EVIDENCE, OF COURSE.

26        MS. HOLLEY:  SO I WAS TALKING ABOUT THAT IT'S UNCLEAR

27   EXACTLY WHAT LINDSEY IS DOING, BECAUSE SHE IS POKING FUN

28   BEHIND TREVOR'S BACK.  YET SHE IS SAYING NICE THINGS TO HIM.

558

1   SHE IS TELLING HIM WHAT HE WANTS TO HEAR.  SO I DON'T KNOW.

2   BUT AFTER THAT FIRST NIGHT TOGETHER, HE DOESN'T REACH OUT TO

3   HER.  BUT SHE REACHES OUT TO HIM.  I THINK THAT MS. MEYER

4   MISSPOKE WHEN SHE SAID THERE WERE CALLS BECAUSE THERE WERE

5   NOT.

6          THIS IS ALL TAKING PLACE ON INSTAGRAM DIRECT

7   MESSAGE.  AND LINDSEY SENDS TREVOR VIDEOS, WHICH WE DON'T

8   HAVE, OF WHAT SHE SAYS WERE SMALL BRUISES ON HER BOTTOM.  AND

9   HE SAYS IN RESPONSE TO THAT, "WHAT ON EARTH WAS THAT FROM?"

10  SHE LAUGHS "HAHAHAHA" IN WRITING.  "YOU GOT ME GOOD."

11  TREVOR, "WHAT IS IT?"  SHE SAYS, "I HAVE NO IDEA.  PROBABLY

12  YOUR THUMB.  LOL.  JUST A BRUISE IN THE SHAPE OF A

13  FINGERPRINT."  "WHERE AT?"  SHE SAYS, "RIGHT BUT MY PRIZED

14  POSSESSION."  HE SAYS, "OH GOSH.  I DON'T KNOW IF THAT WAS ME

15  OR NOT, BUT SORRY IF IT WAS."  SHE SAYS, "U GUCCI.  I'M INTO

16  IT."

17         NOW, THERE IS NO OTHER INTERPRETATION WITHIN THE

18  CONTEXT OF THAT BACK AND FORTH BESIDES I LIKED WHAT YOU DID

19  THAT CAUSED THAT.  NOW, SHE TRIED TO SAY, "U GUCCI.  I'M INTO

20  IT," MEANT SOMETHING ELSE.  BUT WHEN HE IS SAYING, "IF I DID

21  THAT, I AM SORRY," AND SHE SAYS, "U GUCCI, I'M INTO IT," THAT

22  IS AN EXPRESSION OF PLEASURE, ENCOURAGEMENT, POSITIVE

23  REINFORCEMENT.  NO OTHER INTERPRETATION.

24         THERE'S NO DISCUSSION ABOUT SEEING EACH OTHER

25  DURING THAT TIME.  AND AT SOME POINT SHE GIVES HIM HER CELL

26  PHONE NUMBER.  HE DOESN'T ASK FOR IT.  SHE GIVES IT TO HIM.

27  AND WHEN HE USES IT TO TEXT HER, SIMPLY CHANGING ONE FORM OF

28  COMMUNICATION TO ANOTHER WRITTEN FORM OF COMMUNICATION TO

```
 1   ANOTHER, SHE INTERPRETS THAT AS THE RELATIONSHIP IS NOW GOING
 2   TO THE NEXT LEVEL.
 3          AGAIN, THIS IS IN HER HEAD.  EITHER HER PERCEPTION,
 4   HER BELIEF, HER WISHES.  THAT'S HOW SHE INTERPRETS THAT.
 5   NOW, ON MAY 9TH SHE SAYS IT WAS A GAME CHANGER WHEN SHE WAS
 6   CHOKED OUT.  SHE WANTS TO BE CHOKED OUT.  SHE HAS NEVER BEEN
 7   MORE TURNED ON IN HER LIFE THAN WHEN SHE WAS CHOKED OUT.
 8          "GIMME ALL THE PAIN.  GET A COUPLE OF SLAPS IN
 9   THERE.  ANOTHER HANDPRINT ON MY ASS.  AND THEN PAPI TELL ME
10   WHAT ELSE HE WANTS."  "SLAPS IN THE FACE OR?"  "YES YES AND
11   YES."  DO YOU EVEN KNOW WHAT PAIN IS?"  "I DON'T KNOW.  TRY
12   ME."  "WELL, YOU HAVE TO BE HERE."
13          AT WHICH POINT SHE THEN STARTS TRYING TO GET THERE.
14   SHE MAKES SEVERAL SUGGESTIONS.  ALL OF WHICH HE DECLINES.
15   WHAT ABOUT THIS NIGHT?  NO.  SOMEONE ELSE IS COMING OVER THAT
16   NIGHT.  WHAT ABOUT THIS NIGHT?  SOMEBODY IS COMING FROM OUT
17   OF TOWN.  WHAT ABOUT THIS NIGHT?  NO, THAT DOESN'T WORK.  I
18   PITCH THE NEXT DAY.
19          SO FINALLY THEY AGREE ON MAY 15.  THAT DAY, THE DAY
20   THAT THEY AGREE SHE IS GOING TO COME OVER THAT NIGHT, ON TEXT
21   HE SAYS, "AM I GOING TO WRECK YOU," BASED ON THE NUMEROUS
22   INDICATIONS THAT THAT'S WHAT SHE WANTS GIVEN THAT SHE SAID
23   REPEATEDLY THAT'S WHAT SHE WANTS.  SHE SAYS, "ABSOLUTELY YOU
24   ARE."
25          NOW, MS. MEYER ASKED HER ON DIRECT EXAMINATION WHY
26   SHE SAID ALL OF THOSE THINGS TO HIM.  SHE SAID, "I WAS
27   COMMUNICATING TO HIM NOT HOW I ACTUALLY FELT, BUT I WAS
28   TELLING HIM WHAT HE WANTED TO HEAR."  SHE ASKED, "WHY DID YOU
```

1    DO THAT?"  "BECAUSE I WAS FIXATED ON GETTING HIM TO WANT TO
2    SEE ME AGAIN."  WHY -- MS. MEYER, "WHY WOULD YOU WRITE
3    SOMETHING LIKE THAT TO SOMEBODY WHO YOU HAD FEELINGS FOR IF
4    YOU DIDN'T FEEL THAT WAY?"

5          "I WAS JUST GOING WITH THE FLOW.  I COULD TELL THAT
6    CHOKING IS SOMETHING THAT HE REALLY LIKES.  WHEN HE SAID TELL
7    ME MORE, I DIDN'T KNOW WHAT TO SAY BESIDES THAT I HAD NEVER
8    BEEN MORE TURNED ON IN MY LIFE.  I TRIED TO LIGHTEN THE MOOD
9    AT THE END BY SAY THE WORD, RAWR, WHICH IS A WORD I SAY A
10   LOT.  BUT REALLY I WAS JUST GOING WITH THE FLOW TELLING HIM
11   WHAT HE WANTED TO HEAR BECAUSE I KNEW HE WAS INTO ROUGH SEX."

12         NOW, SHE HAS TOLD US REPEATEDLY THAT THERE'S TWO
13   PEOPLE.  SO THE AMBASSADOR IS THE ONE WHO IS PRESENTING
14   HERSELF TO TREVOR AS THE TOUGH CHICK.  THE SCARED LITTLE GIRL
15   IS INSIDE.  BUT, AGAIN, THEY DON'T EVEN KNOW EACH OTHER.  SO
16   HE DOESN'T KNOW THAT.  OKAY.  SHE -- BECAUSE THEY ARE ADULTS,
17   HE IS TAKING HER AT HER WORD.

18         SO SHE GETS THERE AT MIDNIGHT.  THEY TALK FOR A
19   COUPLE OF HOURS.  AND HE ASKS HER IF SHE WANTED TO GO TO HIS
20   ROOM.  SHE SAYS "YES."  THEY BEGIN HAVING SEX.  HE SAYS,
21   "LET'S AGREE ON A SAFE WORD."  SHE TELLS US SHE KNOWS WHAT
22   THAT MEANS.  SO BY ASKING THAT QUESTION, PARAMETERS ARE BEING
23   SET.  LET ME KNOW SINCE WE ARE ENGAGING IN ROUGH SEX WHAT
24   SAFE WORD YOU WANT TO USE TO LET ME KNOW WHAT IS NOT OKAY.

25         SHE GIVES HIM A SAFE WORD.  IN FACT, SHE ULTIMATELY
26   USES THE SAFE WORD.  SHE UNDERSTANDS THE CONCEPT OF IT, AND
27   IT WORKS.  ALSO, IT HAS ALREADY BEEN DEMONSTRATED WHEN SHE
28   SAYS "STOP," HE STOPS.  WHEN SHE MOTIONS "STOP," HE STOPS.

1  AND NOW THERE'S A SAFE WORD.  YET ANOTHER PLAN, PARAMETER,

2  BOUNDARY.  "STOP."  HE ALSO ASKS, "WHAT'S OFF LIMITS?"  HE IS

3  A GROWN-UP.  HE IS AN ADULT.  AS IS SHE.  AND SHE HAS

4  PRESENTED HERSELF AS A TOUGH PRO GROWN-UP.

5        SO WHEN HE SAYS TO HER, "WHAT'S OFF LIMITS," HE IS

6  ASKING HER, WHAT DO YOU NOT WANT ME TO DO?  AND THE ONLY

7  THING SHE SAYS IS "DON'T PUT YOUR FINGERS DOWN MY THROAT."

8  SHE PRESUMES THAT HE ALREADY KNOWS THAT SHE WASN'T INTO THE

9  ANAL SEX.  AND HE DOESN'T TRY TO HAVE ANAL SEX WITH HER.

10        WHAT SHE DOESN'T SAY IS, DON'T CHOKE ME.  DON'T HIT

11  ME.  DON'T SLAP ME.  DON'T CAUSE ME PAIN.  DON'T PUT A

12  HANDPRINT ON MY ASS.  AND GUESS WHAT?  SHE SAID SHE WANTED

13  ALL THOSE THINGS.

14        NOT ONLY DID SHE NOT SAY, DON'T DO THIS, SHE

15  ALREADY SAID, DO THIS.  I WANT THIS.  I WANT YOU TO DO THESE

16  THINGS TO ME.  I WANT YOU TO DO THEM MORE THAN YOU DID THEM

17  THE LAST TIME.  AND THE LAST TIME YOU WRAPPED YOUR HAIR -- MY

18  HAIR AROUND MY NECK AND CHOKED ME OUT.  I'VE NEVER BEEN MORE

19  TURNED ON.

20        NEVER BEEN MORE TURNED ON.  AND WHY IS SHE SAYING

21  THAT?  BECAUSE SHE WANTS HIM TO LIKE HER.  AND SHE WANTS TO

22  MAKE UP FOR -- SHE SAID THIS -- WHAT SHE THOUGHT WAS AN

23  EMBARRASSING AND LESS THAN SATISFYING PRIOR EXPERIENCE.

24  AGAIN, HOW DID HE KNOW THAT?  HE IS TAKING HER AT HER WORD.

25  HE IS ASKING HER WHAT HE SHOULD NOT DO.

26        SO SHE SAYS HE PUNCHED HER VAGINA AND HER FACE.

27  SCRATCHED HER.  NOW, THE MEDICAL EVIDENCE PRESENTED BY OUR

28  EXPERT, DR. HAMMERS, SAYS THAT WHAT SHE OBSERVED IS NOT

 1   CONSISTENT WITH THE SERIOUSNESS OF THE CLAIMS MADE BY
 2   LINDSEY.  WITH THAT SAID, I'M SURE IT WAS PAINFUL AND
 3   UNPLEASANT FOR HER.  AND THAT IS UNFORTUNATE.
 4        I'M NOT MAKING EXCUSES FOR THAT.  BUT SHE ASKED FOR
 5   THESE THINGS.  SHE ASKED FOR IT TO ROUGH.  SHE ASKED TO BE
 6   CHOKED OUT.  SHE SAID SHE LIKED IT.  HE ASKED HER, WHAT
 7   SHOULDN'T I DO?  SHE DID NOT TELL HIM, DON'T DO THESE THINGS.
 8        SHE SAID EXACTLY THE OPPOSITE OF ALL OF THAT.  WHEN
 9   SHE SAYS THE SAFE WORD, HE IMMEDIATELY STOPS.  WHEN HE SAW
10   HOW SHAKEN SHE WAS, HE HELD HER.  ASKED HER IF SHE WAS OKAY.
11   HE TOLD HER, "I WOULD NEVER DO THESE THINGS IF IT WASN'T IN A
12   SEXUAL CONTEXT," WHICH I THINK IS BELIEVABLE AND CLEAR GIVEN
13   THAT THIS IS A ROUGH SEX -- THE SECOND OF TWO ROUGH SEX
14   ENCOUNTERS.
15        SHE FINALLY TOLD HIM THE TRUTH, THAT SHE HAD NEVER
16   BEEN HIT BEFORE.  FOR THE FIRST TIME SHE TELLS HIM SOMETHING
17   TRUE ABOUT HER SEXUAL EXPERIENCE WITH RESPECT TO ROUGH SEX.
18   SO SHE TAKES A PICTURE OF HERSELF.  AND SHE SENDS THAT
19   PICTURE TO KYLE.  AND SHE TELLS MELY AND KYLE AND LISA THAT
20   IT WAS CONSENSUAL ROUGH SEX.  BUT SHE WONDERS LAUGHINGLY IF
21   IT WENT TOO FAR.
22        AND SHE WONDERS IF IT'S HER FAULT THAT IT WENT TOO
23   FAR.  AND IT'S SMART TO WONDER THAT.  I UNDERSTAND WHY SHE
24   WONDERED THAT, BECAUSE SHE DID PLAY A PART IN THAT BY NOT
25   SPEAKING UP FOR HERSELF.  SHE TOLD KYLE THAT TREVOR FELT BAD
26   AND SHE BELIEVED THAT.  SHE BELIEVED THAT HE FELT BAD THAT
27   SHE WAS SHAKEN UP, THAT SHE HAD A MARK.  SHE BELIEVED THAT.
28   AT SOME POINT SHE DECIDED SHE DIDN'T BELIEVE THAT ANYMORE.

1  BUT THAT'S, AGAIN, IN HER OWN HEAD.

2          AT THE HOSPITAL SHE SAYS, "I WAS AT HIS HOUSE IN

3  PASADENA.  I WENT OVER AT MIDNIGHT.  WE HUNG OUT AND TALKED

4  JUST AS FRIENDS.  WE WENT UPSTAIRS AND WE STARTED MAKING OUT.

5  WE HAD HOOKED UP ONCE BEFORE.  AND I KNOW HE IS INTO ROUGH

6  SEX."  RIGHT.  CORRECT.

7          SHE SAID -- WELL, FIRST SHE LIES TO MELY, HER BEST

8  FRIEND, ABOUT WHEN IT HAPPENED.  AND SHE IS LYING, I GUESS,

9  TO HER BEST FRIEND AND HER BOSS, BECAUSE SHE'S TAKEN OFF FROM

10 WORK.  SO SHE TELLS MELY THAT IT REALLY HAPPENED THREE NIGHTS

11 AGO, EVEN THOUGH IT JUST HAPPENED 30 MINUTES BEFORE THAT SHE

12 HAS LEFT THE HOUSE.  SHE TELLS LISA, BECAUSE LISA WAS

13 DISAPPROVING, HER SPONSOR -- WHERE HONESTY IS THE CORNERSTONE

14 AND FRAMEWORK OF THE RELATIONSHIP -- SHE LIES TO LISA ABOUT

15 WHERE IT HAPPENS.  SHE SAYS HE CAME DOWN TO SAN DIEGO.  SHE'S

16 LYING ABOUT ALL OF IT.

17          AND THEN SHE GETS MAD WHEN TREVOR DOESN'T REACH OUT

18 TO HER.  SO SHE SENDS A PICTURE FROM THE HOSPITAL TO SHOW HIM

19 HER INJURIES.  BUT THEN LATER SHE SAYS, "I WAS SCARED ABOUT

20 WHAT HE WOULD DO IF HE KNEW I WAS IN THE HOSPITAL."  BUT SHE

21 IS THE ONE WHO TELLS HIM AND SHOWS HIM SHE IS IN THE

22 HOSPITAL.

23          SHE SAYS THAT SHE WANTS TO SHOW HIM HER INJURIES,

24 BUT THERE'S NO PICTURE OF THE SCRATCHES THAT SHE CLAIMS TO

25 HAVE.  AFTER SHE SPEAKS WITH HIM -- AND I THINK THIS IS THE

26 VERY FIRST TIME THEY SPEAK ON THE PHONE.  SHE SEEMS TO FEEL

27 BETTER THAT SHE TALKED TO HIM.  AND SHE SENDS A VERY FLIRTY,

28 SMILEY HAPPY PICTURE OF HERSELF IN THE HOSPITAL.  SHE IS

1  SMILING.  HER HAIR IS UP IN A LITTLE THING.

2        SHE HAS NICE MESSAGE TO HIM ABOUT PLAYING WITH HER

3  HAIR.  AND HE CONTINUES TO BE THE NICE GUY THAT HE HAS ALWAYS

4  BEEN, THAT HE IS ASKING HER WHAT SHE WANTS.  STOPPING WHEN

5  SHE DOESN'T WANT.  TALKING TO HER AT LENGTH.  DIFFERENT THAN

6  SHE THOUGHT.  SO HE CALLS HER BECAUSE HE IS A NICE GUY.  HE

7  IS WORRIED ABOUT HER BECAUSE SHE IS IN THE HOSPITAL.

8        HE NEVER ONCE SAYS, YOU DIDN'T TELL ANYBODY ABOUT

9  ME; RIGHT?  YOU DIDN'T TELL ANYBODY ABOUT WHAT HAPPENED WITH

10 US?  HE DOESN'T SAY ANY OF THAT.  THAT'S NOT THE PURPOSE OF

11 HIS CALL TO MAKE SURE THAT HE SAFE.  NOT AT ALL.  HE IS

12 CHECKING ON HER.  HE ASKED, "CAN I SEND YOU SOMETHING?"

13 BECAUSE OBVIOUSLY SHE IS IN THE HOSPITAL.

14        SHE SAYS ON THE STAND THAT SHE'S ASHAMED AND

15 CONFUSED AS TO WHETHER IT'S HER FAULT OR NOT.  NOW,

16 UNBEKNOWNST TO HIM, AT SOME POINT SHE IS WORKING WITH THE

17 POLICE AND SHE HAS A PRETEXT CALL OR A COLD CALL.  AND

18 THERE'S NOTHING SHE SAYS -- I HAVEN'T HEARD THE CALL -- BUT

19 THERE'S NOTHING SHE SAYS THAT INDICATES HE SAYS ANYTHING

20 INCRIMINATING IN THAT CALL AT ALL DESPITE HER BEST EFFORTS,

21 WITH THE HELP OF THE POLICE, TO GET HIM TO DO SO.  HE DOES

22 NOT.

23        SHE THEN DECIDES AT SOME POINT HE MUST PAY.  HE

24 MUST BE HELD ACCOUNTABLE.  AND SHE ADMITS THAT HER FEAR OF

25 HIM IS BASED ON HIS FINDING OUT THAT SHE FILED FOR A

26 RESTRAINING ORDER.  SHE DOESN'T HAVE ANY FEAR OF HIM BEFORE

27 THEN.  THE FEAR IS BASED ON THE FILING OF THE RESTRAINING

28 ORDER.

565

```
 1        JUST LIKE THE CONCERN AT THE HOSPITAL IS BASED ON
 2   HER OWN TELLING HIM THAT SHE IS IN THE HOSPITAL.  SHE THEN
 3   FILES FOR A DOMESTIC VIOLENCE RESTRAINING ORDER.  AND IN SO
 4   DOING, SHE PRESENTS AN INCREDIBLY MISLEADING ACCOUNT OF WHAT
 5   HAPPENED.  IT IS SO MISLEADING THAT I FIRST ASKED ABOUT A LIE
 6   OF OMISSION, BECAUSE THE WAY SHE DESCRIBES WHAT HAPPENED AND
 7   WHAT SHE LEAVES OUT COMPLETELY CHANGES THE NARRATIVE AND THE
 8   TRUTH.
 9        SHE LEAVES OUT KEY FACTS LIKE THAT SHE SPECIFICALLY
10   TOLD HIM THAT SHE WANTED TO BE TREATED MORE -- WE'LL USE THE
11   WORD "VIOLENTLY" -- THAN THE FIRST TIME THEY WERE TOGETHER.
12   BY LEAVING THAT OUT, THAT PRESENTS A FALSE NARRATIVE ABOUT
13   WHAT HE IS DOING AND WHY HE IS DOING IT.  PART OF WHAT HE IS
14   DOING IT -- PART OF WHAT HE IS DOING AND PART OF WHY HE IS
15   DOING IT IS BECAUSE HE HAS HAD A MATURE ADULT CONVERSATION
16   WITH LINDSEY ABOUT IT.  AND SHE HAS MORE THAN ACQUIESCED.
17   SHE HAS ENCOURAGED IT.
18        NOT ONLY DOES SHE LEAVE THAT OUT COMPLETELY OF HER
19   PETITION, BUT WHEN I ASK HER, "DIDN'T YOU THINK THAT WAS
20   IMPORTANT," SHE SAYS "NO."  THE ONLY THING SHE THINKS IS
21   IMPORTANT IS THAT SHE WENT TO THE HOSPITAL.  NONE OF THE
22   THINGS THAT HAPPENED THAT PRECEDED THAT ARE IMPORTANT TO HER.
23   SHE WENT TO THE HOSPITAL.  AND THAT'S ALL THAT MATTERS.
24        SHE STARTS OFF THE FALSE NARRATIVE.  THIS MAY HAVE
25   SEEMED LIKE A SMALL THING, BUT FROM MY STANDPOINT, IT SETS
26   THE ENTIRE CONTEXT.  BASICALLY THAT HE PURSUED HER, THAT HE
27   IS INVITING HER OVER AND SHE IS SIMPLY ACQUIESCING TO COME
28   OVER, WHICH ISN'T ACCURATE.  IT ISN'T ACCURATE AT ALL.
```

1    AND THE POINT ABOUT THE PHOTOGRAPH IS THAT IT IS
2  NOT REFLECTIVE, AS SHE ACKNOWLEDGED -- THE EXHIBIT THAT SHE
3  INCLUDES IN HER RESTRAINING ORDER PETITION -- OF HOW SHE
4  LOOKED.  SHE HAS A RED FACE.  SHE HAS BLACK EYE IRISES.  I
5  THINK THAT'S -- AND SO IT LOOKS WORSE.  IT'S JUST PART OF THE
6  FALSE NARRATIVE PRESENTED TO THE COURT TO CAUSE THE COURT IN
7  READING THE PETITION AND DECIDING WHETHER OR NOT TO GRANT IT
8  ON A NARRATIVE IN WHICH SHE IS THE INNOCENT VICTIM WHO HAD
9  NOTHING TO DO WITH ANY OF THIS.  THIS IS HOW SHE LOOKED.  AND
10  THAT'S NOT RIGHT.

11    ANOTHER THING THAT'S NOT RIGHT IS THE VERY FEW AND
12  SCANT INSTAGRAM MESSAGES THAT SHE INCLUDES WITH THE PETITION.
13  THE MOST EGREGIOUS IS THE ONE WHERE SHE STARTS -- SHE PUTS
14  THE PAGE WHERE HER ANSWER IS "YES YES AND YES."  IT'S THE
15  ANSWER.  WE DON'T GET TO SEE THE QUESTION.  SHE LEFT THE
16  QUESTION OUT.  AND THE QUESTION, OF COURSE, IS DO YOU --
17  SOMETHING, LIKE -- I'M PARAPHRASING -- DO YOU WANT ME TO SLAP
18  YOU HERE OR?  "YES YES AND YES."  SHE LEFT THAT OUT.  BUT
19  STARTS WITH HER ANSWER OUT OF CONTEXT.  AND SHE THINKS ALL OF
20  THAT IS PERFECTLY FINE.

21    SHE CLAIMS THAT ALL OF HER DIRECT MESSAGES HAVE
22  BEEN DELETED.  THAT IT'S THE PASADENA POLICE DEPARTMENT'S
23  FAULT.  SHE THOUGHT THEY HAD IT.  SHE DOESN'T HAVE IT.  AND
24  THEN MIRACULOUSLY SOME OF THE THINGS APPEAR.  AND,
25  INTERESTINGLY, THE THINGS THAT STILL EXIST ARE INCLUDED IN
26  THE PETITION, AGAIN, OUT OF CONTEXT AND WITHOUT ANYTHING AT
27  ALL THAT IS DAMNING TO HER.  NOTHING.  ALL OF THESE MESSAGES
28  MISSING, CRITICAL TIME PERIOD AFTER MAY 16 WITH MELY AND WITH

1  LISA, GONE.

2          SHE LIES AND SAYS THAT HE CALLS HER INCESSANTLY.

3  THE COURT WILL BE ABLE TO LOOK AT THE CALL LOG, THE TEXTS.  I

4  MEAN, IT'S MAYBE TWO A DAY WHERE HE IS CHECKING ON HER TO SEE

5  IF SHE IS OKAY.  AGAIN, NOT ASKING, DIDN'T SAY IT WAS ME;

6  RIGHT?  NONE OF THAT.

7          AND IT IS CLEAR, BASED ON ALL OF THE INFORMATION WE

8  GOT IN THE TEXTS BETWEEN HER FRIENDS, WHAT WE HEARD FROM HER,

9  WHAT WE HEARD FROM MS. MEYER JUST NOW, THAT THIS IS ABOUT THE

10  MEDIA FINDING OUT.  SHE JUST SAID -- MS. MEYER JUST SAID THAT

11  EVEN IF WE LOSE, AT LEAST EVERYBODY KNOWS THAT TREVOR BAUER

12  IS A MONSTER.  THEY HAD PROJECTORS HERE FOR A COURT TRIAL,

13  BECAUSE THAT'S WHAT THIS IS ABOUT.

14          SHE SAID SO.  LINDSEY SAID SO.  SHE TRIED TO SAY

15  THAT SHE DIDN'T CARE ABOUT THE MEDIA UNTIL MR. FETTEROLF'S

16  STATEMENT CAME OUT.  THAT'S NOT TRUE.  SHE IS EXCITEDLY

17  TELLING HER FRIENDS HIS LIFE IS OVER.  HE IS FUCKED.  THIS IS

18  THE LAST TIME HE IS EVER GOING TO PLAY.  THIS IS HIS LAST

19  START.  I CAN'T WAIT.  WE'RE GOING TO CELEBRATE.  WOO HOO.

20          NOTHING ABOUT, WELL, THANK GOD.  I'VE BEEN SO

21  SCARED.  I'VE BEEN LIVING IN FEAR, BECAUSE MY SOUL LEFT MY

22  BODY.  AND NOW I'M SCARED.  AND NOW I DON'T HAVE TO BE SCARED

23  BECAUSE THE COURT INTERFERED.  NONE OF THAT.  WOO HOO.  WE'RE

24  GOING TO CELEBRATE.  HE IS GOING TO BE HELD ACCOUNTABLE.

25  THAT'S NOT WHAT THIS IS FOR.

26          IT'S -- THE LEGAL ANALYSIS HAS BEEN VERY

27  INTERESTING FOR ME TO CONTEMPLATE.  AND THE REASON IS THAT,

28  AS MS. MEYER CORRECTLY POINTS OUT, THE D.V.P.A. AND THE

568

1    PROCEEDINGS CONCERNING THE D.V.R.O., THE "V" STANDS FOR

2    VIOLENCE.  AND THE VIOLENCE THAT IS CONTEMPLATED IN THE

3    STATUTE, IN THE PROCEEDING -- IN THESE PROCEEDINGS, IN

4    D.V.R.O.S, THE RATIONALE, THE LEGISLATIVE HISTORY, IS SOME

5    ACT OF VIOLENCE PERPETRATED OUT OF MALEVOLENCE, ANGER,

6    VENGEANCE THAT'S UNILATERALLY UNPREDICTED, FRIGHTENING BY

7    VIRTUE OF ITS UNPREDICTABILITY, AND ILL INTENT.  THAT'S THE

8    VIOLENCE THAT IS BEING PROTECTED.  AND THAT'S THE CONCERN OF

9    THE LEGISLATURE AND THE COURT IS THAT VIOLENCE.

10           AND I -- IT'S DIFFICULT TO USE THE WORD "VIOLENCE"

11   IN TALKING ABOUT ROUGH SEX BECAUSE OF WHAT I JUST SAID.  THAT

12   THE CONNOTATION IS VIOLENCE AS IT RELATES TO DOMESTIC

13   VIOLENCE IN THE CONTEXT IN WHICH WE KNOW IT.  AND THAT'S NOT

14   WHAT'S HERE.  IS ROUGH SEX ARGUABLY BY DEFINITION VIOLENT?

15   I'LL SAY "YES" FOR PURPOSES OF THIS DISCUSSION.  BUT THAT IS

16   NOT WHAT IS CONTEMPLATED BY THE D.V.P.A. OR THE D.V.R.O.

17   PROCEEDINGS.

18           THE PURPOSE IS TO PREVENT ACTS OF DOMESTIC

19   VIOLENCE, ABUSE, AND SEXUAL ABUSE, TO PROVIDE FOR A

20   SEPARATION OF THE PERSONS INVOLVED IN THE DOMESTIC VIOLENCE

21   FOR A PERIOD SUFFICIENT TO ENABLE THESE PERSONS TO SEEK A

22   RESOLUTION OF THE CAUSES OF THE VIOLENCE.  THAT HAS NOTHING

23   TO DO WITH THIS.  NOTHING WHATSOEVER.

24           THERE IS NO ONE ON THE PLANET WHO WOULD BELIEVE

25   THAT THERE IS ANY POSSIBILITY IN THIS LIFE OR THE NEXT ONE,

26   ON THIS PLANET OR ANOTHER, THAT THESE TWO PEOPLE ARE EVER

27   GOING TO BE IN ANY SORT OF SEXUAL ENCOUNTER EVER AGAIN.  AND

28   THAT IS THE CONTEXT IN WHICH THE VIOLENCE (INDICATING) -- I'M

1   DOING MY FINGERS IN AIR QUOTES, MADAM COURT REPORTER -- THE

2   ROUGH SEX, IT'S IN THE CONTEXT OF A SEXUAL ENCOUNTER.  TWO.

3   BOTH OF WHICH INVOLVED MR. BAUER, LIKE AN ADULT, SAYING, HAVE

4   YOU EVER DONE THIS?  WHAT DO YOU NOT WANT ME TO DO?  I STOP

5   WHEN YOU TELL ME TO STOP.  TELL ME THE WORD THAT YOU CAN USE

6   THAT I CAN STOP.

7          AND LINDSEY'S AMBASSADOR COMES OUT SIGNING UP FOR

8   DUTY.  JUST DON'T PUT YOUR FINGERS DOWN MY THROAT.  LET'S GO.

9   CHOKE ME OUT.  I'VE NEVER BEEN MORE TURNED ON.  GIVE IT ALL

10  TO ME.  SHOW ME THE PAIN.  OKAY.  THAT IS NOT WHAT IS

11  CONTEMPLATED BY THE D.V.P.A.  THAT IN NO WAY SERVES ITS

12  FUNCTION.

13         MS. MEYER QUOTED TO A COUPLE OF CASES EXPANDING

14  THE -- IN WHICH THE LEGISLATURE -- THE CASE LAW EXPANDED THE

15  DEFINITION OF A DATING RELATIONSHIP.  AND SHE IS RIGHT.  I

16  MEAN, THERE ARE NOW SAME SEX RELATIONSHIPS.  THERE ARE NOW

17  RELATIONSHIPS WITH SEVERAL DIFFERENT PARTNERS.  THAT'S NOT

18  WHAT WE'RE TALKING ABOUT HERE.  THERE IS ABSOLUTELY NO

19  EVIDENCE OF A DATING RELATIONSHIP.

20         CAN I HAVE ONE MOMENT, YOUR HONOR?

21      THE COURT:  YES.

22      MS. HOLLEY:  KATE IS LOOKING FOR SOMETHING.  AND I LOST

23  IT.

24         MS. MEYER IS CORRECT THAT PEOPLE NOW COMMUNICATE

25  VIA TEXT AND SOCIAL MEDIA.  ALL PEOPLE DO THAT.  IT'S NOT

26  SPECIFIC TO DATING.  AS SHE SAID, EVERYBODY'S TEXTING.

27  EVERYBODY IS TALKING.  THAT IS A MECHANISM, A PLATFORM THAT

28  PEOPLE COMMUNICATE WITH ONE ANOTHER.  THAT'S NOT THE

1  EXPANSION OF THE DEFINITION OF DATING WHEN WE'RE NOW TALKING

2  ABOUT SAME SEX COUPLES AND -- YES, OF COURSE, PEOPLE GO GET

3  MARRIED WHEN THEY'RE IN LONG STANDING RELATIONSHIPS.  SHE

4  QUOTED PEOPLE VS. RUCKER FOR THAT PROPOSITION.

5          IN RUCKER, THE PEOPLE WENT OUT ON NUMEROUS DATES,

6  ATTENDED A WEDDING TOGETHER, PLANNED A TRIP TOGETHER, AND

7  DATED FOR A TOTAL OF ABOUT NINE MONTHS.  IN PHILLIPS VS.

8  CAMPBELL, THEY HAD KNOWN EACH OTHER FOR TWO AND A HALF YEARS.

9  THERE WERE NUMEROUS TEXTS ABOUT THE RELATIONSHIP, INCLUDING

10 THAT THEY BOTH INVESTED TO BUILD A RELATIONSHIP OVER THE PAST

11 SEVEN MONTHS STRENGTHENING OUR LOVE AND RESPECT FOR EACH

12 OTHER.  THEY TALKED ABOUT FALLING IN LOVE.  AND THEY

13 DISCUSSED THE POSSIBILITY OF DATING.

14         SO WHEN THEY CAME TO COURT AND SAID WE WEREN'T

15 DATING, THE COURT COULD LOOK TO THESE THINGS AND RECOGNIZE

16 THAT IRRESPECTIVE OF WHAT THEY SAID, ALL OF THIS INFORMATION

17 COULD BETTER INFORM THE COURT AS TO THE NATURE OF THEIR

18 RELATIONSHIP.  THERE IS NOTHING HERE LIKE THAT.

19         I'M VERY SORRY TO REPORT TO MS. HILL THAT THERE WAS

20 NO EMOTIONAL CONNECTION, THAT THERE WAS NO REASON FOR HER TO

21 BELIEVE SO.  AND, ALSO, THAT THERE WAS NOTHING HE EVER DID TO

22 MISLEAD HER.  HE MADE IT VERY CLEAR AS TO WHO HE WAS, WHAT HE

23 WAS ABOUT, AND HE DID HIS BEST TO ASK HER.  DID HIS VERY BEST

24 TO ASK HER.

25         I WAS TALKING TO ONE OF THESE GUYS ON THE TEAM --

26 ON A DIFFERENT TEAM -- ABOUT WHAT MANY GUYS WOULD DO WITH THE

27 INFORMATION THAT THEY HAD FROM HER SAYING, I WANT IT MORE

28 HARD.  AND THEY COME RIGHT -- AS SOON AS SHE GOT THERE, IT

571

```
1   WOULD BE ON AND POPPIN.  THAT'S NOT HIM.  HE TALKED TO HER
2   FOR HOURS.  HE WAS WITHIN THE CONTEXT AND CONFINES OF THE,
3   QUOTE, "RELATIONSHIP" THAT THEY HAD.  COULD NOT HAVE BEEN
4   MORE RESPECTFUL OF WHAT SHE WANTED AND WHAT SHE DIDN'T WANT.
5            A DATING RELATIONSHIP MEANS FREQUENT, INTIMATE
6   ASSOCIATIONS.  THERE IS NO FREQUENCY.  THERE ARE TWO
7   OCCASIONS OF SEX THAT WERE DISCUSSED WITHIN THE CONTEXT OF
8   SEX AND SEX ONLY, DESPITE WHAT MS. HILL CONCOCTED IN HER
9   HEAD.
10           THE FIRST INCIDENT, APRIL 21ST, IS REALLY
11  IMPORTANT, BECAUSE THINGS HAPPENED THERE THAT -- THE
12  EXPERIENCES THAT THEY BOTH HAD THAT HAPPENED ON APRIL 21ST
13  INFORM WHAT MIGHT HAPPEN ON MAY 15TH, LIKE YOUR HAIR MIGHT BE
14  WRAPPED AROUND YOUR THROAT AND YOU MIGHT BE CHOKED OUT TO
15  UNCONSCIOUSNESS.  AND BECAUSE THAT HAPPENED ON APRIL 21ST,
16  AND NOT ONLY DID YOU SAY YOU WERE OKAY WITH THAT, BUT YOU
17  SAID YOU HAD NEVER BEEN MORE TURNED ON AND YOU WANTED IT TO
18  HAPPEN MORE THE NEXT TIME.  IF THESE THINGS HADN'T HAPPENED
19  ON APRIL 21ST AND HE SPRUNG THEM ON HER ON MAY 15, I WOULD BE
20  LIKE, "OKAY."  BUT THEY ALREADY HAPPENED.  SHE SAID SHE
21  EXPECTED THAT.
22           YOU KNOW -- AND SHE KEPT SAYING ON THE STAND, I
23  SAID "YES" TO THIS AND "YES" TO THIS.  I DIDN'T REALLY MEAN
24  IT.  I DIDN'T MEAN IT.  BUT I SAID "YES" BECAUSE I WANTED HIM
25  TO HEAR WHAT HE WANTED TO HEAR.  I WANTED TO SAY WHAT I KNEW
26  HE WANTED TO HEAR.  BUT I SAID "YES" TO THIS, BUT NOT THAT.
27  WELL, AS I SAID IN OPENING, IT'S A CONTINUUM.  WHEN YOU
28  ENGAGE -- I DON'T KNOW PERSONALLY -- BUT IF --
```

1    THE COURT:  DON'T EVEN KNOW WHETHER YOU DO OR DON'T.
2  IT'S ALL THE SAME IN CLOSING ARGUMENT.
3    MS. HOLLEY:  IN THIS MILIEU, YOU ARE ENTERING INTO A
4  DANGER ZONE.  AND THE BEST YOU CAN DO, IF YOU ARE ENTERING
5  INTO SUCH AN ENCOUNTER, IS TO HAVE AS MUCH OF AN
6  UNDERSTANDING WITH THE OTHER PERSON AS POSSIBLE.  WHAT DON'T
7  YOU WANT ME TO DO?  TELL ME WHEN TO STOP.  ALL OF THAT
8  HAPPENED.  SO SHE CAN'T SAY, HAVING ACQUIESCED, ENCOURAGED,
9  DEMANDED MORE, SAY, YEAH, BUT THAT PART WASN'T OKAY.
10      IT IS HARD TO HAVE A MEETING OF THE MINDS -- AND I
11  HAVE TO SAY, THIS IS LIKE AN AGREEMENT -- WHEN ONE OF THE
12  PEOPLE HAS SENT THEIR FAKE AMBASSADOR TO THE NEGOTIATING
13  TABLE WHEN INSIDE THAT PERSON IS SAYING THIS IS NOT WHAT I
14  MEAN, THIS IS NOT WHAT I FELT, THIS IS NOT WHAT I WANTED.
15  BUT THE AMBASSADOR IS SAYING THIS IS WHAT I WANT, I'M GOOD
16  WITH IT.  WE'RE IN AGREEMENT.
17      AND BECAUSE HE DOESN'T KNOW HER AND SHE DOESN'T
18  KNOW HIM, BECAUSE ALL THEY'VE DONE IS TALK ON INSTAGRAM DM
19  FOR MOST OF THEIR COMMUNICATION, ALL HE CAN DO, AS A GROWN-UP
20  TALKING TO ANOTHER GROWN-UP, IS PRESUME THAT WHAT SHE IS
21  SAYING IS WHAT SHE MEANS, AND WHAT SHE WANTS, AND WHAT SHE
22  DOESN'T WANT, SO HE DOESN'T DO WHAT SHE DOESN'T WANT.
23      AND TO GLEEFULLY FILE PAPERS BECAUSE SHE WANTS HIM
24  TO BE HELD ACCOUNTABLE, AND BECAUSE SHE IS UPSET BECAUSE THE
25  PASADENA POLICE, WHO SHE HATES, HASN'T DONE WHAT SHE WANTS,
26  SHE IS GOING TO PUT THIS ON BLAST IS AN ABUSE OF PROCESS.
27  IT'S AN ABUSE OF THIS COURT'S TIME.  AS I SAID IN QUOTING
28  MS. MEYER A FEW MOMENTS AGO, "IF WE LOSE, AT LEAST THE WORLD

1   KNOWS ABOUT TREVOR BAUER."

2       THAT WAS THEIR POINT FROM THE START.  THAT WAS

3   LINDSEY'S POINT FROM THE START.  AND THEY GOT WHAT THEY WANT.

4   AND I WOULD ASK THE COURT TO DENY THE PETITION FOR ALL OF

5   THESE REASONS.

6       IT SHOULD NOT BE IN THE DOMESTIC VIOLENCE COURT.

7   IT SHOULD NOT EXIST AT ALL.  SHE HAS LIED REPEATEDLY.  SHE

8   HAS ADMITTED THAT SHE LIED REPEATEDLY.  SHE HAS MISLED THE

9   COURT, IF NOT LIED IN HER PAPERS.  AND SHE IS -- NOT ONLY IS

10   SHE NOT DESERVING OF A PETITION THAT I THINK WE ALL AGREE IS

11   UNNECESSARY, BUT SHE'S ABUSED THE COURT PROCESS AS WELL.

12       THANK YOU.

13     THE COURT:  THANK YOU.  ANY REBUTTAL?

14     MS. MEYER:  YES, YOUR HONOR.

15     THE COURT:  ALL RIGHT.  AGAIN, WE'RE USING SORT OF THE

16   FUNNEL SYSTEM.  IF YOU SAID IT IN YOUR CLOSING, YOU DON'T

17   NEED TO SAY IT AGAIN OR I REALLY MEAN IT.  ONLY ADDRESS

18   THINGS YOU HAVE TO.

19     MS. MEYER:  YES, YOUR HONOR.  I ONLY WROTE DOWN THE

20   NOTES THAT WERE RAISED AS A RESULT OF WHAT MS. HOLLEY SAID.

21     THE COURT:  THANK YOU.

22     MS. MEYER:  FOR MOST OF MS. HOLLEY'S ARGUMENT I DIDN'T

23   DISAGREE WITH HER.  I THINK A LOT OF OUR FACTS ARE SIMILAR.

24   AND I THINK WHAT THE COURT HAS TO DO IS DECIDE, BASED UPON

25   THOSE FACTS, WHETHER WHAT LINDSEY IS SAYING IS CORRECT OR

26   WHAT TREVOR AND HIS TEAM ARE SAYING IS CORRECT.  ONE OF THE

27   BIG POINTS I THINK OF AGREEMENT IS WHAT MS. HOLLEY JUST SAID.

28       THAT WHEN YOU ENGAGE IN THESE KIND OF ACTS, ROUGH

1    SEX, YOU GOT TO HAVE AN AGREEMENT.  YOU DON'T SPRING IT ON

2    SOMEBODY WHEN YOU HAVE THEIR HAIR AROUND THE FRONT OF THEIR

3    NECK AND YOU'RE APPLYING PRESSURE.  IF YOU'RE GOING TO ENGAGE

4    IN THAT TYPE OF SEX, THEN YOU GOT TO DISCUSS IT BEFOREHAND.

5    SO I ASK THE COURT WHEN TREVOR WAS CHATTING UP LINDSEY AND

6    LINDSEY WAS CHATTING UP TREVOR FOR FOUR TO FIVE HOURS ON

7    APRIL 21, WHY DIDN'T HE TALK ABOUT WHAT HIS INTERESTS WERE,

8    THAT HIS SEXUAL PROCLIVITIES LIE IN HAVING ROUGH SEX?

9         NOT A WORD.  THEY TALKED ABOUT THE THREE RULES OF

10   DATING.  THAT WASN'T ONE OF THE RULES OF DATING.  I LIKE

11   ROUGH SEX.  I GUESS HE COULD HAVE PUT THAT IN THERE, BUT HE

12   DIDN'T.  HE WAITED UNTIL SHE WAS LITERALLY IN HIS BED WHEN HE

13   STARTED TO GET MORE AGGRESSIVE THAT HE INITIATED THE

14   CONVERSATION OF "WHAT DO YOU LIKE?"  AND SHE SAYS, "ROUGH SEX

15   IS OKAY."  AND HE SAYS, "I LIKE IT ROUGHER THAN YOU."

16        HOW IS THAT A MATURE ADULT CONVERSATION?  IT'S NOT.

17   A MATURE ADULT CONVERSATION WOULD HAVE BEEN WHEN THEY WERE

18   SITTING THERE FOR THOSE FOUR TO FIVE HOURS AND HIM SAYING,

19   THIS IS WHAT MY INTERESTS ARE.  DO YOU HAVE INTERESTS IN

20   THIS?  NONE OF THAT WAS SAID.

21        SO THERE WAS NO CONSENT.  THERE WAS A LOT OF

22   DISCUSSION.  AND ON THIS POINT, I DISAGREE WITH MS. HOLLEY

23   ABOUT THE FACT THAT TREVOR DIDN'T KNOW THE REAL LINDSEY.  HE

24   DID KNOW THE REAL LINDSEY, BECAUSE HE TOLD HER HE HAD

25   SEARCHED HER OR INVESTIGATED HER ON INSTAGRAM -- HER PROFILE

26   ON INSTAGRAM AFTER SHE TAGGED HIM ON THAT FIRST OCCASION ON

27   APRIL 18.  SO HE KNEW ABOUT HER PAST.  HE ALSO LEARNED A LOT

28   ABOUT HER WHEN THEY SPOKE FOR THOSE FOUR TO FIVE HOURS.

1    SO ANYBODY WITH ANY BRAIN HAD TO HAVE KNOWN THAT A

2  YOUNG WOMAN WHO JUST MEETS YOU WHO LIVES IN SAN DIEGO, THAT

3  IS GOING TO DRIVE TO YOUR HOUSE AT MIDNIGHT, MAY NOT BE THE

4  MOST MATURE OR STABLE PERSON IN THE WORLD.  AND I'M SAYING

5  THAT NOT TO BE CRUEL, BUT THAT'S THE TRUTH.  HE IS NOT A

6  30-YEAR-OLD YOUNG MAN WHO JUST STARTED OUT IN THIS WORLD.  HE

7  IS A FAMOUS BASEBALL PLAYER.  AS WE KNOW, BASEBALL PLAYERS

8  TRAVEL ALL OVER THE COUNTRY MEETING ALL KINDS OF PEOPLE,

9  DOING ALL KINDS OF THINGS.

10    HE IS NOT SOME NAIVE GUY THAT WAS CUCKOLDED BY THIS

11  YOUNG WOMAN.  TO THE CONTRARY, IT WAS EXACTLY THE OPPOSITE.

12  ANOTHER THING THAT MS. HOLLEY FAILS TO MENTION DURING THE

13  ENTIRETY OF HER CLOSING, EXCEPT FOR ONE POINT WHERE SHE SAYS

14  THAT HE DID RENDER HER UNCONSCIOUS BY STRANGULATION, IS HOW

15  DOES SHE CONSENT TO ANYTHING WHEN SHE IS UNCONSCIOUS?  SO

16  MAYBE THAT SHOULD HAVE BEEN A POINT OF DISCUSSION ON APRIL

17  21.

18    YOU KNOW WHAT?  I'M INTO THE STUFF WHERE I STRANGLE

19  YOU.  NOT GOING TO KILL YOU.  BUT I'M GOING TO STRANGLE YOU

20  AND YOU'RE GOING TO BE OUT.  AND I'M GOING TO JUST DO

21  WHATEVER I WANT WITH YOUR BODY.  SO WHEN SHE WOKE UP THE

22  FIRST TIME AND THEY WERE HAVING ANAL SEX, THEY NEVER

23  DISCUSSED THAT.  NOT ONCE DID SHE DISCUSS THAT.  AND THE FACT

24  SHE TOLD HIM NOT TO DO IT AGAIN DOESN'T JUSTIFY DOING IT IN

25  THE FIRST PLACE WITHOUT HER CONSENT.  ANOTHER THING THAT HE

26  SHOULD HAVE DISCUSSED ABOUT IT.

27    AND FOR MS. HOLLEY TO SAY THAT I DON'T BELIEVE HER,

28  IT'S NOT CREDIBLE.  HOW IS IT NOT CREDIBLE?  WE KNOW ABOUT

1    THE ACTS THAT HE COMMITS SEXUALLY.  WE HEARD THE PANOPLY.  WE

2    READ THE MENU, BECAUSE LINDSEY TOLD US WHAT HE DID.  SO HOW

3    IS ANAL SEX NOT ON HIS PLAYLIST.  IT IS ON HIS PLAYLIST.  HE

4    DID DO IT TO HER.  SHE WAS CREDIBLE WHEN SHE TALKED ABOUT IT,

5    THAT THERE WAS BLOOD IN THE TOILET AND ON HER TOILET PAPER

6    WHEN SHE WIPED HERSELF.  TO ME, THAT'S CREDIBLE.

7         SHE TESTIFIED SHE HAD NEVER HAD ANAL SEX BEFORE.

8    AND SHE ALSO TESTIFIED THE SECOND TIME SHE DIDN'T EVEN HAVE

9    TO ASK HIM, BECAUSE HE HAD DONE IT THE FIRST TIME AND SHE

10   TOLD HIM THAT SHE DIDN'T LIKE IT.  I DON'T THINK THERE IS ONE

11   SCINTILLA OF EVIDENCE TO SUPPORT THE FACT THAT THAT DIDN'T

12   HAPPEN.  IT DID HAPPEN.  IT WAS PART OF WHAT THIS GUY LIKES

13   TO DO.

14        JUST VERY BRIEFLY ABOUT THE TEXT MESSAGES TO THE

15   FRIENDS AND THE COUSIN.  "HE IS AN AMAZING HUMAN."  SHE WAS

16   MAKING FUN OF HIM.  DOESN'T NEGATE ANYTHING.  ALSO, A POINT

17   ABOUT THE THREE RULES OF DATING, WHICH I KNEW NOTHING ABOUT

18   BEFORE.  AND NOW I HAVE TO HEAR IT ALL THE TIME.

19        HE BROKE HIS OWN RULES.  THE SNAPCHAT PHOTO.  THE

20   NO FEELINGS.  HE HAD FEELINGS FOR THIS WOMAN.  SO HE BROKE

21   HIS OWN RULES OF DATING WHEN YOU READ ALL THOSE MESSAGES

22   AFTER THE MAY 15TH INCIDENT WHEN HE IS SAYING TO HER THINGS

23   LIKE, "HOW ARE YOU DOING?  HOW ARE YOU FEELING?  I'M WORRIED

24   ABOUT YOU.  I WANT TO COME SEE YOU."  ET CETERA.  ET CETERA.

25        SO HOW IS THAT NOT PART OF A RELATIONSHIP, WHETHER

26   IT'S MODERN DAY OR WHETHER WE WERE IN THE 1950'S.  AND

27   SPEAKING OF THE 1950'S, I FELT LIKE I WAS SITTING IN A

28   COURTROOM IN THE 1950'S WHEN I WAS LISTENING TO MS. HOLLEY.

1  IT'S LIKE WHEN WE WERE IN JUNIOR HIGH SCHOOL AND YOU GOT IN

2  TROUBLE FOR WEARING PATENT LEATHER SHOES BECAUSE IT REFLECTED

3  YOUR UNDERWEAR AND THAT, LIKE MEANT YOU WERE A SLUT.  I MEAN,

4  WE'RE SORT OF BEYOND THAT IN 2021.

5       LINDSEY ISN'T RESPONSIBLE FOR THIS.  IS SHE

6  ACCOUNTABLE?  DID SHE EXERCISE BAD JUDGMENT?  ABSOLUTELY.  IF

7  SHE WERE MY DAUGHTER, I WOULD HAVE SAID, DON'T YOU DARE GO

8  OVER TO THAT CREEP'S HOUSE.  I MEAN, YOU SEE THE RED FLAGS AT

9  THE VERY BEGINNING.  LISA WAS RIGHT.  MELY WAS RIGHT.  HER

10 COUSIN WAS RIGHT.  STAY AWAY FROM THAT GUY.  DANGER.  DANGER.

11 DANGER.  SO SHE IS ACCOUNTABLE FOR THAT.

12      BUT HE IS ACCOUNTABLE FOR WHAT HE DID TO HER.  AND

13 WHAT IS REALLY UNFORTUNATE, AND WHAT THE D.V.P.A. IS DESIGNED

14 TO PROTECT, IS IT IS DESIGNED TO MAKE PERPETRATORS OF

15 DOMESTIC VIOLENCE, WITH A CAPITAL "V," ACCOUNTABLE.  HE IS

16 NOT ACCOUNTABLE FOR HIS ACTIONS.  AND IF LINDSEY HADN'T --

17 HAD NOT BROUGHT THIS ACTION, WE DON'T KNOW WHAT THE END OF

18 THE STORY MIGHT HAVE BEEN.

19      THE COMMENT ABOUT KNOWING THE WORD -- KNOWING WHAT

20 A SAFE WORD WAS.  DADDY ISSUES.  REALLY?  AND LINDSEY

21 TESTIFIED -- AND THIS WAS DURING THE SECOND INCIDENT AND

22 AFTER HE HAD RENDERED HER UNCONSCIOUS THE SECOND TIME BY

23 STRANGULATION, SHE SAID SHE COULD BARELY GET OUT THE WORD

24 "DADDY."  SHE COULDN'T EVEN GET TO THE WORD "ISSUES."  HOW

25 SAD TO BE STRUGGLING IN BED AND HAVING -- I MEAN, COULDN'T --

26 SHE IS -- SHE WAS SHAKING LITERALLY ALL OVER HER BODY.

27      SHE WAS CRYING.  AND SHE WAS TRYING TO STRUGGLE TO

28 GET OUT THE WORD "DADDY."  AND THIS GUY KEPT AT IT AND TRIED

1   TO REINITIATE SEX AFTER THAT.  MS. HOLLEY MADE A COMMENT

2   THAT, YEAH, IT MUST HAVE BEEN PAINFUL AND UNPLEASANT.  THAT,

3   TO ME, IS LIKE, MRS. LINCOLN, HOW DID YOU ENJOY THE PLAY?  I

4   MEAN, REALLY?

5            HER COMMENTS -- MS. HOLLEY'S COMMENTS ABOUT IT NOT

6   BEING -- NOT BEING PART OF THE D.V.P.A., SEXUAL ASSAULT IS

7   DEFINED AS DOMESTIC VIOLENCE AND ABUSE UNDER THE D.V.P.A.

8   AND WE CAN'T CONDONE BEHAVIOR JUST BECAUSE IT'S SEXUAL.  JUST

9   BECAUSE THIS GUY BEAT THE "S" OUT OF HER IN BED DOESN'T

10  CONDONE IT BECAUSE IT'S ROUGH SEX.  IT DOESN'T WORK LIKE

11  THAT.

12           WE KNOW YOU CANNOT CONSENT TO AN ASSAULT AND A

13  BATTERY.  LINDSEY CAME CLEAN AFTER THE INCIDENT BY TELLING

14  HER FRIENDS AND BY GOING TO THE HOSPITAL.  I WOULD SUGGEST --

15  AND I THINK HER TESTIMONY IS CONSISTENT WITH WHAT -- THE FACT

16  THAT SHE WAS SCARED OUT OF HER MIND.  AND SHE WAS SCARED

17  BECAUSE SHE HAD A SPLITTING HEADACHE, THAT SHE WAS -- SHE WAS

18  DISORIENTED.  SHE HAD ACHES AND PAINS ALL OVER HER BODY.

19           I THINK SHE WAS SCARED TO DEATH, BECAUSE I DON'T

20  THINK IN HER WILDEST DREAMS THAT SHE EVER THOUGHT THAT PART

21  OF HAVING ROUGH SEX WAS BEING PUNCHED IN THE VAGINA

22  REPEATEDLY, HIT ON HER BUTT, AND ALL THE OTHER PANOPLY OF

23  WONDERFUL SEX GAMES THAT THIS GUY LIKES TO PLAY.

24           I THINK HER PHOTOGRAPH IN THE HOSPITAL TO HIM --

25  AND I WAS JUST LOOKING AT IT BEFORE I CAME UP HERE -- IS

26  REALLY, REALLY SAD.  THAT SHE -- EVEN AFTER EVERYTHING SHE

27  DID, THAT SHE HAD TO STOOP TO THE LEVEL OF TAKING THAT

28  PHOTOGRAPH.

1    THE COMMENTS ABOUT THE DECLARATION.  I HEAR THIS

2  TIME AND TIME AGAIN WITH DOMESTIC VIOLENCE CASES.  AS THE

3  COURT HAD DESCRIBED THEM, THEY'RE NOT TRUNCATED PROCEEDINGS.

4  BUT THEY HAPPEN VERY QUICKLY.  IT IS NOT UNUSUAL FOR THE

5  TESTIMONY IN A DECLARATION TO BE DIFFERENT FROM WHAT THE

6  WITNESS TESTIFIES TO BECAUSE THEY'RE DONE QUICKLY.  YOU DON'T

7  KNOW ALL THE FACTS.  YOU DON'T NECESSARILY HAVE ALL THE

8  EVIDENCE AT THE TIME THAT THEY'RE FILED.

9    BUT THERE'S NOTHING THAT I FOUND SO COMPELLING

10  ABOUT WHAT WAS ALLEGEDLY MISSING FROM THAT DECLARATION.  IT'S

11  NOT LIKE SHE SAID, YOU KNOW, HE PENETRATED ME ANALLY THE

12  SECOND TIME.  SHE HAS BEEN VERY CONSISTENT IN DESCRIBING THE

13  ONE MAIN ACT OF SEXUAL ABUSE.

14    MS. HOLLEY COMMENTED ON THE TEXT MESSAGES.  I SAID

15  ONE A DAY.  SHE SAID TWO A DAY.  I THINK EITHER OR TOMATOE,

16  TOMATO.  THAT IS STILL A RELATIONSHIP.

17    LINDSEY WENT TO THE MEDIA NOT EXCITEDLY, NOT

18  GLEEFULLY, AS MS. HOLLEY HAS SAID, BUT IN ORDER TO PROTECT

19  HER REPUTATION, IN ORDER TO GET JUSTICE BECAUSE THE POLICE

20  WEREN'T ACTING.  AND SHE IN GOOD FAITH FILED THIS DOMESTIC

21  VIOLENCE RESTRAINING ORDER.

22    A COMMENT ABOUT THE PHILLIPS VS. CAMPBELL CASE,

23  BECAUSE I'M SO WELL VERSED ON THAT CASE.  THE RELATIONSHIP

24  STARTED TWO AND A HALF YEARS -- STRIKE THAT.  THE PARTIES MET

25  TWO AND A HALF YEARS PRIOR.  THEY DIDN'T STRIKE UP WHAT THE

26  COURT CONSIDERED TO BE THE DATING RELATIONSHIP UNTIL ABOUT

27  SEVEN MONTHS.

28    WHAT I THINK IS INTERESTING IN THIS CASE, BECAUSE

1    OF THE NATURE OF WHAT TREVOR DOES FOR A LIVING, THIS WAS A

2    FAST AND FURIOUS RELATIONSHIP AND VERY INTENSE, BY LINDSEY'S

3    ACCOUNT AND HER PERCEPTION OF WHAT TREVOR WAS FEELING,

4    CONDENSED IN A VERY, VERY SHORT PERIOD OF TIME.  AND I THINK

5    THAT STILL FALLS UNDER THE DEFINITION.

6          PART OF EXHIBIT 2, BATES STAMP 89, IS A MAY 15 TEXT

7    MESSAGE FROM TREVOR TO LINDSEY WHERE HE SAYS WE'RE GOING TO

8    HAVE A CASUAL EVENING OR A MODEST EVENING.  WORDS TO THAT

9    EFFECT.  SHE TESTIFIED SHE WAS HOPING THERE WAS NOT GOING TO

10   BE A REPEAT OF WHAT HE DID BEFORE.  AND SHE COULD NOT IMAGINE

11   WHAT WAS YET TO COME.

12        MS. HOLLEY:  THAT MISSTATES THE EVIDENCE.  BUT --

13        THE COURT:  IT DOES MISSTATE THE EVIDENCE.

14        MS. MEYER:  I'M SORRY.  IF I MISSTATED THE EVIDENCE,

15   THEN I APOLOGIZE.  BUT THAT WAS ALL I HAD TO SAY.  I THINK

16   THAT THIS DOMESTIC VIOLENCE RESTRAINING ORDER IS PROPERLY

17   BEFORE THIS COURT.  I THINK THIS COURT HAS JURISDICTION.  AND

18   WE RESPECTFULLY REQUEST THAT THE COURT GRANT THE RESTRAINING

19   ORDER AS WE REQUESTED.

20        THANK YOU, YOUR HONOR.

21        THE COURT:  THANK YOU.  THE COURT IS GOING TO TAKE ABOUT

22   FIVE MINUTES.  AND THEN I WILL COME OUT.

23            (RECESS TAKEN.)

24        THE COURT:  LET ME FIRST START BY THANKING THE ATTORNEYS

25   FOR THE QUALITY OF THEIR PRESENTATION.  IT ASSISTS THE COURT

26   TREMENDOUSLY TO HAVE ATTORNEYS OF YOUR CALIBER PRESENTING THE

27   BEST CASE ON BOTH SIDES.

28            I START THE ANALYSIS ADDRESSING FAMILY CODE SECTION

1  6220, WHICH STATES THAT "THE PURPOSE OF THIS DIVISION IS TO

2  PREVENT ACTS OF DOMESTIC VIOLENCE, ABUSE, AND SEXUAL ABUSE

3  AND TO PROVIDE FOR A SEPARATION OF THE PERSONS INVOLVED IN

4  THE DOMESTIC VIOLENCE FOR A PERIOD SUFFICIENT TO ENABLE THESE

5  PERSONS TO SEEK A RESOLUTION OF THE CAUSES OF THE VIOLENCE."

6    I THEN GO TO FAMILY CODE SECTION 6340(1), WHICH

7  STATES, IN PERTINENT PART, "WHEN DETERMINING WHETHER TO MAKE

8  ANY ORDERS UNDER THIS SUBDIVISION, THE COURT SHALL CONSIDER

9  WHETHER FAILURE TO MAKE ANY OF THESE ORDERS MAY JEOPARDIZE

10  THE SAFETY OF THE PETITIONER."  ALTHOUGH, AS POINTED OUT IN

11  NEVAREZ VS. TONNA, NOTES THAT THE TRIAL COURT IS NOT REQUIRED

12  TO FIND A PROBABILITY OF FUTURE ABUSE TO MAKE A DETERMINATION

13  THAT IT'S APPROPRIATE TO HAVE A RESTRAINING ORDER ISSUED.

14    THEN WE GET TO THE ISSUE OF WHAT A DATING

15  RELATIONSHIP IS.  FAMILY CODE SECTION 6210 DEFINES THAT AS

16  "FREQUENT, INTIMATE ASSOCIATIONS PRIMARILY CHARACTERIZED BY

17  THE EXPECTATION OF AFFECTION OR SEXUAL INVOLVEMENT

18  INDEPENDENT OF FINANCIAL CONSIDERATIONS."

19    COUNSEL RAISED THE POINT CORRECTLY THAT THAT

20  STATUTE WAS REVISED IMMEDIATELY BY THE LEGISLATURE AFTER

21  ORIOLA VS. THALER, WHICH REQUIRED, AS A CONDITION OF A DATING

22  RELATIONSHIP, THAT IT BE A "NON-CASUAL, SERIOUS COURTSHIP,

23  CONTINUING AND MUTUALLY COMMITTED EMOTIONAL RELATIONSHIP."

24  SO CLEARLY THE LEGISLATURE INTENDED TO HAVE THE D.V.P.A.

25  ADDRESS ISSUES THAT WERE LESS SERIOUS THAN THAT WHICH WAS

26  FOUND IN ORIOLA.

27    WHAT MY RESEARCH HAS UNCOVERED IS THERE'S VIRTUALLY

28  NO CASE THAT HAS ADDRESSED THE ISSUE OF WHAT IS MEANT UNDER

1  THE STATUTE OR BY THE LEGISLATURE BY THE WORD "FREQUENT."

2  AND WHETHER TWO OCCASIONS OF IN-PERSON CONTACT IS FREQUENT.

3  I FOUND THE SAME CASES THAT COUNSEL RAISED.

4        PEOPLE VS. RUCKER, WHICH ADDRESSES THE STATUTORY

5  DEFINITION AND USES THE LANGUAGE THAT THE LEGISLATURE COULD

6  REASONABLY CONCLUDE DATING RELATIONSHIPS, EVEN WHEN NEW, HAVE

7  UNIQUE EMOTIONAL AND PRIVACY ASPECTS THAT DO NOT EXIST IN

8  OTHER SOCIAL OR BUSINESS RELATIONSHIPS AND THOSE ASPECTS MAY

9  LEAD TO DOMESTIC VIOLENCE EARLY IN A RELATIONSHIP.  AND IN

10 THAT CASE, THE INTERPERSONAL RELATIONSHIP OF THE PARTIES WAS,

11 BY THE FACTS, FAR MORE EXTENSIVE THAN THE RELATIONSHIP

12 BETWEEN THE PARTIES HERE.

13        IN PHILLIPS VS. CAMPBELL, IT WAS IN THE

14 COMMUNICATIONS WITH THE RESPONDENT AFTER SHE HAD REBUFFED HIS

15 ADVANCES THAT APPELLANT MADE CLEAR THAT IT WAS HE WHO

16 CONSIDERED THEIR RELATIONSHIP TO HAVE BEEN MORE THAN A MERE

17 FRIENDSHIP.  IN THAT CASE, THOUGH, THE COURT -- THIS

18 COURT FINDS IT TO BE A STRAINED ANALYSIS AT BEST -- THE COURT

19 FOUND THAT IT WAS THE DEFENDANT WHO IMAGINED THAT A

20 RELATIONSHIP EXISTED WHEN IT DID NOT.  AND THAT THAT WAS

21 SUFFICIENT FOR THE COURT TO DEFINE IT AS A DATING

22 RELATIONSHIP.

23        IN THIS CASE, THE DATING RELATIONSHIP WAS AT MOST

24 TENUOUS.  AT MOST, THE FACTS INDICATE THAT THERE WERE TWO

25 IN-PERSON MEETINGS BETWEEN THE PARTIES HERE AND SOME DIRECT

26 MESSAGES AND TEXTS BETWEEN APRIL 18TH OF THIS YEAR AND MAY

27 30TH OF THIS YEAR.  ONLY A VERY LIBERAL INTERPRETATION OF THE

28 STATUTE, WHICH SEEMS TO BE WHAT THE LEGISLATURE INTENDED,

1  ALLOWS THE COURT TO INCLUDE AMONG "INTIMATE ASSOCIATIONS" THE

2  DIRECT MESSAGES AND TEXTS BETWEEN THE PARTIES, WHICH COULD BE

3  CHARACTERIZED AS HAVING THE EXPECTATION OF AFFECTION OR SEX,

4  AT LEAST AS TO THAT PERIOD BETWEEN APRIL 18 AND MAY 15.

5       SO THE COURT FINDS THAT, WHILE A CLOSE CALL, THIS

6  DOES FALL WITHIN THE AMBIT OF THE LEGISLATIVE INTENT THAT

7  THIS BE INCLUDED -- THE TYPE OF RELATIONSHIP BETWEEN THESE

8  PARTIES BE INCLUDED UNDER THE D.V.P.A.

9       I THEN GO TO THE TESTIMONY AND THE EVIDENCE THAT

10 THE COURT RECEIVED.  PETITIONER MADE CLEAR IN HER TESTIMONY

11 THAT WHAT SHE THOUGHT PRIVATELY AND WHAT SHE COMMUNICATED TO

12 RESPONDENT WERE OFTEN NOT THE SAME THING, SPECIFICALLY WHEN

13 IT CAME TO ROUGH SEXUAL ACTS.  PETITIONER TESTIFIED THAT WHEN

14 SHE SET BOUNDARIES, RESPONDENT RESPECTED THEM.

15      PETITIONER TESTIFIED THAT RESPONDENT ASKED

16 PETITIONER TO SET BOUNDARIES.  ON THEIR SECOND IN-PERSON

17 ENCOUNTER, PETITIONER SET ONE THING AS OFF LIMITS AND ASSUMED

18 THAT ANOTHER WAS OFF LIMITS AFTER THE PARTIES' FIRST

19 ENCOUNTER, WHICH SHE TOLD NURSE VALENCIA DID NOT OCCUR DURING

20 THE SECOND ENCOUNTER.

21      THE EVIDENCE, INCLUDING PETITIONER'S TESTIMONY,

22 SHOW THAT RESPONDENT INVITED PETITIONER TO TALK TO HIM WHEN

23 SHE SEEMED UPSET AND THAT SHE HAD MULTIPLE OPPORTUNITIES TO

24 SET BOUNDARIES.  PETITIONER TESTIFIED THAT RESPONDENT DIDN'T

25 CROSS THE BOUNDARIES WHICH PETITIONER EXPRESSED TO HIM.

26 RESPONDENT COULDN'T KNOW THE BOUNDARIES WHICH PETITIONER

27 DIDN'T EXPRESS TO HIM.

28      PETITIONER TESTIFIED THAT BOTH SEXUAL ENCOUNTERS

1  BEGAN CONSENSUALLY BUT THAT, AT LEAST AS TO THE SECOND

2  ENCOUNTER, IT VENTURED INTO AREAS TO WHICH SHE DID NOT

3  CONSENT.

4        THE PRIMARY QUESTION FOR THIS COURT IS, TO WHAT DID

5  PETITIONER CONSENT?  AND HOW DID SHE MANIFEST THAT CONSENT TO

6  RESPONDENT?

7        IN WRITTEN EXCHANGE PETITIONER SAID THAT "SHE

8  WANTED ALL THE PAIN."  THOSE WERE HER WORDS.  SHOULD

9  RESPONDENT HAVE BELIEVED HER?

10        IN WRITTEN COMMUNICATION PETITIONER SAID SHE WANTED

11  TO BE CHOKED OUT.  RESPONDENT SOUGHT CLARIFICATION AS TO

12  WHETHER SHE MEANT "OUT," AS IN UNCONSCIOUS, AND PETITIONER

13  REPLIED IN THE AFFIRMATIVE.  SHOULD RESPONDENT HAVE BELIEVED

14  HER?

15        WE CONSIDER THAT, IN THE CONTEXT OF A SEXUAL

16  ENCOUNTER, WHEN A WOMAN SAYS "NO," SHE SHOULD BE BELIEVED.

17  SO WHAT ABOUT WHEN SHE SAYS "YES"?

18        PETITIONER TESTIFIED THAT SHE DID NOT CONSENT TO

19  BEING PUNCHED TO THE POINT OF HAVING BLACK EYES AND HAVING TO

20  BE HOSPITALIZED.  HAVING BLACK EYES AND BEING HOSPITALIZED

21  WERE THE POTENTIAL CONSEQUENCES OF THE ACTIVITIES, INCLUDING

22  SOME OF WHICH PETITIONER ACKNOWLEDGED THAT SHE DID CONSENT

23  TO, SUCH AS BEING CHOKED.

24        THE ONLY EVIDENCE OF ANYTHING WHICH HAPPENED WHILE

25  PETITIONER WAS UNCONSCIOUS WAS HAVING BEEN HIT ON THE BUTT IN

26  THE PARTIES' FIRST ENCOUNTER.  OTHER ACTS OCCURRED WHILE

27  PETITIONER WAS CONSCIOUS.  SHE TESTIFIED THAT SHE WASN'T ABLE

28  TO SPEAK PART OF THAT TIME BUT RESPONDENT COULDN'T KNOW THAT.

1   ON AT LEAST ONE OCCASION, WHEN RESPONDENT WAS DOING SOMETHING

2   PETITIONER DIDN'T WANT AND SHE COULDN'T SPEAK, SHE MOTIONED

3   TO HIM AND HE DID STOP.  ON ANOTHER, SHE USED THE FIRST PART

4   OF THEIR AGREED SAFE WORD AND HE DID STOP.

5           RESPONDENT DID NOT PURSUE PETITIONER.  HE DID NOT

6   THREATEN PETITIONER TO COERCE HER INTO SEXUAL ACTIVITY.  AND

7   HE DIDN'T THREATEN HER AFTER THEY HAD ENGAGED IN SEXUAL

8   ACTIVITY.

9           PETITIONER COMPLAINS IN HER TESTIMONY THAT ONE OF

10  HER PROBLEMS HAS BEEN HER DESIRE TO SEEK ATTENTION.

11  COMMUNICATIONS TO HER FRIENDS, WHICH ARE ENTERED INTO

12  EVIDENCE, INDICATE SHE WAS EXCITED FOR THE ATTENTION TO HER

13  AND, EVENTUALLY, THE DAMAGE THAT ATTENTION WOULD HAVE ON

14  RESPONDENT.

15          LET ME BE CLEAR.  THE INJURIES AS SHOWN IN THE

16  PHOTOGRAPHS ARE TERRIBLE.  UNDER MOST CIRCUMSTANCES, MERELY

17  SEEING PHOTOGRAPHS SUCH AS THOSE WOULD SERVE AS A PER SE

18  CONDEMNATION OF THE PERPETRATOR OF SUCH INJURIES.  BUT

19  PETITIONER HAD AND HAS THE RIGHT TO ENGAGE IN ANY KIND OF SEX

20  AS A CONSENTING ADULT THAT SHE WANTS TO WITH ANOTHER

21  CONSENTING ADULT.

22          SHE WAS NOT AMBIGUOUS ABOUT WANTING ROUGH SEX IN

23  THE PARTIES' FIRST ENCOUNTER AND WANTING ROUGHER SEX IN THE

24  SECOND ENCOUNTER.  PETITIONER WAS ASKED BY RESPONDENT TO

25  DECIDE WHATEVER SHE WANTED TO LET RESPONDENT KNOW WAS OFF

26  LIMITS, AND SHE DID.

27          IF SHE HAD SET LIMITS AND HE HAD EXCEEDED THEM,

28  THIS CASE WOULD BE VERY CLEAR.  BUT SHE SET LIMITS WITHOUT

586

1    FULLY CONSIDERING ALL THE CONSEQUENCES AND RESPONDENT DID NOT
2    EXCEED THE LIMITS THAT PETITIONER SET.
3          GOING BACK TO FAMILY CODE SECTION 6220 AND 6340,
4    THE FUNDAMENTAL PURPOSE OF THE DOMESTIC VIOLENCE PREVENTION
5    ACT, THE COURT FINDS THAT PETITIONER'S INITIAL DECLARATION,
6    WHICH WAS THE BASIS UPON WHICH SHE OBTAINED A TEMPORARY
7    RESTRAINING ORDER, WAS MATERIALLY MISLEADING.  SHE CLAIMED
8    THAT RESPONDENT WAS CALLING AND TEXTING NON-STOP FOR TWO
9    WEEKS.  WHEN THE REALITY WAS THAT RESPONDENT RARELY CALLED
10   AND TEXTED ONLY WHEN SHE HAD TOLD HIM SHE WAS IN THE HOSPITAL
11   TO MAKE SURE THAT SHE WAS STILL OKAY.  EACH OF THOSE TEXTS OR
12   VOICEMAILS WAS OF A SIMILAR SORT, "ARE YOU OKAY?"
13         PETITIONER WAS CLEAR THAT SHE WAS EXTREMELY
14   STRESSED AND HAD EXTREME ANXIETY WHEN RESPONDENT SENT
15   MESSAGES.  SHE ALSO TESTIFIED THAT SHE WAS EXTREMELY STRESSED
16   AND ANXIOUS WHEN HE DIDN'T SEND MESSAGES.  THAT ISN'T
17   RATIONAL.
18         RESPONDENT DID NOT PURSUE PETITIONER.  SHE PURSUED
19   HIM.  PETITIONER'S TESTIMONY MADE CLEAR THAT SHE WAS UPSET
20   THAT RESPONDENT DIDN'T CALL HER WHEN SHE EXPECTED HIM TO AND
21   THAT DURING AND AFTER THEIR FIRST IN-PERSON ENCOUNTER,
22   PETITIONER WANTED MORE OF A RELATIONSHIP WITH RESPONDENT THAN
23   THE FACTS, AS SHE PRESENTED THEM, COULD REALISTICALLY BE
24   EXPECTED.
25         HER FEAR THAT RESPONDENT MIGHT DO SOMETHING IF HE
26   KNEW SHE WENT TO THE HOSPITAL HAD NO FACTUAL BASIS.  HER FEAR
27   THAT RESPONDENT MIGHT DO SOMETHING IF HE KNEW SHE HAD FILED A
28   REQUEST FOR RESTRAINING ORDER DOES NOT APPEAR TO HAVE HAD ANY

1    FACTUAL BASIS.  ALTHOUGH THE NEVAREZ CASE DOES NOT REQUIRE A

2    JUDGE TO CONSIDER WHETHER THERE IS A PROBABILITY OF FUTURE

3    HARM, FAMILY CODE 6340 DOES REQUIRE THAT IT BE PART OF THE

4    COURT'S CONSIDERATION.

5            IN THIS CASE, THE COURT FINDS THERE IS NO

6    SUPPORTABLE EVIDENCE THAT RESPONDENT IS LIKELY TO CAUSE

7    PETITIONER ANY HARM OR EVEN HAVE CONTACT WITH THE PETITIONER.

8    FOR ALL THE REASONS STATED, THE COURT DENIES PETITIONER'S

9    REQUEST FOR A LONG TERM DOMESTIC VIOLENCE RESTRAINING ORDER.

10   AND THE COURT HEREBY DISSOLVES THE TEMPORARY RESTRAINING

11   ORDER.

12        MS. HOLLEY:  THANK YOU, YOUR HONOR.

13        MR. FETTEROLF:  THANK YOU, YOUR HONOR.

14        MS. MEYER:  THANK YOU, YOUR HONOR.

15            (THE PROCEEDINGS WERE CONCLUDED.)

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF LOS ANGELES

 3      HON. DIANNA GOULD-SALTMAN, JUDGE        DEPARTMENT 35

 4

 5   LINDSEY HILL,                      )
                                        )
 6                                      )
                         PETITIONER,    )  NO. 21STRO03198
 7                                      )
                VS.                     )
 8                                      )  REPORTER'S
                                        )  CERTIFICATE
 9   TREVOR BAUER,                      )
                                        )
10                                      )
                         RESPONDENT.    )
11   _____)

12

13           I, JACQUELINE M. CAIRE, CSR #9599, OFFICIAL

14   REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

15   FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE

16   FOREGOING PAGES, 521 THROUGH 587, INCLUSIVE, COMPRISE A FULL,

17   TRUE, AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD IN THE

18   MATTER OF THE ABOVE-ENTITLED CAUSE ON AUGUST 19, 2021.

19           DATED THIS 23RD DAY OF AUGUST, 2021.

20

21

22   _____
        JACQUELINE M. CAIRE, CSR #9599, RPR
23      OFFICIAL REPORTER

24

25

26

27

28
```