1                        UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

4

5

TREVOR BAUER,                        )
6                                    )
            Plaintiff,               )
7                                    )
                 vs.                 )
8                                    )   2:22-CV-2062-MWF
THE ATHLETIC MEDIA COMPANY, et       )
9   al.,                             )
                                     )
10          Defendants.              )
    _____

11

12

13                   REPORTER'S TRANSCRIPT OF HEARING

14                        Los Angeles, California

15                       Monday, August 29, 2022

16

17

18          _____

19

20

21

22
                        AMY DIAZ, RPR, CRR, FCRR
23                      Federal Official Reporter
                        350 West 1st Street, #4455
24                       Los Angeles, CA 90012

25
            *Please order court transcripts here:  www.amydiazfedreporter.com*

```
 1          APPEARANCES OF COUNSEL:

 2
            For the Plaintiff:
 3

 4                      ZUCKERMAN SPAEDER LLP
                        By:  Nell Peyser, Attorney at Law
 5                      485 Madison Avenue, 10th Floor
                        New York, New York 10002
 6
                        KINSELLA WEITZMAN ISER KUMP HOLLEY LLP
 7                      By:  Suann MacIsaac, Attorney at Law
                        808 Wilshire Boulevard, Suite 300
 8                      Santa Monica, California 90401

 9

10
            For the Defendants:
11

12                      DAVIS WRIGHT TREMAINE LLP
                        By:  Diana Palacios, Attorney at Law
13                      865 South Figueroa Street, Suite 2400
                        Los Angeles, California 90017
14
                        THE NEW YORK TIMES COMPANY
15                      By:  Dana Green, Attorney at Law
                        620 8th Floor, 13th Floor
16                      New York, New York 10018

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 10:04:38 | THE CLERK:  Calling item number 4, case number |
| 2 10:04:41 | CV-22-2062-MWF, Trevor Bauer vs. The Athletic Media Company, |
| 3 10:04:48 | et al. |
| 4 10:04:48 | Counsel, please rise and state your appearance for |
| 5 10:04:51 | the record. |
| 6 10:04:56 | MS. PEYSER: Good morning, Your Honor.  My name is |
| 7 10:04:58 | Nell Peyser from the law firm Zuckerman Spaeder, and I'm |
| 8 10:05:01 | counsel for Mr. Bauer. |
| 9 10:05:04 | MS. MACISAAC: Good morning, Your Honor.  Suann |
| 10 10:05:07 | MacIsaac, also appearing on behalf of Plaintiff Trevor Bauer. |
| 11 10:05:09 | MS. PALACIOS:  Good morning, Your Honor.  Diana |
| 12 10:05:10 | Palacios, Davis Wright Tremaine, appearing on behalf of The |
| 13 10:05:16 | Athletic and Ms. Molly Knight. |
| 14 10:05:16 | MS. GREEN: Good morning, Your Honor.  Dana Green, |
| 15 10:05:18 | in-house counsel for the New York Times, appearing for the |
| 16 10:05:21 | New York Times. |
| 17 10:05:22 | THE COURT:  Good morning, counsel. |
| 18 10:05:25 | My tentative ruling, which won't be on the docket, |
| 19 10:05:28 | is to grant the motion to strike as to The Athletic, but to |
| 20 10:05:41 | deny it as to Ms. Knight, at least in part. |
| 21 10:05:47 | For The Athletic, it does seem that there is a real |
| 22 10:05:53 | issue and a failure to plead appropriately that it was the |
| 23 10:05:59 | publisher in the technical sense in which California |
| 24 10:06:04 | construes that word in the statute. |
| 25 10:06:07 | So while Mr. Bauer has the right, I think, to seek |

1  10:06:12   to amend and get around that, whether he can or not, or

2  10:06:15   whether there is a basis under Rule 11, I really don't know.

3  10:06:19   It really just comes down to the status of those people who

4  10:06:24   did receive the notice.

5  10:06:27        As to Ms. Knight, it seems to me that the issue here

6  10:06:32   is the implication from what was written, and it does strike

7  10:06:41   me that while one way of construing what she wrote in the

8  10:06:49   context, and it's -- and the medium on which it was conveyed

9  10:06:57   was her statement that -- that it was really dealing with the

10 10:07:03   consent; that she was offering her opinion that consent could

11 10:07:07   not be done to, in the abstract, a fractured skull.

12 10:07:12        I suppose under this theory, the idea is that she

13 10:07:15   could just as well have written to amputating a leg, or

14 10:07:19   consent to a knife through the heart, or some other thing

15 10:07:23   which in her view was meant to convey that it's outlandish to

16 10:07:28   think that there would be true consent for that, however

17 10:07:33   rough the sexual encounter might be.

18 10:07:35        But it seems to me that what is -- what would be the

19 10:07:43   ordinary understanding of what was being conveyed was, in

20 10:07:47   fact, a true assertion of a fact, provable or not, albeit

21 10:07:53   implied, but that is fine under the law, and that is that the

22 10:07:57   victim truly did have a fractured skull.

23 10:08:00        And then there were further allegations that Ms.

24 10:08:03   Knight knew that was not true, or as *Times vs. Sullivan*

25 10:08:12   applies here, was still liable for that based on all the

1 10:08:16   circumstances.

2 10:08:17           So to that case, then it does seem to me that the

3 10:08:21   motion should be denied.

4 10:08:25           The motion to dismiss, I think just follows really

5 10:08:28   from the ruling on the motion to strike, albeit under

6 10:08:32   somewhat different standards.  But still, it's moot as to The

7 10:08:39   Athletic, and then it would be denied as to Ms. Knight for

8 10:08:44   the same reasons that I have just said.  It makes out a claim

9 10:08:49   here even for defamation of a public figure.

10 10:08:53          So with that summary of the tentative, let me hear

11 10:08:58   from the defendants.

12 10:09:06          MS. GREEN: Good morning, Your Honor.  I'm sorry, I

13 10:09:13   misspoke, habit, I'm actually here appearing for The

14 10:09:16   Athletic, our newly-acquired subsidiary.

15 10:09:18          THE COURT:  I understood that, counsel.

16 10:09:20          MS. GREEN: Thank you.

17 10:09:20          And if I may, because Ms. Knight is no longer with

18 10:09:23   The Athletic, I would like to address the issues that concern

19 10:09:27   The Athletic, and my cocounsel, Ms. Palacios, will address

20 10:09:31   issues relating to Ms. Knight.

21 10:09:32          THE COURT:  You may.

22 10:09:34          MS. GREEN: Your Honor, we appreciate the Court's

23 10:09:36   very careful analysis of the retraction statute in this draft

24 10:09:40   decision, which I don't think gets it exactly right.  And we

25 10:09:45   certainly appreciate the approach to judicial economy here in

1 10:09:48   terms of disposing of the case on that ground to start with.

2 10:09:51         But we are concerned that leave to replead is really

3 10:09:56   only appropriate when it would not be futile, when a claim

4 10:09:59   could be made out; and therefore, the Court does still need

5 10:10:04   to reach the merits of the claim here.  Because even were

6 10:10:07   Mr. Bauer to replead and allege special damages, his claim is

7 10:10:12   barred by multiple doctrines under the First Amendment and

8 10:10:16   the common law, and would fail.

9 10:10:17         And so with Your Honor's permission, I would like to

10 10:10:20   address those merits of his claims.

11 10:10:22         THE COURT:  You may.

12 10:10:23         MS. GREEN: Your Honor --

13 10:10:25         THE COURT:  I don't necessarily agree with you that

14 10:10:27   I have to reach them.  It seems to me I should reach them

15 10:10:30   once, and then reaching them when everything is set up, so

16 10:10:36   if, in fact, judgment is entered separately as to The

17 10:10:41   Athletic, and it was appealed -- I'm not saying I would agree

18 10:10:44   to that -- but it just seems to me to make sense to let

19 10:10:48   Mr. Bauer put his best foot forward and then address

20 10:10:51   everything.

21 10:10:52         But I understand your desire to cut it off right

22 10:10:54   now.

23 10:10:54         So with that, I'll let you address the futility.

24 10:10:58         MS. GREEN: Thank you, Your Honor.  And we do

25 10:11:01   appreciate the efficient approach here.

10:11:04          I think as Your Honor weighs these things, what I

10:11:08   would suggest is, is also to consider the fact that the

10:11:12   anti-SLAPP and the First Amendment both encourage the Court

10:11:15   to resolve defamation claims at the earliest opportunities,

10:11:20   and not to put media defendants to the cost of rebriefing and

10:11:23   rearguing cases, for the very reason that the costs of

10:11:27   litigation are their own chilling effect on freedom of

10:11:30   speech.

10:11:31          With regard to the merits of Mr. Bauer's claim, Your

10:11:34   Honor, you know, the first barrier, as we set out in our

10:11:38   briefing, is of course the fair report privilege.

10:11:40          And when we look at this publication, there is no

10:11:43   real dispute that the privilege is triggered here, that this

10:11:46   was an account of an official court proceeding.  And, you

10:11:50   know, what The Athletic was doing is something that

10:11:53   journalists do every day, which is to report on the contents

10:11:56   of those court proceedings.

10:11:58          We submit if the Court reviews that article, that it

10:12:02   was a fair summary of the contents.  It described very

10:12:07   briefly the actions that were alleged.  It described very

10:12:11   briefly some of the alleged injuries.  It was clear to

10:12:14   readers these were allegations.  It explained that they were

10:12:17   untested; that Mr. Bauer hadn't had a chance to respond.  It

10:12:21   included a lengthy response from Mr. Bauer, which is more

10:12:26   than the law requires.  And it did include the final

1  10:12:29   diagnosis of her visit to the ER, that she had been diagnosed

2  10:12:33   with an acute head injury, and with assault by manual

3  10:12:38   strangulation.

4  10:12:39        So Mr. Bauer's whole claim rests on the argument

5  10:12:42   that The Athletic should have been more specific as to how

6  10:12:44   that final diagnosis was reached; that one of the CT scans

7  10:12:49   did not find a fracture.

8  10:12:51        And that is more than the law requires.  It is --

9  10:12:56   that kind of discrepancy that Mr. Bauer is trying to

10 10:13:00   manufacture here is something that courts have repeatedly

11 10:13:04   cautioned should not overcome the fair report privilege,

12 10:13:06   which is designed specifically for the purposes of

13 10:13:08   encouraging the press to do exactly what The Athletic did

14 10:13:11   here, which was to report on the contents of what was going

15 10:13:14   on in this petition.

16 10:13:16        In an effort to try to create that distinction,

17 10:13:22   Mr. Bauer is giving enormous weight to one of those CT scans,

18 10:13:26   which he's arguing disproved that she had had a fracture, and

19 10:13:31   that the petition as a whole absolutely proved that that was

20 10:13:37   false.

21 10:13:37        So he is both arguing that there was an implication

22 10:13:39   created by the verbatim recounting of her diagnosis, and that

23 10:13:43   that was not sufficiently dispelled.

24 10:13:46        We respectfully submit that Mr. Bauer has not even

25 10:13:50   in opposition acknowledged the fact that the full medical

10:13:54   file shows that there was, in fact, doubt as to the scale of

10:13:58   her injuries.  She did have that CT scan in the emergency

10:14:02   room, which did not find a fracture.

10:14:04        But his pleading, his briefing, ignores the fact

10:14:07   that a short time later, she went for a follow-up

10:14:10   examination, and the doctor records real concern that that CT

10:14:13   scan may not have detected a fracture, because she is

10:14:17   suffering ongoing symptoms.  And the doctor sends her for

10:14:20   additional scans of her brain and her face.  The results of

10:14:23   that are not included in the petition.

10:14:25        So much of Mr. Bauer's claim is premised on a

10:14:31   misreading of this record.  That this record absolutely

10:14:34   proves that no fracture was inflicted; when in fact, the

10:14:40   record, which is all that the claim -- that The Athletic is

10:14:45   held to, the petition itself does not provide that kind of

10:14:48   categorical finding.

10:14:51        Mr. Bauer tries to get around the fair report

10:14:57   privilege.  And Your Honor defined that it did not apply by

10:15:01   arguing defamation by implication, of course.

10:15:03        And in a claim for defamation by implication,

10:15:06   Mr. Bauer has three hurdles that he needs to overcome.  And

10:15:10   as set out in our briefing, we do not believe that he has met

10:15:13   any of those requirements.

10:15:15        The first is the reasonableness of his

10:15:18   interpretation.  He, of course, bears the burden of showing

1 10:15:20   that his interpretation of the article is the reasonable one.

2 10:15:25        We have sort of gone back and forth on the standard,

3 10:15:27   but I think we both can agree that that standard is an

4 10:15:31   objective one.  It's not whether any particular reader would

5 10:15:34   have read it that way.  It is the sort of hypothetical,

6 10:15:37   reasonable reader in the community.

7 10:15:39        And that the Court is not to strain one way or the

8 10:15:42   other in terms of finding or avoiding meaning.  It is to find

9 10:15:46   the most natural reading of the article.

10 10:15:48        And again, we would encourage the Court to go back

11 10:15:51   and read the actual article, rather than the way that counsel

12 10:15:54   have described it.  That Mr. Bauer's argument rests on this

13 10:15:58   idea, first, that the article creates an implication of a

14 10:16:03   skull fracture by reporting verbatim from the medical records

15 10:16:07   that there were signs of a skull fracture.  Signs, of course,

16 10:16:12   are not proof of an injury.  If it were, there would be no

17 10:16:15   reason to engage in diagnostic tests.

18 10:16:17        And secondly, that the story does include the final

19 10:16:20   diagnosis, that she had an acute head injury but not a

20 10:16:26   fracture.

21 10:16:26        So it's very unclear how Mr. Bauer can say that this

22 10:16:29   was not a fair summary of the allegations.

23 10:16:34        And from a reader's perspective, if, in fact, she

24 10:16:38   had suffered a skull fracture, there would really be no

25 10:16:40   reason to be coy about that, or to sort of bury it.

10:16:46    To the extent that the Court feels, as Bauer argues,

10:16:48    that the article was sort of silent as to the outcome, that

10:16:51    rather cuts against an injury like that, rather than that a

10:16:55    reader would find it.

10:16:56    Second, Mr. Bauer, of course, would have to show

10:17:01    that the story was substantially false.  And while it may

10:17:06    seem odd to say if we assume, as Mr. Bauer pleads, that the

10:17:13    article implied that there was a fracture, and if we assume,

10:17:15    as we must based on the pleading, that there was not, to say

10:17:18    that a piece could nevertheless be substantially true.  But

10:17:21    that is a First Amendment doctrine that is capturing the idea

10:17:25    that a plaintiff should not be able to assert a claim based

10:17:29    upon a factual difference that would not substantially affect

10:17:33    a reader's opinion of that person based on the pleaded truth.

10:17:37    So the idea is, in Mr. Bauer's reading, if The

10:17:41    Athletic had included a single line saying, but a CT scan did

10:17:46    not find a fracture, that that would substantially change the

10:17:48    way that a reader viewed him, and their opinion of him is

10:17:53    just not supportable.

10:17:55    The allegations in this petition are significant.

10:17:58    They are very serious.

10:17:59    THE COURT:  But let me put it this way:  At some

10:18:04    point all of that clearly matters, if just for damages.  I

10:18:08    mean, let's say that it were to determine that Mr. Bauer --

10:18:14    they went forward on the merits, *Times vs. Sullivan*,

1 10:18:20  everything is done.  And the jury just said, No, everything

2 10:18:22  is met, this was defamatory.  But he either can't plead under

3 10:18:26  Rule 11 special damages, or the jury gave him, you know, like

4 10:18:29  a dollar on this.

5 10:18:30      But I understand your point of saying that the issue

6 10:18:33  is coming up, and it's coming up much earlier than that, and

7 10:18:37  it's coming up as an issue of law.

8 10:18:40      But at what point does it go from being sort of the

9 10:18:43  ultimate issue of fact for a jury at trial to being a

10 10:18:49  preliminary issue of law for the Court?

11 10:18:51      What case do you believe is the one that would give

12 10:18:55  me the greatest leeway to follow this argument and say, You

13 10:18:59  know, in the context of everything, this is just kind of a

14 10:19:02  trivial thing?

15 10:19:03      MS. GREEN: I think there is a couple of cases that

16 10:19:06  both parties are relying on that the Court could look to.  I

17 10:19:10  think particularly, the Court could look to the *Carver* case,

18 10:19:13  the *Jezzini* case and the *Sipple* case.  All three of those, I

19 10:19:17  think, get at this idea where there is a discrepancy between

20 10:19:21  the allegations made in an official record and the reported

21 10:19:25  allegations.  And the Court discusses the value of this

22 10:19:30  doctrine and what it means.

23 10:19:31      And I certainly understand Your Honor's concern

24 10:19:34  that, you know, in an ordinary civil claim, these kinds of

25 10:19:38  findings around reasonableness instinctively feel more like a

1 10:19:43    jury question.

2 10:19:44           But in the First Amendment context, because of our

3 10:19:47    commitment to breathing room for error, our commitment to

4 10:19:49    avoiding the burdens of litigation for the press, courts have

5 10:19:53    repeatedly said that these are correct determinations for the

6 10:19:57    Court to make, although I sympathize with the fact that that

7 10:19:59    is an unusual situation to be in.

8 10:20:01           THE COURT:  All right.  Counsel, we've -- I have set

9 10:20:04    aside a certain amount of time for this matter, but I've got

10 10:20:08    a long calendar coming up.

11 10:20:10           So I want to obviously hear from Ms. Knight's

12 10:20:15    lawyer, as well.

13 10:20:16           So is there -- very briefly, if you would please sum

14 10:20:21    up your belief that it would be futile here to allow the

15 10:20:25    leave to amend.  And I understand your point that in a First

16 10:20:28    Amendment case, whereas in other cases the proper procedure

17 10:20:33    might be to just have there be a First Amended Complaint, the

18 10:20:36    plaintiff put his best foot forward, see everything, rule on

19 10:20:40    everything so it's clear, especially if it would terminate

20 10:20:43    the case, that that is not something that should happen here.

21 10:20:46           So I understand that.  So why don't you sum up your

22 10:20:51    argument, so I can hear on behalf of Ms. Knight.

23 10:20:55           MS. GREEN:  Thank you, Your Honor.

24 10:20:55           Just the very last thing, as a reminder, of course,

25 10:20:58    that there is also the actual malice standard, perhaps the

most important of the First Amendment protections.  And that
the evidence pled here of actual malice is clearly deficient,
clearly does not meet that standard.

There is, as set out in our briefing, two showings
in a defamation by implication claim.  Mr. Bauer has an even
heavier burden than in an ordinary defamation claim, and he
has not even attempted to meet that.

And I will close on that, Your Honor.  There were
two small concerns I had about the draft decision that I
think potentially misstate the record that I wanted to
highlight.

THE COURT:  Well, then tell me -- I mean, that is
precisely why I do this.  So tell me what those are.

MS. GREEN:  The first, Your Honor, this may be a
small thing, but I think it is important.  On page 4, I think
that the Court is just summarizing Mr. Bauer's allegations
about what the Superior Court found in the third paragraph
down, but it slips out of that language.  And I'm concerned
because, as we've argued, Mr. Bauer I think very much
misrepresents the contents of those Superior Court
proceedings.

THE COURT:  It was certainly my intent through this
to just say, this is what is alleged.  So it's not like I
have read a transcript of the --

MS. GREEN:  Thank you.  Yes.

1 10:22:17          And then the last sentence running from 3 to 4 just

2 10:22:20   above it, where it describes Mr. Bauer's contentions about

3 10:22:24   why the correction was not sufficient, I think it's just a

4 10:22:29   slight misreading there, because the correction does not

5 10:22:35   allege that she was diagnosed with a skull fracture, it just

6 10:22:38   says there were signs of it.

7 10:22:40          THE COURT:  Okay.  Thank you.

8 10:22:42          MS. GREEN:  Thank you.

9 10:22:42          THE COURT:  Let me hear from counsel for Ms. Knight.

10 10:22:54          MS. PALACIOS:  Thank you, Your Honor.  Diana

11 10:22:55   Palacios on behalf of Ms. Knight.  And thank you, I echo my

12 10:22:58   cocounsel's statement, for the thoughtfulness in the

13 10:23:04   tentative.

14 10:23:04          I do want to address a couple of points as to the

15 10:23:10   argument regarding the tweets being opinion.  As to the

16 10:23:14   broader context, while as the tentative acknowledges, Twitter

17 10:23:21   and Ms. Knight's other tweets are an important consideration

18 10:23:25   of that context.

19 10:23:26          Another important consideration that is not

20 10:23:27   discussed in the tentative is that these tweets were issued

21 10:23:30   or part of an ongoing public debate, a public debate

22 10:23:34   regarding consent.

23 10:23:37          Other courts, like *Nicosia*, have acknowledged that

24 10:23:40   heated online public debates are something that can convert

25 10:23:43   the broader context into something that can be considered as

1 10:23:47   opinion.

2 10:23:47          And here, that is exactly what is going on.  Ms.

3 10:23:52   Knight is replying to another Twitter user.  She issues her

4 10:23:57   tweets within three minutes.  She also acknowledges that this

5 10:24:00   is part of a debate.

6 10:24:03          In one of her tweets, what she says, there may be,

7 10:24:07   you know -- there is some confusion as to the issue of

8 10:24:10   consent.  I'm looking for the exact wording.  Give me one

9 10:24:13   second.  Here it is.  "There seems to be some confusion

10 10:24:22  surrounding the issue of consent, but here is some clarity.

11 10:24:25  It's not possible to consent to a cracked skull."

12 10:24:27          So she is acknowledging that her tweets are part of

13 10:24:30  this broader public debate.  That is something courts should

14 10:24:34  consider.

15 10:24:34          And the case that I mentioned is *Nicosia*.  There,

16 10:24:38  there was an online public debate, and it was part of that

17 10:24:41  broader context.

18 10:24:43          The specific context, the tentative mentions the

19 10:24:47  directness of her tweets, but there are other aspects of the

20 10:24:50  language of the tweets, and the tweets themselves that are

21 10:24:53  important consideration.

22 10:24:55          As I mentioned, the tweets were issued within three

23 10:24:57  minutes.  They were rapid succession.  They have incomplete

24 10:25:03  sentences.  She turns one of the statements to the reader,

25 10:25:06  saying, You would like rough sex, right?  So she's now using

1 10:25:09   a rhetorical device, posing it to the reader.

2 10:25:12        And she also includes colloquialisms, like cracked

3 10:25:17   skull.  That is not a term a doctor would use.

4 10:25:19        In addition to the specific context, another

5 10:25:22   important consideration not mentioned in the tentative is

6 10:25:25   that her statements disclosed the underlying facts.  We have

7 10:25:29   cases like *Nicosia* that has -- and *Global* where a link to a

8 10:25:34   tweet was sufficient to say that the underlying facts have

9 10:25:37   been disclosed.  That is opinion based on disclosed fact.

10 10:25:40        There is also *Cochran*, where the Court recognized

11 10:25:44   that everybody knew the underlying facts.  It was understood.

12 10:25:49        And here, too, the tweet that she is responding to

13 10:25:52   is fully disclosed.  It was part of the tweet chain.  It

14 10:25:55   also, the article she is responding to, also linked that.  So

15 10:26:01   that is disclosure of the underlying facts which would

16 10:26:04   convert the specific context into being more appropriate for

17 10:26:08   opinion.

18 10:26:09        And then in general, this was a discussion.  As the

19 10:26:14   tweets themselves show, the assumptions that the people knew

20 10:26:18   what she was discussing, right?  So like in *Cochran*, there

21 10:26:21   was an underlying understanding of those facts.

22 10:26:25        As to the third aspect of opinion under the Court --

23 10:26:31        THE COURT:  Counsel, don't you feel that that cuts

24 10:26:33   against you?  Because it's precisely on that where if someone

25 10:26:37   had been at least somewhat following this, where it makes it

1 10:26:39   all the more likely that the implication was that the issue

2 10:26:42   here -- like I said, that negates the possibility that the

3 10:26:47   idea of the cracked skull would be a rhetorical device.  As I

4 10:26:50   said earlier, along the lines of saying nobody could consent

5 10:26:54   to a knife through the heart, or nobody could consent to

6 10:26:57   their leg being chopped off with an axe, or something like

7 10:27:00   this.

8 10:27:00       It wasn't meant to be a rhetorical device to say,

9 10:27:04   Well, of course you can't consent to utterly unspeakable

10 10:27:08   conduct, because it was precisely something which in the

11 10:27:12   context of what a reasonable reader would know of the

12 10:27:16   allegations here could very well have been what the -- or

13 10:27:20   would be taken, in fact, as a reference to the injury here;

14 10:27:26   which, in fact, according at least to the allegations of

15 10:27:29   Mr. Bauer, was not true and was known to Ms. Knight not to be

16 10:27:33   true.

17 10:27:35       MS. PALACIOS:  Well, I'll take the truth statements

18 10:27:37   in a second.

19 10:27:38       But as to the statements, yes, she could have said,

20 10:27:44   you know, somebody could not consent to death.  They would

21 10:27:48   have made and had the same affect.  That was the point of the

22 10:27:51   statement.  Her point of the statement is consent.

23 10:27:53       THE COURT:  But you are asserting that, but that is

24 10:27:56   not necessarily using the indicia that have been established

25 10:28:00   in the case law of how the reader would take that.

1 10:28:05        It just seems the reader -- it just seems to me,

2 10:28:08   looking at the indicia to be employed, that have been

3 10:28:13   established in case law, that if you apply them, which is

4 10:28:15   what I tried to do in the tentative, that it comes out that

5 10:28:19   the reader would, in fact, say is that she had a cracked

6 10:28:24   skull, which shows that the idea that she consented to that

7 10:28:27   is -- it's ridiculous.  It's just -- it's a nullity.

8 10:28:32        You know, that is -- that is what you are saying,

9 10:28:34   that is the way it should be understood, but that is not the

10 10:28:37   way I believe the reasonable reader would have understood it.

11 10:28:40   The reasonable reader would have said, since here the fact

12 10:28:43   is, is that she had a cracked skull, nobody could think that

13 10:28:46   that is what she was consenting to.

14 10:28:49        MS. PALACIOS:  Your Honor, the Ninth Circuit has

15 10:28:51   explained that when you are reading the context of these

16 10:28:55   statements, that you also look at the, you know, the essence

17 10:28:58   of it.  What is the point of it?

18 10:29:01        If you look at *Knievel*, for example, the Court is

19 10:29:06   explaining that what is the essence of the statement

20 10:29:09   regarding Knievel being a pimp.  Is it really that he is a

21 10:29:13   pimp or is there a greater context?

22 10:29:15        And here, too, the greater context, Ms. Knight

23 10:29:18   explains it, it is about the issue of consent; not as to

24 10:29:21   establishing facts.

25 10:29:22        She is not setting out any additional facts.  She is

1 10:29:25   discussing the issue of consent.  She tells us so in her

2 10:29:29   tweets that that is the issue she is discussing.

3 10:29:31           THE COURT:  But the point is, Ms. Knight has every

4 10:29:34   ability to argue that, both on summary judgment, and

5 10:29:39   ultimately if it comes to that, to a jury.

6 10:29:43           While of course because of the First Amendment

7 10:29:46   concerns here, there is this vehicle to raise it at the very

8 10:29:52   beginning of the case, that is the whole reason that

9 10:29:54   California has the anti-SLAPP statute, and at least for now

10 10:30:00   it applies in Federal Court.

11 10:30:02           But there is something a little unusual, to put it

12 10:30:05   mildly, that that is about the relief that you are

13 10:30:10   requesting.

14 10:30:11           I mean, the implication I think at times in the

15 10:30:15   brief was almost, Well, if we don't cut it off now, then

16 10:30:21   suddenly she's liable.  She is not liable.  The allegations

17 10:30:24   have to be proper.  They have to be proven.  The jury has to

18 10:30:28   agree, and *Times vs. Sullivan* has to apply.

19 10:30:31           It's not as if -- it's not as if like the whole case

20 10:30:35   is coming down to something which is being decided right at

21 10:30:40   this hearing.  There is all the other -- what you are saying

22 10:30:43   is under a California statute and the Federal and California

23 10:30:47   cases that construe it, she has the right to something

24 10:30:52   extraordinary.  And the question is whether that is true or

25 10:30:54   not.

1  10:30:55   But that -- implicit in that is the idea that she

2  10:30:59   has not made an assertion of fact that is either true or

3  10:31:03   false.

4  10:31:03   And as I said, it seems to me that she did make an

5  10:31:08   assertion of fact, albeit implied, of something which is

6  10:31:12   represented -- you know, we aren't going to have the whole

7  10:31:15   case decided here -- but is alleged by Mr. Bauer to have been

8  10:31:19   false, and known to have been false.

9  10:31:21   Look, I'll think more about the argument that was

10 10:31:24   made by cocounsel that at some point it's so trivial that

11 10:31:28   it's not a reason for the case to go forward within the First

12 10:31:34   Amendment concerns.  But on the narrow issue of the -- of the

13 10:31:39   anti-SLAPP here, it does seem that there is -- I will just

14 10:31:45   tell you, I am not saying that I am the reasonable reader,

15 10:31:51   okay?  I can't be cross-examined.  I might be very

16 10:31:53   unreasonable.  I'm trying to construct a reasonable reader

17 10:31:58   that -- I am trying to construct a reasonable reader based on

18 10:32:02   how the case law has defined that.

19 10:32:05   But to the extent that you are saying nobody could

20 10:32:07   take it that way, that is simply not true, because that is

21 10:32:10   the way that I took it when I first read the full record.

22 10:32:13   I took it that she was saying that there was a

23 10:32:17   cracked skull here.  And then the allegations are further

24 10:32:21   made that that was not true and that she knew it.

25 10:32:24   So again -- but anyway, let me hear the rest of your

1   10:32:29   argument, and give Mr. Bauer a chance to respond.

2   10:32:32          MS. PALACIOS:  Sure.  I appreciate that.

3   10:32:33          I do want to point out that the -- whether a

4   10:32:36   challenged statement conveys a requisite factual imputation

5   10:32:41   is ordinarily a question of law for the Court.  And that

6   10:32:44   is --

7   10:32:44          THE COURT:  At this stage, correct.  I understand

8   10:32:45   that, which is why I was looking at the case law.

9   10:32:49          But that is -- again, in the application, it's not

10  10:32:52   to say -- it's an issue of law, but then the point is, is

11  10:32:55   that it's not as if there would be no other time in the Court

12  10:32:58   for -- there would be no other time for that to be addressed

13  10:33:02   throughout the course of the case.  It's basically we are

14  10:33:05   addressing it right here.

15  10:33:06          I agree with you, that it is said that this is a --

16  10:33:09   this is a matter of law in regard to whether there is an

17  10:33:12   implication of fact involved here.

18  10:33:15          MS. PALACIOS:  Understood, Your Honor.

19  10:33:16          I do want to point out, as well, especially in

20  10:33:19   consideration with Ms. Knight, that because the motion to

21  10:33:22   dismiss is -- I'm sorry -- the motion to strike is being

22  10:33:25   denied as to the argument regarding opinion, it is crucial

23  10:33:28   that the Court address the other arguments raised on behalf

24  10:33:31   of Ms. Knight, including actual malice and substantial truth.

25  10:33:35          As to actual malice, the allegations are completely

10:33:38  1   lacking.  You mentioned the standard of *New York Times vs.*

10:33:43  2   *Sullivan.*  It's incredibly important to apply that standard

10:33:45  3   even at the pleading stage.

10:33:46  4          And so general statements regarding actual malice,

10:33:52  5   general allegations are insufficient.

10:33:54  6          THE COURT:  But I think, isn't there more than -- I

10:33:57  7   understand the point that you are making.  But under Rule 8

10:34:00  8   and *Twombly* and *Iqbal*, isn't there something more than just

10:34:04  9   the naked allegation and legal terms?

10:34:07  10         He's saying that there was a personal vendetta as to

10:34:10  11  him.  So why would that almost ipso facto not satisfy the

10:34:14  12  legal requirement of actual malice?

10:34:16  13         MS. PALACIOS:  Because a personal vendetta or ill

10:34:19  14  will has been recognized to be insufficient on its own to

10:34:23  15  establish actual malice.  And that comes from the Supreme

10:34:25  16  Court in *Harte-Hanks*.

10:34:27  17         So therefore, they are allegations.  And that is the

10:34:30  18  only allegation they really have as to Ms. Molly are

10:34:34  19  sufficient as a matter of law.  According to the Supreme

10:34:36  20  Court, that type of evidence, or alleged evidence, because we

10:34:38  21  also believe that these articles are misconstrued, the

10:34:44  22  vendetta is insufficient as actual malice as a matter of law.

10:34:47  23         THE COURT:  Well, I will go back and look at that

10:34:50  24  point while I'm looking at the fair reporting issue that was

10:34:54  25  raised.

1 10:34:54          So let me -- anything else you want to say to me

2 10:34:58   before we hear from Mr. Bauer?

3 10:35:00          MS. PALACIOS:  I will do so only briefly.

4 10:35:01          In that the other argument we raised is the

5 10:35:03   substantial truth, and we do believe that that is an argument

6 10:35:06   that should be addressed as to Ms. Knight, but actual malice,

7 10:35:09   I think, really goes to the pleadings.

8 10:35:10          For substantial truth, it's the thrust of her

9 10:35:13   statements are substantially true when you consider the

10 10:35:16  petition as a whole, because the -- Mr. Bauer does not deny

11 10:35:22  that many of the allegations in the petition, the setting

12 10:35:27  aside the issue of consent, he does not deny what's in the

13 10:35:32  medical report.  Taking that into consideration as a whole,

14 10:35:34  it's not substantially -- the thrust is similar to the

15 10:35:37  statements in the -- in the tweets themselves.

16 10:35:42          And that is sufficient for substantial truth.

17 10:35:45          THE COURT:  All right.  Thank you.

18 10:35:46          MS. PALACIOS:  And I'll leave it there.  Thank you.

19 10:35:47          THE COURT:  Let me hear from counsel for the

20 10:35:49  plaintiff.

21 10:35:57          MS. PEYSER: Good morning, Your Honor.

22 10:36:01          In light of your tentative ruling, I would like to

23 10:36:05  start with the correction statute issue.

24 10:36:09          Mr. Bauer alleges that he complied with the

25 10:36:13  corrections statute because he sent a letter within the

1  10:36:17  proper timeframe that specifically stated what needed to be

2  10:36:20  corrected.

3  10:36:20       It appears that the only issue that the parties

4  10:36:24  disagree about is whether Mr. Bauer sent his demand letter to

5  10:36:28  the correct individuals.

6  10:36:30       THE COURT:  An issue which the California courts who

7  10:36:33  have the right to construe California statutes have cared a

8  10:36:39  great deal about, that it be the precisely right person.

9  10:36:44       MS. PEYSER: In the case that you reference in your

10  10:36:48  tentative ruling, Your Honor, you mention the *Freedom*

11  10:36:52  *Newspapers* case, which states that the -- if the demand is

12  10:36:59  served on someone other than the publisher, and the publisher

13  10:37:03  acquires actual knowledge of the request for correction

14  10:37:06  within the time limit, that is sufficient.

15  10:37:09       And here, I would like to take a look at the

16  10:37:12  allegations.  The complaint alleges that an e-mail was sent

17  10:37:17  to an editor and the chief content officer followed by a

18  10:37:22  formal demand letter.  And the complaint importantly alleges

19  10:37:26  that The Athletic responded first by refusing to correct, and

20  10:37:30  then by issuing the insufficient correction.

21  10:37:33       So the publisher must have necessarily been put on

22  10:37:37  notice, because Mr. Bauer either sent the demand letter to

23  10:37:43  the correct people, or they, those people, gave notice to the

24  10:37:48  individuals who had authority to respond and to issue a

25  10:37:53  correction if they decided to.

10:37:55    So another point is The Athletic argues, and Your

10:38:02    Honor recognizes, that a demand letter should be sent to the

10:38:06    publisher, but The Athletic never tells us who that is.  Who

10:38:09    is the publisher?  Do they have a name?  Do they have an

10:38:13    e-mail address?  Is that information publically available and

10:38:16    reasonably accessible?

10:38:17    If you Google The Athletic publisher, and this is

10:38:20    before The Athletic was acquired, I do not believe that any

10:38:25    individual's name comes up.

10:38:27    In The Athletic's briefing, they say that Mr. Bauer

10:38:31    should have sent his demand letter to the publisher.  They

10:38:34    never say it should have been sent to Mr. Smith at this

10:38:37    e-mail address.  The letter was sent to an editor and the

10:38:41    chief content officer.

10:38:43    It is reasonable to think that the chief content

10:38:46    officer is in charge of content, and would have authority to

10:38:49    handle the issue.  He has a C title in a large organization.

10:38:53    He works on the business side, and is in charge of content.

10:38:57    Who else would be a more appropriate person to send

10:39:00    the demand letter to, especially given that there is no

10:39:03    individual person with the title publisher that Mr. Bauer is

10:39:08    aware of.

10:39:09    And the demand letter itself suggests that the

10:39:15    individuals it was sent to forwarded it to their legal

10:39:17    department; thus indicating that if this letter is not sent

1  10:39:22   to the people with authority to handle it, please forward it.

2  10:39:25        But above all, we know that the letter was sent to

3  10:39:29   the right people, or was eventually given to the right

4  10:39:33   people, because Mr. Bauer did get a response.

5  10:39:37        And if Your Honor disagrees, Mr. Bauer would like

6  10:39:45   leave to amend to allege special damages as you suggest.

7  10:39:48        THE COURT:  What is your response to the argument

8  10:39:50   that leave to amend shouldn't even be given, because assuming

9  10:39:56   arguendo that he would be able to properly allege service on

10  10:40:00   the publisher pursuant to Rule 8 and *Twombly* and *Iqbal*, that

11  10:40:08   there are just these other legal doctrines that render the

12  10:40:12   complaint futile?

13  10:40:16        MS. PEYSER: The article itself explains that The

14  10:40:23   Athletic knew for certain what was in LH's petition.  The

15  10:40:28   petition as a whole explains that three things happened in

16  10:40:30   relationship to this skull fracture issue:

17  10:40:33        1.  LH presented to the ER with what she describes

18  10:40:38   as indications of a possible skull fracture.

19  10:40:41        2.  LH underwent CT scans, which was the only way to

20  10:40:46   rule that out.  And;

21  10:40:47        3.  The CT scan results were unremarkable and showed

22  10:40:53   no acute fracture.

23  10:40:54        The Athletic reported two of those things:  The

24  10:40:57   possibility of an initial skull fracture and the fact that

25  10:41:00   she underwent scans.  And they knew the results of those

10:41:03  scans.  They had the entire petition, the 67-page petition,

10:41:07  in front of them.  And it begs the question:  What was the

10:41:09  result of those scans?

10:41:11      But they never answered that question in the

10:41:13  article; by doing so, they created the distinct impression

10:41:18  that there was a skull fracture.

10:41:20      The Athletic says that the effect on the reader

10:41:22  would have been the same regardless of whether or not there

10:41:25  was a skull fracture, but at this stage at least it is

10:41:29  plausible that a skull fracture has a very different affect

10:41:33  on the reader than black eyes and bruises.  Ms. Knight said

10:41:38  so in her tweets.

10:41:39      Going back to LH's petition, which is important,

10:41:44  because the fair report privilege obviously requires a fair

10:41:48  report of the petition, LH alleges that she had two sexual

10:41:53  encounters with Mr. Bauer.  They began as consensual.  LH

10:41:58  herself says in the petition she consented to rough sex, and

10:42:02  she consented to choking.

10:42:05      She then alleges that Mr. Bauer went beyond the

10:42:08  bounds of consent, which he vigorously disputes.  LH's

10:42:13  petition in the form of her medical records showed the

10:42:17  physical effects of her two encounters with Mr. Bauer, and

10:42:20  those were surface level bruises and black eyes.

10:42:23      She was given a CT scan to rule out the possibility

10:42:26  of a skull fracture.  The Athletic describes the final

diagnosis as assault by manual strangulation, but LH says in her petition that she consented to being choked as part of the rough sex that the parties agreed to engage in.

In light of the whole petition, that final diagnosis of strangulation would not come as a huge surprise to any reader; a skull fracture would.

Remember, the anonymous Twitter user, who Ms. Knight responded to in her tweets, who said, bruises and black eyes are part and parcel of rough sex, he himself is living proof that it's plausible that a reader could have come away with that interpretation if they had read the underlying petition, or at least a reader could have come away with the understanding that something lesser had occurred than actual broken bones.

And as Ms. Knight makes clear in her tweets, The Athletic's false reporting of a skull fracture makes clear that consent is completely out of the equation.

The Athletic essentially turned a petition that raised questions about what happens when two people engage in consensual rough sex and what goes beyond the bounds, to a petition that rules out consent entirely.

THE COURT: The issue, as I've approached it, have sort of -- or the issues, I should say, have risen or fallen together for the motion to strike and the motion to dismiss. But an issue that has been raised here at the hearing is that

1  10:44:02  as to actual malice, that is a mistake, because that is

2  10:44:08  something which has to be addressed on just a motion to

3  10:44:12  dismiss.

4  10:44:13      Let's say the whole California anti-SLAPP statutory

5  10:44:17  regime didn't exist, then we would be here saying, is this --

6  10:44:21  is this complaint sufficient?

7  10:44:23      So what is the response of the plaintiff to that

8  10:44:29  argument that as it is currently drafted -- and I would

9  10:44:34  certainly give leave to amend if that is the case, but I --

10 10:44:39  that it just simply fails to allege actual malice

11 10:44:45  sufficiently?

12 10:44:47      MS. PEYSER: Actual malice requires knowledge of the

13 10:44:50  truth and disregard for that truth, or reckless disregard for

14 10:44:56  the truth.

15 10:44:56      So starting with Ms. Knight's tweets, as to actual

16 10:45:01  malice, one of two things could have happened:

17 10:45:04      1.  Ms. Knight read the entire petition and

18 10:45:10  deliberately falsified information about it.  That is

19 10:45:14  plausible.  She is a reporter known for reporting on

20 10:45:18  baseball, seems reasonable she would have read the petition

21 10:45:20  that she was tweeting about.  Or;

22 10:45:23      2.  She had reckless disregard for the truth by

23 10:45:28  tweeting alleged facts about a petition without actually

24 10:45:30  reading it.

25 10:45:32      If number two is the case, she must have gotten the

1 10:45:35   impression that there was a skull fracture from somewhere.

2 10:45:39   The Athletic contends that the article itself cannot be

3 10:45:42   reasonably read to create the impression that LH suffered a

4 10:45:46   skull fracture.

5 10:45:48        But if Ms. Knight hadn't read -- hadn't read the

6 10:45:51   petition and had reckless disregard, she got the exact

7 10:45:57   impression from the article that The Athletic now argues that

8 10:46:00   the article did not convey.

9 10:46:01        So either way, Ms. Knight as a baseball reporter,

10 10:46:07   who is tweeting facts that her readers expect to be the

11 10:46:12   truth, had actual malice, or at least there is the

12 10:46:16   possibility that there is clear and convincing evidence of

13 10:46:20   actual malice, which is all Mr. Bauer must plead at this

14 10:46:23   stage.

15 10:46:23        THE COURT:  All right.  Thank you, counsel.

16 10:46:24        Anything else on behalf of Mr. Bauer?

17 10:46:27        MS. PEYSER:  That's it.  Thank you, Your Honor.

18 10:46:29        THE COURT:  Let me hear briefly from The Athletic in

19 10:46:36   response to the points that were raised, and I'll hear from

20 10:46:41   Ms. Knight in regard to the actual malice issue.

21 10:46:46        MS. GREEN:  Thank you, Your Honor.  Very briefly on

22 10:46:48   the correction statute.

23 10:46:54        Mr. Bauer's arguing that he couldn't have written to

24 10:46:58   the publisher because he now can't find out who the publisher

25 10:47:02   is.  Nothing prevents him from just sending a letter to the

1  10:47:05   publisher.  The statute doesn't require that you know the

2  10:47:08   name of the publisher, it's just that it be sent to the

3  10:47:11   publisher.  And there is nothing in the record that indicates

4  10:47:14   that it was actually constructively delivered to the

5  10:47:17   publisher.  The e-mails that have been attached are from the

6  10:47:20   same editor to whom he wrote.

7  10:47:24        You know, I don't know if Your Honor has particular

8  10:47:26   questions about that, but I don't think there is much to

9  10:47:29   respond to there.

10  10:47:30        In terms of the petition, you know, I think again,

11  10:47:33   Mr. Bauer is misrepresenting what that petition said.  We are

12  10:47:38   still hearing nothing about the second medical appointment

13  10:47:42   and the MRI scans that were done.

14  10:47:45        Mr. Bauer also continued to focus exclusively on the

15  10:47:50   injuries that might have been caused to LH, while also

16  10:47:52   minimizing those injuries; sort of suggesting that all she

17  10:47:56   had were some black eyes and bruises, which I would submit

18  10:48:00   are significant injuries based on the medical records.

19  10:48:06        But what is alleged here is far more than just that.

20  10:48:08   I mean, the allegations -- I don't want to sort of go through

21  10:48:11   them all over again -- but they are really graphic and

22  10:48:13   serious allegations of extreme violence.

23  10:48:16        So the idea that a reader's opinion was really only

24  10:48:21   being affected by the particular injuries, I think is really

25  10:48:23   not plausible.

1 10:48:24          What is going to shock the conscience of a reader

2 10:48:26 here is the actions that Mr. Bauer was taking towards this

3 10:48:30 woman, which whether she's an egg shell plaintiff or not,

4 10:48:34 whatever her particular vulnerabilities, I think for most of

5 10:48:38 society would be quite shocking.

6 10:48:41          And it's that, really, that we are focusing on in

7 10:48:44 terms of the gist of that petition.

8 10:48:46          THE COURT:  All right.  Thank you.

9 10:48:47          Counsel, thank you for your briefs.  Thank you for

10 10:48:50 your arguments.

11 10:48:51          Oh, I'm sorry, counsel.  Let me hear from you on the

12 10:48:54 actual malice.

13 10:48:55          MS. PALACIOS:  Thank you.  I appreciate it.

14 10:48:56          I will keep it short.  It's just really two points.

15 10:49:00          Counsel for Mr. Bauer makes the argument regarding

16 10:49:04 whether Ms. Knight could have, should have read the petition.

17 10:49:09          First, those allegations are not in the complaint.

18 10:49:11 The allegations regarding actual malice have to be specific

19 10:49:14 to each defendant, and those allegations are not present.

20 10:49:17          Second, the Ninth Circuit has stated that must,

21 10:49:21 quote, "Must or should have known arguments is an objective

22 10:49:24 negligence test, while actual malice test is a deliberative

23 10:49:28 subjective test."

24 10:49:29          So those type of arguments are also just

25 10:49:32 insufficient under the Ninth Circuit standard for actual

10:49:34  malice.

10:49:34         If you have any other questions regarding actual

10:49:36  malice, I'm happy to address them, but it's clear based on

10:49:40  the allegations and counsel's argument today that actual

10:49:43  malice has not been alleged as to Ms. Knight.

10:49:46         THE COURT:  It's really just a matter of closely

10:49:48  looking at the case law on the point, which I will do.

10:49:51         So thank you, counsel.  Again, thank you for your

10:49:54  briefs.  Thank you for your arguments.  The two motions are

10:49:58  taken under submission.

                          *****     *****     *****

I certify that the foregoing is a correct transcript from the

record of proceedings in the above-titled matter.



---------------------------


Amy C. Diaz, RPR, CRR              November 11, 2022

S/  Amy Diaz