1
2
3
4
5

KINSELLA WEITZMAN ISER KUMP HOLLEY LLP
Shawn Holley (Cal. Bar No. 136811)
Suann C. MacIsaac (Cal. Bar No. 205659)
808 Wilshire Boulevard., 3rd Floor
Santa Monica, CA 90401
Tel: (310) 566-9800
Fax: (310) 566-9873
sholley@kwikhlaw.com
smacisaac@kwikhlaw.com

6
7
8
9
10

ZUCKERMAN SPAEDER LLP
Blair G. Brown (*pro hac vice*)
Jon R. Fetterolf (*pro hac vice*)
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 882-8106
bbrown@zuckerman.com
jfetterolf@zuckerman.com

11
12
13
14

ZUCKERMAN SPAEDER LLP
Nell Z. Peyser (*pro hac vice*)
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: (212) 704-9600
Fax: (212) 704-4256
npeyser@zuckerman.com

15

*Attorneys for Plaintiff*

16
17
18

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

19
20
21
22
23
24
25

TREVOR BAUER,

              Plaintiff,

    v.

THE ATHLETIC MEDIA
COMPANY and MOLLY KNIGHT,

              Defendants.

Case No. 22-cv-2062-MWF(AGRx)

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

26
27
28

Plaintiff Trevor Bauer, by his undersigned attorneys, alleges as follows:

**NATURE OF THE ACTION**

1.     In May and June 2021, Plaintiff Trevor Bauer was falsely accused of sexual assault by a woman ("the Complainant"). Two independent arbiters—a California Superior Court judge and the Los Angeles District Attorney's Office—reviewed her claims. The California Superior Court judge concluded that the Complainant's petition for a restraining order against Mr. Bauer was "materially misleading."  In denying that petition, the Court further found that there was no act of abuse—including no physical or sexual assault—by Mr. Bauer. The District Attorney's Office declined to prosecute Mr. Bauer "after a thorough review of all the available evidence including the civil restraining order proceedings, witness statements, and the physical evidence," and specifically noted the Complainant's failure to meet the "very low" standard for obtaining a restraining order.

2.     Despite being cleared by those independent arbiters, Mr. Bauer had already been convicted by the media through false and malicious reporting.

3.     Within days of the Complainant filing a petition for a restraining order against Mr. Bauer, the on-line sports news website *The Athletic* and its former employee Molly Knight ("Defendants") defamed Mr. Bauer by creating and spreading the false narrative that Mr. Bauer fractured the Complainant's skull. There was no basis for that assertion because the Complainant's *own medical records*—which *The Athletic* possessed—showed that she had no such fracture. Nonetheless, consistent with their prior and subsequent expressions of animus toward Mr. Bauer, *The Athletic* and Ms. Knight publicized that false attack, which was picked up and further disseminated to a larger audience by other media outlets and social media sites.

4.     *The Athletic* published the defamatory statements on June 30, 2021, in its article "Graphic details, photos emerge in restraining order filed against Dodgers pitcher Trevor Bauer" ("the Article"). The Article purported to report on the

FIRST AMENDED COMPLAINT

Complainant's petition for a restraining order, which included a declaration from the Complainant and exhibits that included her medical records.

5.    The Article stated that the Complainant had signs of a basilar skull fracture, and that she received CT scans of her brain, neck and face. The clear implication was that the CT scans confirmed the skull fracture. But the Article ignored the results of the CT scans that showed *no skull fracture*. By omitting those results, the Article conveyed the false message that the Complainant had suffered a skull fracture.

6.    Ms. Knight also explicitly communicated this false message in three tweets to her over 100,000 followers. Each of her tweets falsely referred to a "cracked" or "fractured" skull in describing the Complainant's allegations against Mr. Bauer.

7.    Defendants acted with actual malice because they deliberately ignored the truth—which was evident in the medical records possessed by *The Athletic*—and because the Defendants' defamatory statements were part of a campaign to harass Mr. Bauer, as evidenced by, among other actions, their  prior and subsequent false and misleading statements about his conduct and character, their efforts to dissuade Major League Baseball teams from signing him, and their strident complaints about the Los Angeles Dodgers' decision to add him to their team.

8.    Mr. Bauer now brings this action seeking redress for Defendants' defamatory and malicious actions.

## PARTIES

9.    Trevor Bauer is a citizen of the State of Texas and a Major League Baseball player.

10.    Defendant The Athletic Media Company ("*The Athletic*") is a Delaware corporation with its principal place of business in California.

11.    Molly Knight was an employee of *The Athletic* through July 30, 2021 and is a citizen of the State of California and a resident of Los Angeles County,

FIRST AMENDED COMPLAINT

California. Ms. Knight's actions prior to July 30, 2021, described in this Complaint were taken in the course of, and within the scope of, her employment by *The Athletic*.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

13.     This Court has personal jurisdiction over all Defendants because *The Athletic*, which published the Article, maintains its principal place of business in California and Ms. Knight is a citizen and resident of California.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Ms. Knight is a resident of Los Angeles County, California, *The Athletic* is a resident of the State of California, and a substantial part of the events giving rise to the claims in this Complaint occurred in this District.

## FACTUAL ALLEGATIONS

### I.     *The Athletic* Targets Mr. Bauer

15.     On November 11, 2020, Mr. Bauer won the National League Cy Young award, a prestigious honor given to the best pitcher in the National League of Major League Baseball. That same November, Mr. Bauer entered free agency, in which he could be signed by any team in Major League Baseball.

16.     During Mr. Bauer's free agency, *The Athletic* repeatedly impugned Mr. Bauer's character in an effort to prevent teams from signing him.

17.     On November 17, 2020, *The Athletic* published an article titled "Trevor Bauer could help the Blue Jays. But is his total package worth the risk?"[1]  The article stated that Mr. Bauer was "an active Twitter user" who has "been a part of some ugly

---

[1] Kaitlyn McGrath, *Trevor Bauer could help the Blue Jays. But is his total package worth the risk?*, THE ATHLETIC (Nov. 17, 2020), https://theathletic.com/2201359/2020/11/17/trevor-bauer-could-help-the-blue-jays-but-is-his-total-package-worth-the-risk/.

FIRST AMENDED COMPLAINT

interactions, including one in 2019 when a young woman said she felt harassed by Bauer and his followers after interacting with the pitcher online."  Although the article recognized that Mr. Bauer "acknowledged the situation and asked his followers to stop," it characterized him as "polarizing," having "outbursts," displaying "poor judgment on social media," and "engag[ing] in problematic interactions with ordinary people, including the aforementioned young woman."

18.    The article did not identify any other "problematic interactions with ordinary people."  It cited an article by the sports-news website *Deadspin* that listed several of Mr. Bauer's tweets, none of which were "problematic interactions with ordinary people."

19.    The article then cautioned that the Toronto Blue Jays "would need to be prepared for the potential headaches [Mr. Bauer] might bring" given his "reputation and his personality."

20.    An article in *The Athletic* from December 18, 2020 questioned "[w]hether Bauer's history of antics and outspokenness would fit in with the culture Toronto is building," and claimed that "[s]ome teams may also consider Bauer's personality and outspokenness on social media when factoring his fit with a club."[2] It did not provide any examples of teams expressing concern about Mr. Bauer's social media activity.

21.    On January 22, 2021, Ken Rosenthal at *The Athletic* wrote the article "Mets increasing focus on free-agent pitcher Trevor Bauer."[3]  That article also questioned Mr. Bauer's character and sought to dissuade teams from signing him in

---

[2] The Athletic MLB Staff, *MLB free agency fits: Trevor Bauer potential landing spots,* THE ATHLETIC (Dec. 18, 2020), https://theathletic.com/2266264/2020/12/18/mlb-free-agency-fits-bauer/?source=twitterhq.

[3] Ken Rosenthal, *Rosenthal: Mets increasing focus on free-agent pitcher Trevor Bauer,* THE ATHLETIC  (Jan. 22, 2021), https://theathletic.com/2340432/2021/01/22/rosenthal-mets-increasing-focus-on-free-agent-pitcher-trevor-bauer/.

free agency.  Mr. Rosenthal described Mr. Bauer as "an active and occasionally controversial social-media presence" and warned that, if the New York Mets signed Mr. Bauer, it "would renew questions about the team's culture."  The article acknowledged that Mr. Bauer was "well-liked by his Reds teammates last season," but said "[s]ome in baseball"—without identifying whom, or what team they were affiliated with—"take exception with Bauer's personality."

22.    Despite *The Athletic*'s harassment campaign, Mr. Bauer signed a record-breaking contract with the Los Angeles Dodgers, making him the highest paid player in Major League Baseball for the upcoming season.

23.    In response to Mr. Bauer's success, *The Athletic* continued to malign him.  An article on February 5, 2021, called the Dodger's decision "bewildering."  It asserted that Mr. Bauer has "wielded his influence to belittle and harass people, particularly women, across the internet. He has trolled."  It identified no examples of harassment or belittling.[4]

24.    The same day, Mr. Rosenthal wrote another article, titled "In a surprise, Dodgers sign Trevor Bauer – now we'll see how the story unfolds."[5]  He asserted that Mr. Bauer "will need to . . . put an end to[] social-media tactics that include harassment when he responds aggressively to fans and reporters on Twitter, particularly women, prompting his followers to attack those who challenge him." Mr. Rosenthal did not identify harassment against "fans and reporters" or the women allegedly harassed. He further lamented that "by lashing out at his critics, [Mr. Bauer] fails to recognize the power he has over that audience and its desire to defend him. Continuing that behavior is inexcusable."

---

[4] Pedro Moura, *Dodgers accept Trevor Bauer's history and bet he will pitch great,* THE ATHLETIC (Feb. 5, 2021), https://theathletic.com/2370891/2021/02/05/dodgers-trevor-bauer-contract/?source=twitterhq.

[5] Ken Rosenthal, *Rosenthal: In a surprise, Dodgers sign Trevor Bauer – now we'll see how the story unfolds,* THE ATHLETIC (Feb. 5, 2021),
https://theathletic.com/2370899/2021/02/05/rosenthal-in-a-surprise-dodgers-sign-bauer-now-well-see-how-the-story-unfolds/.

25.     These attacks continued in two articles written by Defendant Molly Knight. Even before his signing with the Dodgers, Ms. Knight had sought out negative interactions with Mr. Bauer. In 2018, Ms. Knight was described as "egg[ing]" on Mr. Bauer on social media.[6] In another interaction with Mr. Bauer in 2018, Ms. Knight said that she was "gonna spare [him] but [he] couldn't let it go."[7]

26.     Following Mr. Bauer's record contract, Ms. Knight wrote an article in *The Athletic* titled "Trevor Bauer isn't worth the headache, so why would the Dodgers want him?"[8] She accused Mr. Bauer of "harbor[ing] prehistoric cultural opinions," having "questionable judgment and immaturity," and "buil[ding] an army of hundreds of thousands of followers ready to attack others on his behalf." Ms. Knight decided that Mr. Bauer's signing "alienat[ed] a segment of the team's loyal fan base."

27.     Ms. Knight claimed that a *New York Daily News* writer "said she endured death threats and Holocaust jokes in her mentions for months after Bauer told his followers to go after her." However, Mr. Bauer never told his followers to "go after" the *Daily News* writer. Ms. Knight did not include the supposed tweet from Mr. Bauer telling his followers to go after the writer, because no such tweet exists.

28.     Instead, Mr. Bauer had tweeted—after the writer accused Mr. Bauer of not being concerned for the health and safety of his teammates—"[w]hen you're definitely not terrible at your job or desperate for someone to notice you. Here, let

---

[6] Whitney McIntosh, *Trevor Bauer accused Astros' pitchers of cheating and their response was hilariously savage,* SB NATION (May 1, 2018, 4:54 PM), https://www.sbnation.com/mlb/2018/5/1/17308814/trevor-bauer-astros-cheating-twitter-hell-no-maga-bro.

[7] 12Up, *Indians' Trevor Bauer and Reporter Molly Knight Are in Middle of Worst Twitter Beef Ever*, THE START MAGAZINE, (Oct. 22, 2018, 8:44 PM), https://www.thestartmagazine.com/article/9ca341a5-cbaa-4eae-b707-04ffc870cdd5?

[8] Molly Knight, *Knight: Trevor Bauer isn't worth the headache, so why would the Dodgers want him?,* THE ATHLETIC (Feb. 6, 2021), https://theathletic.com/2370865/2021/02/06/dodgers-trevor-bauer-clubhouse-problem/.

me send some more followers your way.  Have a wonderful day!!"[9]  Nothing about that tweet directed followers to "go after" the *New York Daily News* writer as Ms. Knight claimed. Ms. Knight did not provide any examples of Mr. Bauer's followers sending negative tweets to the writer.

29.     With no factual basis, Ms. Knight also speculated that Mr. Bauer might have harassed women at prior organizations, asking "Have they interviewed women who work in the organizations where he's played to find out if any of this harassment extended offline?"

30.     In a tweet about her own article, Ms. Knight did not hide her ill will toward Mr. Bauer. She repeated her view that "the Dodgers did not need to award a record breaking contract to a guy with a well known history of harassing women online. It's a huge disappointment they did."[10]

31.     Following a press conference by Mr. Bauer, *The Athletic* and Ms. Knight again went after Mr. Bauer's character in the article "What Trevor Bauer should've said at his first Dodgers press conference."[11] Ms. Knight repeated the same false claims made in prior articles and continued to use *The Athletic* as a vehicle to express her ill will toward Mr. Bauer. She described "two highly publicized incidents in which young women came forward to say they were harassed by [Mr. Bauer] and his followers."   The only alleged "incident" described in the article was the mischaracterization of Mr. Bauer's tweets from Ms. Knight's prior article.

---

[9]  Trevor Bauer (@BauerOutage), TWITTER, (Aug. 15, 2020, 2:20 P.M.) https://twitter.com/BauerOutage/status/1294700832764702720.

[10] Molly Knight (@molly_knight), TWITTER, (Feb. 5, 2021) https://twitter.com/molly_knight/status/1358098962016739328 [subsequently deleted].

[11] Molly Knight, *Knight: What Trevor Bauer should've said at his first Dodgers press conference,* THE ATHLETIC (Feb. 11, 2021), https://theathletic.com/2383113/2021/02/11/trevor-bauer-dodgers-press-conference/.

32.    The next day *The Athletic* published another negative article about Mr. Bauer's Twitter presence.[12]  As with prior articles, *The Athletic* accused Mr. Bauer of "for years wield[ing] his sizable platform to harass people on the internet and espouse views that marginalize people." It asserted that there are "too many examples to recount here," yet could identify only a handful of Twitter interactions.

33.    Articles in *The Athletic* throughout 2021 continued to paint Mr. Bauer in a negative light. One article called him an "irritant to several of baseball's conventions, and to the league itself, by his own volition and intent."[13] Another described him as a "brash free-agent acquisition" who has "constantly made clear how he's felt."[14]

## II.    *The Athletic* **Publishes the False and Defamatory Article and Ms. Knight Issues False and Defamatory Tweets**

34.    On June 28, 2021, the Complainant filed a petition for a restraining order against Mr. Bauer based on allegations of sexual assault that a judge would later determine were unfounded. The petition contained a declaration from the Complainant, in which she alleged that she was given a CT scan because of "signs of a basilar skull fracture."  In fact, medical records the Complainant attached to her petition—and which were publicly available on the Los Angeles Superior Court

---

[12] Pedro Moura, *Introduced as a Dodger, Trevor Bauer declines to address his online behavior,* THE ATHLETIC (Feb. 12, 2021), https://theathletic.com/2383080/2021/02/12/dodgers-trevor-bauer-online-behavior/?source=twitterhq.

[13] Fabian Ardaya, *As MLB plans to more strictly enforce sticky stuff, Trevor Bauer's latest start brings additional focus,* THE ATHLETIC (June 6, 2021), https://theathletic.com/2635884/2021/06/06/as-mlb-plans-to-more-strictly-enforce-sticky-stuff-trevor-bauers-latest-start-brings-additional-focus/.

[14] Fabian Ardaya, *How (and why) the Dodgers' Trevor Bauer and Walker Buehler are changing up midseason,* THE ATHLETIC (June 23, 2021), https://theathletic.com/2668291/2021/06/23/how-and-why-the-dodgers-trevor-bauer-and-walker-buehler-are-changing-up-midseason/; *see also* Stephen J. Nesbitt, 'Why do those two clash?' Inside the legendary Gerrit Cole-Trevor Bauer rivalry at UCLA, THE ATHLETIC, https://theathletic.com/2645021/2021/06/14/why-do-those-two-clash-inside-the-legendary-gerrit-cole-trevor-bauer-rivalry-at-ucla/ ("Bauer is brash, brutally honest, occasionally out of bounds").

docket—conclusively found that the CT scans showed that the Complainant did not suffer a skull fracture.

35.    On June 30, 2021, *The Athletic* published an article about the Complainant's *ex parte* petition for a restraining order titled "Graphic details, photos emerge in restraining order filed against Dodger pitcher Trevor Bauer" ("the Article").  A copy of the Article is attached to this Complaint as Exhibit A.  That article, written by *The Athletic's* employees Brittany Ghiroli and Katie Strang, stated that *The Athletic* had obtained a copy of the Complainant's "67-page ex parte document."  The *ex parte* restraining order petition included the Complainant's declaration and exhibits.  The exhibits included copies of the Complainant's medical records, including her CT scan results.  The Article repeatedly referred to the Complainant's allegations of injury in her declaration and to "two medical examinations in connection with her injuries," and "CT scans for her brain, face, and neck."

36.    In its second paragraph, the Article reported that the Complainant's declaration stated that "medical notes" stated "that there were signs of a basilar skull fracture" following her sexual encounter with Mr. Bauer.  The Complainant, however, did not have a fractured skull.

37.    CT scan results included in the medical records attached to the Complainant's declaration and possessed by *The Athletic* definitively concluded that she had "no acute fracture" and stated that fact multiple times (Ex. 6 at p. 73; Ex. 12 at pp. 94, 95, 99).[15]  The purpose of the CT scans was to rule out the possibility of a skull fracture.  The CT scan did that.

38.    The Complainant's declaration made clear that her CT scan results were part of her filing.  The declaration explained that she received CT scans at Alvarado

---

[15] Exhibits 6 and 12 to the Complainant's petition can be found at ECF No. 38.

FIRST AMENDED COMPLAINT

Hospital Medical Center, and that the records "from Alvarado Hospital Medical Center" were "attached as Exhibit '6.'"  Exhibit 6 included the CT scan records.

39.    The Complainant also attached as Exhibit 12 to her declaration "progress notes" of a follow-up appointment at a different medical facility approximately two weeks later. (Ex. 12 at pp. 93-97).  In response to the Complainant referencing some residual symptoms, including pain while masticating (chewing) and opening her mouth, a physician ordered an MRI of the Complainant's face and head in order to "rule out" an undetected fracture of the jaw.

40.    The summary does not state that an MRI was ordered to "rule out" an undetected fracture of the skull. The notes in Exhibit 12 repeatedly and clearly state that the previous CT scan had already found no acute fracture of the skull. Unsurprisingly, no MRI was ordered for Complainant's skull because a CT scan is the standard for detecting skull fractures. There was nothing in the CT scan results or any of the follow-up medical records that indicated any reasonable probability of a skull fracture, whether detected or undetected.

41.    The multiple references to the CT scans in both the original and follow up medical examinations of the Complainant were the only portions of the petition and accompanying exhibits that directly addressed and ruled out whether the Complainant's skull was fractured.

42.    *The Athletic* did not refer to the CT scan results in the Article, although *The Athletic* had a copy of them.

43.    *The Athletic*, Ms. Ghiroli, and Ms. Strang knew that the Complainant had CT scans on her head, neck, and face because the Article *said so*.  The Article explained that the Complainant "underwent rapid CT scans for her brain, face and neck" but nonetheless omitted the results of the scans included in the medical records the Complainant attached to her petition.  The results of the Complainant's CT head scan attached to the petition clearly state that she suffered "no acute fracture."

FIRST AMENDED COMPLAINT

44.     Thus, either Ms. Ghiroli and Ms. Strang reviewed the medical records attached to the petition and deliberately knew their reporting was false, or they had reckless disregard for the truth by writing the Article without reviewing the medical records attached to the petition at all. Either way, by omitting the negative results of the CT scan to the Complainant's head, the authors knowingly or recklessly intended for the Article to give the clear—but false—impression that Mr. Bauer had fractured the Complainant's skull.

45.     If Ms. Ghiroli and Ms. Strang had reviewed and reported on the petition in its entirety, including the medical records, they would have known that the statement that Complainant had "signs of a basilar skull fracture" was grossly misleading in light of the attached medical records in the reporters' possession. Indeed, the Article as written would have had a dramatically different gist had it accurately reported on the petition as a whole, including the medical records that accompanied the Complainant's declaration.

46.     The Article contains lengthy quotations from the Complainant's petition and accompanying documents, which purport to describe shocking and graphic acts of alleged nonconsensual violence. If the Article had accurately reported that the Complainant's allegations in her declaration, which selectively quoted the medical records (referring to "signs of a basilar skull fracture" and ignoring "no acute skull fracture" based on CT scans), the reader would have had a substantially different impression of the Complainant's credibility.

47.     Furthermore, the statement in the Article that the Complainant had "signs of a basilar skull fracture" without including the CT scan results impacted the gist of the Article in another material way. Consensual rough sex is increasingly common, especially among millennials and younger generations. Consensual rough sex is marked by choking, hitting, and other mutually agreed-upon aggressive physical acts. However, it typically does not include force of the kind that would fracture a skull.

FIRST AMENDED COMPLAINT

48.     Absent the false reporting of a skull fracture, the Article would have told a very different story about the Complainant's petition, which would have been that Mr. Bauer and the Complainant had engaged in rough sex that, at most, resulted in ecchymosis (or surface-level bruising) and nothing more. This would have invited an informed discussion on consent and rough sex instead of an immediate vilification of Mr. Bauer for a violent act that he did not commit. By falsely reporting that the Complainant had signs of a skull fracture without including the CT scan results, the Article changed the gist of the story so as to minimize or eliminate any possibility of consent from the discussion. This defamed Mr. Bauer by falsely suggesting he committed an act of extreme violence against a woman that went beyond consent.

49.     In addition to publishing the Article on its website, which reaches approximately 6 million unique viewers each month, *The Athletic* posted a link to the Article on its Twitter account, which had over 165,000 followers, and on its Facebook account, which had over 300,000 followers.

50.     To further amplify the inaccurate claim that Mr. Bauer had fractured the Complainant's skull, Ms. Knight issued multiple tweets about the nonexistent fracture following publication of the Article.

51.     Ms. Knight tweeted, in response to a Twitter thread about the allegations against Mr. Bauer, that it is "[n]ot possible to consent to a fractured skull."[16]  A copy of that tweet is attached to the Complaint as Exhibit B-1.

52.     Minutes after sending that tweet, Ms. Knight sent a second tweet to her more than one hundred thousand followers: "There seems to be some confusion surrounding the issue of consent but here is some clarity: it's not possible to consent

---

[16] Molly Knight (@molly_knight), TWITTER (July 2, 2021, 12:11 PM), https://twitter.com/molly_knight/status/1411039821091409920 [https://web.archive.org/web/20210702191129].

FIRST AMENDED COMPLAINT

to a cracked skull."[17]  A copy of that tweet is attached to the Complaint as Exhibit B-2.  She followed up with another tweet: "Saying you'd like to engage in rough sex that involves slapping or choking does not equal consent to a cracked skull."[18]  A copy of that tweet is attached to the Complaint as Exhibit B-3.

53.    Ms. Knight's tweets illustrated that the Article conveyed the false message that Mr. Bauer fractured the Complainant's skull.

54.    Ms. Knight's repeated tweets about a non-existent skull fracture were false statements of fact, which made explicit what *The Athletic*'s Article had conveyed through implication.

55.    As a writer for *The Athletic* at the time who reported on Major League Baseball, Ms. Knight's tweets were sent in the course of, and within the scope of, her employment by *The Athletic*.

56.    Not only did *The Athletic*'s own employees understand the Article to accuse Mr. Bauer of fracturing the Complainant's skull, other news outlets had the same understanding of the Article.  For example, *Sports Illustrated*, citing to details published in *The Athletic*, published an article repeating that the Complainant had shown "signs of a basilar skull fracture," while omitting that the Complainant did not in fact sustain a skull fracture.[19]  Once informed that the Complainant did not sustain any fractures, *Sports Illustrated* corrected its reporting and issued a tweet explaining that the CT scan found no fracture.[20]

---

[17] Molly Knight (@molly_knight), TWITTER (July 2, 2021, 12:12 PM), https://twitter.com/molly_knight/status/1411040215234355201 [https://web.archive.org/web/20210702191312].

[18] Molly Knight (@molly_knight), TWITTER (July 2, 2021, 12:14 PM), https://twitter.com/molly_knight/status/1411040526455898114 [https://web.archive.org/web/20210702191419].

[19] Stephanie Apstein, *Trevor Bauer Must Not Start Sunday,* SPORTS ILLUSTRATED (July 1, 2021) https://www.si.com/mlb/2021/07/01/trevor-bauer-must-not-start-after-assault-allegations.

[20] Stephanie Apstein (@stephapstein), TWITTER (July 2, 2021, 2:24 PM), https://twitter.com/stephapstein/status/1411027916893429762?s=20.

57.     *Beyond the Box Score* similarly published an article recounting the allegations made by the Complainant and the "medical evidence, as The Athletic related" which repeated in full *The Athletic* Article's statement that the Complainant showed "signs of a basilar skull fracture."[21]

58.     Other outlets, such as *Fox News* and *Inside Hook*, made similar errors based on *The Athletic*'s false reporting, each citing to *The Athletic* in detailing the Complainant's allegations. Those outlets corrected their reporting once informed that the Complainant did not have any fractures.  *Fox News* described the CT scan's findings of no fracture as "contrary to what was first reported."[22]  *InsideHook* also published a detailed explanation that "representatives of Trevor Bauer refuted a number of claims that appeared in *The Athletic*'s report," including that "[i]n the medical documents supplied by the woman in her petition, there is a CT scan included that **clearly states <u>she does NOT have a skull fracture.</u>**"[23]

### III.     *<u>The Athletic</u> and Ms. Knight Acted With Actual Malice Because They Knew That There Was No Skull Fracture*

59.     *The Athletic*, Ms. Ghiroli, and Ms. Strang knew that the Article's implication that the Complainant had her skull fractured was false. The *Athletic*, Ms. Ghiroli, and Ms. Strang possessed the Complainant's petition for restraining order, declaration, and exhibits, which included her medical records showing that she did not have a skull fracture. The Article itself referenced the CT scans, showing that *The*

---

[21] Sheryl Ring, Esq., *Trevor Bauer is Accused of Sexual Assault,* SB NATION (July 1, 2021, 3:00 PM), https://www.beyondtheboxscore.com/2021/7/1/22557465/trevor-bauer-is-accused-of-sexual-assault.

[22] Daniel Canova and Ryan Gaydos, *Dodgers' Trevor Bauer sex assault allegations detailed in graphic report; pitcher denies claims,* FOX NEWS (July 2, 2021, 6:53 AM), https://www.foxnews.com/sports/dodgers-trevor-bauer-sex-assault-allegations.

[23] *On the Trevor Bauer Allegations and the Need for Better Consent Education,* INSIDEHOOK (July 1, 2021, 1:35 PM), https://www.insidehook.com/daily_brief/sports/trevor-bauer-allegations-consent (emphasis in original).

*Athletic*, Ms. Ghiroli, and Ms. Strang knew that there were CT scans showing whether the Complainant had a skull fracture.

60. *The Athletic*, Ms. Ghiroli, and Ms. Strang reviewed those medical records and deliberately ignored them to perpetuate the false message that Mr. Bauer fractured the Complainant's skull.

61. *The Athletic*, Ms. Ghiroli, and Ms. Strang also deliberately ignored that the medical records directly contradicted the Complainant's statement in her petition about having signs of a skull fracture, and that the Complainant obviously *knew* she did not have a skull fracture when she wrote her petition. This is critical in understanding the gist of the petition as a whole.

62. Alternatively, Ms. Ghiroli and Ms. Strang had reckless disregard for the truth if they wrote the Article without reviewing the medical records, despite the fact that they had the medical records at their fingertips.

63. *The Athletic*'s actual malice is also shown by their campaign to attack Mr. Bauer, in particular the repeated articles impugning Mr. Bauer's character and seeking to harm his baseball career.

64. The actions of the Defendants following the publication of the Article confirm their actual malice.

65. After the Article was published, Mr. Bauer's representatives, Melanie Wadden, promptly contacted *The Athletic*'s Managing Editor (MLB) Emma Span on July 2, 2021. Ms. Wadden's email to Ms. Span explained that the Complainant's own medical records attached to the declaration showed no skull fracture. Mr. Bauer's representatives also provided another copy of those medical records to *The Athletic*. A copy of this email is attached hereto as Exhibit C.

66. After receiving this information, *The Athletic* refused to correct the Article. Emma Span from *The Athletic* stated that "[h]aving looked over the records, we believe our story is *accurate* as currently phrased." (emphasis added). *See* Exhibit C.

FIRST AMENDED COMPLAINT

67.    Also, on July 2, 2021, counsel for Mr. Bauer, Blair G. Brown, served on *The Athletic*'s Chief Content Officer Paul Fichtenbaum and Managing Editor (MLB) Emma Span a letter describing and objecting to the errors in the Article, demanding a retraction, and notifying The Athletic of its potential legal liability ("the Retraction Demand Letter"). The full Retraction Demand Letter is attached hereto as Exhibit D and its full contents are incorporated herein by reference.

68.    The Retraction Demand Letter explained that the Article was misleading and defamatory in part because it "falsely creates the impression that Mr. Bauer caused [the Complainant] to suffer a skull fracture, when in fact she had no such injury." The Retraction Demand letter explained that the medical records attached to the Complainant's declaration showed there was no skull fracture. Additionally, it emphasized that "[m]ultiple other news sites presented with [the Complainant's] medical records have corrected their articles to make it clear that [she] did not suffer a fractured skull." Accordingly, the Retraction Demand letter adequately identified which statements and inferences Mr. Bauer protested and wished corrected.

69.    On July 3, 2021, Ms. Span responded to the Retraction Demand Letter and noted that she had forwarded it to *The Athletic*'s General Counsel and Chief Legal Officer David Ortenberg. Mr. Ortenberg responded to Mr. Bauer's counsel, wherein Mr. Ortenberg reaffirmed *The Athletic*'s position that the Article was not false and further incorrectly stated that the Article was "corroborated by the medical records your client's representatives provided yesterday." Despite taking the foregoing position, Mr. Ortenberg noted that *The Athletic* would issue an update to "highlight [Mr. Bauer's] concerns." This email correspondence with Mr. Ortenberg is attached hereto as Exhibit E.

70.    Following the receipt of the Retraction Demand Letter from Mr. Bauer's counsel, *The Athletic* did not correct the Article.  Instead, it added an inadequate comment to the Article, including the following parenthetical: "(***Update***: After publication, Trevor Bauer's representatives emphasized that medical records showed

1   that while the woman was initially diagnosed with signs of a basilar skull fracture, a

2   subsequent CT scan found no acute fracture.)"

3       71.    The Retraction Demand Letter was served on the "publisher" of *The*

4   *Athletic* for purposes of California Civil Code § 48a. The publisher of *The Athletic* is

5   The Athletic Media Company.  Ms. Span, Mr. Fichtenbaum, and/or Mr. Ortenberg

6   are agents of The Athletic Media Company to whom that corporate entity delegated

7   the authority to respond to and make decisions regarding notices seeking corrections.

8   This authority came by express delegation and/or by a pattern or practice developed

9   over a period of years. *The Athletic's* publicly accessible editorial guidelines identify

10  "the appropriate managing editor and/or the Chief Content Officer" as the

11  representatives with whom writers should confer regarding issues of corrections.[24]

12      72.    This authority to address requests for corrections is further evinced by

13  Mr. Ortenberg's response to the Retraction Demand Letter, which stated, in part, "we

14  have updated our article to highlight your client's concerns."  On information and

15  belief, Mr. Ortenberg sent this response after conferring with Ms. Span and Mr.

16  Fichtenbaum.

17      73.    At the time that the demands for retraction were sent in July of 2021,

18  *The Athletic* did not publicly designate a single individual as its "publisher" or

19  otherwise make available to the public information on how to contact a specific

20  "publisher" for purposes of seeking a retraction under section 48a.

21      74.    Upon information and belief, at the relevant time period, *The Athletic*

22  used the publishing platform WordPress, which gives many of its employees access

23  to publish, retract, and revise its content.

24      75.    Furthermore, on information and belief, the substance of the Retraction

25  Demand Letter was known to the publisher of *The Athletic* at or about the time it was

26  written.  The inadequate revision to the Article demonstrates that the publisher of *The*

27

28      [24] https://theathletic.com/edit-guidelines/

*Athletic* received actual knowledge of the defamatory language within 20 days of Mr. Bauer learning of that language because otherwise this revision could not have been issued. *Freedom Newspapers, Inc. v. Superior Court*, 4 Cal. 4th 652, 656, 14 Cal. Rptr. 2d 839, 840 (1992) ("[T]he publisher . . . has the power effectively to correct or retract.")   Additionally, because the inadequate revision referenced the skull fracture and medical records, the publisher was given adequate notice of which statements Mr. Bauer wanted retracted.

76.     *The Athletic's* correction to the Article was insufficient and inaccurate. There was no "diagnos[is]" of signs of a skull fracture.  Instead, an emergency room physician observed that the Complainant presented with *indications* of a possible basilar skull fracture, which was ruled out by the *only* CT scans the woman had.

77.     Ms. Knight also acted with actual malice in issuing the false tweets about a "cracked skull" and "fractured skull."  Ms. Knight cited no source for her false statements.

78.     Like her colleagues Ms. Ghiroli and Ms. Strang, Ms. Knight deliberately ignored the Complainant's declaration and accompanying exhibits to perpetuate a damaging falsehood about Mr. Bauer.

79.     Ms. Knight's actual malice is also shown by her prior false and misleading comments about Mr. Bauer, her campaign to dissuade teams from signing Mr. Bauer, and her frequent complaints about the Los Angeles Dodgers' decision to add Mr. Bauer to the team. In Ms. Knight's view, the Complainant's allegations confirmed the righteousness of Ms. Knight's vendetta.

80.     Indeed, Ms. Knight tweeted on July 1, 2021, that she was "too angry to keep tweeting about this."[25]  That tweet was linked to a tweet about her February 6 article lamenting the Dodgers' signing of Mr. Bauer.

81.     The next day Ms. Knight tweeted about the non-existent skull fractures.

---

[25] Molly Knight (@molly_knight), TWITTER (July 1, 2021, 4:45 PM), https://twitter.com/molly_knight/status/1410700997790355458.

82.     Ms. Knight deleted her tweets following Mr. Bauer's demand letter. Ms. Knight did not issue a corrective tweet.

83.     Ms. Knight's false statements about a "cracked skull" or "fractured skull" were assertions of fact.

## IV. *The Athletic* and Ms. Knight Continue to Misrepresent the Complainant's Allegations

84.     In addition to the publication of the Article and Ms. Knight's tweets, *The Athletic* and Ms. Knight used the Complainant's allegations to further attack Mr. Bauer in efforts to harm his career.

85.     *The Athletic* published an article by Mr. Rosenthal titled, "MLB cannot allow Trevor Bauer to pitch on Sunday."[26]   Mr. Rosenthal stated that "Bauer responded to the allegations not by denying they happened, but by saying they were consensual."  That was false.  At the time the petition was filed, Mr. Bauer, through his representatives, called the allegations "categorically false" and he has continued to deny the allegations.  Mr. Rosenthal made no reference to the CT scan results, which refuted the veracity of the Complainant's declaration and *The Athletic*'s own reporting.  He also did not hide his desire for MLB to suspend Mr. Bauer.  Even if Mr. Bauer was "neither . . . charged nor convicted," Mr. Rosenthal emphasized that MLB could "suspend him" because "[t]he league has more latitude to exercise discretion."

86.     An article in *The Athletic* by Fabian Ardaya attempted to link the Complainant's allegations to Mr. Bauer's prior tweets, asserting that Mr. Bauer's "online interactions, especially with women, was a subject of focus."[27] But the article

---

[26] Ken Rosenthal, *Rosenthal: MLB cannot allow Trevor Bauer to pitch on Sunday,* THE ATHLETIC (July 1, 2021), https://theathletic.com/2685481/2021/07/01/rosenthal-mlb-cannot-allow-trevor-bauer-to-pitch-on-sunday/.

[27] Fabian Ardaya, *Dodgers plan to start Trevor Bauer on Sunday amid assault allegations,* THE ATHLETIC (July 1, 2021), (Continued…)

did not identify any connection between Mr. Bauer's alleged online interactions with women and a consensual sexual encounter with the Complainant.

87.     Following her false and defamatory tweets, Ms. Knight continued to publish tweets about the allegations, repeatedly impugning Mr. Bauer.

88.     On July 3, 2021, Ms. Knight tweeted that "[m]any of us were screaming about Bauer's harassment of and anger issues toward women before they signed him."   She asserted that "[t]his wasn't rocket science.   Anyone with an internet connection could have Google searched 'Bauer harassment women' and read emerging [sic] they needed to know."   And she reiterated her belief that Mr. Bauer's "signing never should have happened."[28]

89.     She further tweeted, in reference to Mr. Bauer and without any basis in fact, that "a person with a pattern of abusive behavior online towards women allegedly escalating it into physical violence against women is not surprising.   If you were surprised you weren't paying attention."[29]

## V.     *The Athletic* **Mischaracterizes the Judge's Rulings Denying the Complainant's Materially Misleading Petition**

90.     On August 19, 2021, following four days of testimony, the Los Angeles Superior Court denied the Complainant's request for a domestic violence restraining order. In denying the request, the Judge Dianna Gould-Saltman explained that "[t]he primary question for this court is, to what did Petitioner [Complainant] consent? And how did she manifest that consent to [Mr. Bauer]?" Because the Court found that the Complainant consented to her acts with Mr. Bauer, it concluded that Mr. Bauer had not assaulted or abused the Complainant.

---

https://theathletic.com/2685194/2021/07/01/dodgers-plan-to-start-trevor-bauer-on-sunday-amid-assault-allegations/.

[28] Molly Knight (@molly_knight), TWITTER (July 3, 2021, 10:05 AM), https://twitter.com/molly_knight/status/1411325273006501899.

[29] Molly Knight (@molly_knight), TWITTER (JULY 3, 2021, 10:41 AM), https://twitter.com/molly_knight/status/1411334218680913922.

FIRST AMENDED COMPLAINT

91.    As the Court explained, the Complainant "had and has the right to engage in any kind of sex as a consenting adult that she wants to with another consenting adult. She was not ambiguous about wanting rough sex in the parties' first encounter and wanting rougher sex in the second encounter."

92.    The Court also determined that the Complainant's declaration was "materially misleading" and that her accusations against Mr. Bauer lacked credibility. The Court explained that the "[Complainant] was clear that she was extremely stressed and had extreme anxiety when [Mr. Bauer] sent messages. She also testified that she was extremely stressed and anxious when he didn't send messages. That isn't rational." And the Court found that the Complainant's "fear that [Mr. Bauer] might do something if he knew she went to the hospital had no factual basis."

93.    The Court emphasized the Complainant's motivation to harm Mr. Bauer in bringing her false allegations: "[c]ommunications to her friends, which are entered into evidence, indicate that she was excited for the attention to her, and, eventually, the damage that attention would have on [Mr. Bauer]."

94.    Despite these findings thoroughly discrediting the Complainant's allegations, *The Athletic*'s reporting on the Court's ruling on August 19, 2021, continued to take the Complainant's false allegations as true.[30]

95.    *The Athletic* did not state that the Court found that there was no assault, sexual assault, or other act of abuse.

96.    *The Athletic* reported without qualification that the Complainant "was just as afraid of the social consequences as the physical ones of coming forward about her meetings with Bauer." *The Athletic* made no mention of the Court's contrary

---

[30] The Athletic Staff, *Woman loses court bid for long-term restraining order against Trevor Bauer,* THE ATHLETIC (Aug. 19, 2021, 6:46 PM), https://theathletic.com/news/woman-loses-court-bid-for-long-term-restraining-order-against-trevor-bauer/UVcgIU8aWK7s.

finding that the Complainant was motivated by her desire for attention and to destroy Mr. Bauer's reputation and career.

97.     *The Athletic* repeated the Complainant's accusation that Mr. "Bauer punched her, choked her with her own hair until she lost consciousness, then had anal sex with her, which she had not consented to."  It did not explain that the Court rejected these allegations of non-consensual acts in finding no past act of abuse by Mr. Bauer.  Moreover, the article omitted that the Court found no evidence that Mr. Bauer engaged in anal sex with Ms. Hill while she was unconscious.

98.     Likewise, in an article on August 20, 2021,[31] *The Athletic* characterized the Court's ruling as a finding that Mr. Bauer "did not pose an immediate threat to" the Complainant. But that description of the Court's ruling ignored the Court's central finding—the finding upon which the petition for a restraining order was denied—that Mr. Bauer did not commit any act of abuse.

99.     The article also misrepresented the standard applied by the Court in denying the Complainant's request for a restraining order.  It stated that the "request for a restraining order . . . focused more on future risk rather than litigating what had occurred" and that the "burden of evidence was to prove that Bauer was a future threat, not that the alleged assault occurred."

100.    That recitation of the standard is wrong.  To obtain a restraining order under California law, the Complainant was required to show a past act of abuse.  *See* Cal. Fam. Code § 6300(a) ("An order may be issued under this part to restrain any person for the purpose specified in Section 6220, if an affidavit or testimony and any additional information provided to the court pursuant to Section 6306, shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse.").  That

---

[31] Fabian Ardaya, *What the Trevor Bauer decision means and what cold come next for the Dodgers,* THE ATHLETIC (Aug. 20, 2021), https://theathletic.com/2781998/2021/08/20/what-the-trevor-bauer-decision-means-and-what-could-come-next-for-the-dodgers.

showing necessarily would have required the Complainant to prove "that the alleged assault occurred."

101.   For the same reasons, the article was incorrect in stating that the Court's "findings would not be conclusive in a potential civil suit, since this case was solely in regard to the future application of the restraining order."

102.   *The Athletic* also failed to accurately describe the Court's findings in an article on December 21, 2021, again characterizing the Court as only "stating that [Mr. Bauer] did not pose a threat to the woman who filed it moving forward."[32]

103.   Ms. Knight also misrepresented the Court's findings. On August 19, 2021, she tweeted that the Court "declined to extend that order today, finding that Bauer is only violent during sex and Bauer and his alleged victim are not going to have sex again."[33]

104.   The Court did not make any finding that Mr. Bauer "is only violent during sex."  Instead, the Court found there was no sexual assault or other act of abuse.

105.   Ms. Knight's tweets reflected her inability to report accurately on the outcome of the restraining order hearing.  That same day, she tweeted: "Some of you have asked me why I have not yet written about Bauer's situation in my newsletter. It's a fair question.  Honestly I'm protecting my own mental health until we have more clarity on whatever the league and/or the police decide to do."[34]

---

[32] Brittany Ghiroli, *What's the latest with the Trevor Bauer investigations?,* THE ATHLETIC (Dec. 21, 2021), https://theathletic.com/3028210/2021/12/21/whats-the-latest-with-the-trevor-bauer-investigations/.

[33] Molly Knight (@molly_knight), TWITTER (Aug. 19, 2021, 3:02 PM), https://twitter.com/molly_knight/status/1428432083316133890.

[34] Molly Knight (@molly_knight), TWITTER (Aug. 19, 2021, 3:06 PM), https://twitter.com/molly_knight/status/1428433295449026561.

FIRST AMENDED COMPLAINT

**VI.** **The Los Angeles District Attorney Declines to Charge Mr. Bauer with any Crime**

106. On February 8, 2022, the Los Angeles District Attorney stated publicly that his office would not charge Mr. Bauer with a crime.

107. The District Attorney's Office stated that "[a]fter a thorough review of the available evidence, including the civil restraining order proceedings, witness statements and the physical evidence—the People are unable to prove the relevant charges beyond a reasonable doubt."

108. District Attorney George Gascon later reiterated that his office "looked at the case very very closely" and "investigated it thoroughly."  Mr. Gascon also explained that the standard of proof in the civil restraining order proceeding was "very low" and even under that low standard, the allegations could not be proven.

**COUNT ONE – DEFAMATION PER SE**

**(Against *The Athletic*)**

109. Mr. Bauer re-alleges and incorporates paragraphs 1 through 108.

110. The Article written by Ms. Ghiroli and Ms. Strang in the course of, and while acting within the scope of, their employment by *The Athletic*, and published, or caused to be published, by *The Athletic* on June 30, 2021 is false, defamatory and published with actual malice.

111. The defamatory statements in the Article were of and concerning Mr. Bauer and are reasonably understood to be about Mr. Bauer.

112. The Article is defamatory because it conveys the false impression that Mr. Bauer fractured the Complainant's skull.

113. The statements that the Complainant had "signs of a basilar skull fracture" and that she had received CT scans of her brain, head, face, and neck— without including the results of those CT scans—were reasonably understood as stating that the Complainant had a fractured skull.

114.   The Article specifically referenced the Complainant's "rapid CT scans for her brain, face and neck," yet made no mention that the results of those scans were negative.

115.   By informing the reader that the Complainant had CT scans but omitting the results, the Article gave the clear impression that nothing in those scans undermined the alleged "signs of a basilar skull fracture." Accordingly, the reasonable understanding of the Article is that the Complainant's skull was fractured.

116.   By informing the reader that the Complainant showed "signs of a basilar skull fracture" and had CT scans, while omitting the results of the CT scans, the Article communicated a different gist of the Complainant's injuries, credibility, and consent than an accurate report would have.

117.   This reasonable understanding is evident by tweets from then-writer for *The Athletic* Ms. Knight, who issued multiple tweets about a skull fracture in reference to the allegations against Mr. Bauer.

118.   This reasonable understanding is also evident from initial reports from multiple news outlets, based on the Article, that the Complainant suffered a skull fracture.

119.   The Article's false reporting led to a proliferation of articles and tweets referencing a nonexistent skull fracture.

120.   These statements were published to many third parties through *The Athletic*'s website, and *The Athletic* promoted the Article on Facebook and Twitter.

121.   *The Athletic*, Ms. Ghiroli, and Ms. Strang knew that the implication that the Complainant suffered a skull fracture was false, or exhibited reckless disregard for its falsity, because *The Athletic*, Ms. Ghiroli, and Ms. Strang had a copy of the *ex parte* restraining order which included the medical records showing that there was no skull fracture.

122.   In addition, *The Athletic* refused to correct the Article as soon as possible, even after Mr. Bauer's representatives separately provided *The Athletic*

with the medical records and directed them to the portion of the records showing no fracture.

123.   By deliberately omitting the CT scan results, *The Athletic* exhibited actual malice. *The Athletic*'s continuing campaign to discredit, insult, and defame Mr. Bauer is further evidence of actual malice.

124.   *The Athletic*'s campaign against Mr. Bauer is why it ignored the actual facts found in the medical records. To serve their purpose of attacking and harming Mr. Bauer, *The Athletic* deliberately created the false impression that Mr. Bauer fractured the Complainant's skull.

125.   The false and malicious statements by *The Athletic* are not privileged. The Article is not a true and fair report of the Complainant's *ex parte* petition for a restraining order, which included the Complainant's declaration. The Complainant's declaration attached the Complainant's medical records showing no skull fracture. Accordingly, the substance of the declaration and the exhibits was that the Complainant did not suffer a skull fracture.  Any reader of those filings would have come away with the same conclusion. Indeed, the Complainant never claimed that her skull was fractured.

126.   By sending the message that Mr. Bauer fractured the Complainant's skull, the Article accused Mr. Bauer of more serious conduct than that alleged in the Complainant's petition for restraining order.

127.   Because the false statements by *The Athletic* accused Mr. Bauer of a serious crime and maligned him in his profession, those statements constitute defamation per se and Mr. Bauer's injury is presumed.

128.   The false accusations of fracturing the Complainant's skull have also severely damaged Mr. Bauer's reputation, and caused him anguish, humiliation, embarrassment, and financial loss.

129.   Mr. Bauer is entitled to general damages because he has alleged compliance with California's retraction statute, California Civil Code § 48a.

However, in the event the Court finds otherwise, Mr. Bauer alleges he has suffered special damages. Mr. Bauer's special damages include, but are not limited to, loss of earnings from certain brand partners who disassociated with Mr. Bauer following the Article, the loss of a renewed contract with another brand partner and the related loss of earnings from access to the sports memorabilia market, and a decreased demand for Mr. Bauer's merchandise and professional branding.  Additionally, Mr. Bauer has suffered special damages in the form of fees paid to professionals who responded to, and sought to attempt to remediate, the falsehoods in the Article.

130.   Mr. Bauer is entitled to punitive damages because *The Athletic* published the Article with hatred, ill will, and spite, with the intent to harm Mr. Bauer or in blatant disregard of the substantial likelihood of causing him harm. The Article was part of a campaign to maliciously target and harass Mr. Bauer.

### COUNT TWO – DEFAMATION PER SE
### (Against *The Athletic* and Molly Knight)

131.   Mr. Bauer re-alleges and incorporates paragraphs 1 through 108.

132.   Ms. Knight's three tweets referencing a "cracked skull" or "fractured skull" were false statements of fact.

133.   The assertion of a cracked skull or fractured skull is a provable fact, and not opinion.

134.   The Complainant did not suffer a cracked or fractured skull, as the medical records attached to her declaration showed. The Complainant never alleged in her declaration or other filings that she in fact suffered a fractured skull.

135.   The defamatory statements in Ms. Knight's tweets were of and concerning Mr. Bauer and are reasonably understood to be about Mr. Bauer.

136.   Following the publication of the Article's defamatory statements, Ms. Knight tweeted on July 2: "[n]ot possible to consent to a fractured skull." That tweet concerned Mr. Bauer because it responded to two prior messages from other Twitter users about the allegations against Mr. Bauer.

FIRST AMENDED COMPLAINT

137.   Minutes after sending that tweet, Ms. Knight tweeted: "There seems to be some confusion surrounding the issue of consent but here is some clarity: it's not possible to consent to a cracked skull" and "Saying you'd like to engage in rough sex that involves slapping or choking does not equal consent to a cracked skull."

138.   Those two tweets concerned Mr. Bauer as well.

139.   Ms. Knight knew that her statements about Mr. Bauer were false or exhibited reckless disregard for their falsity. Ms. Knight had access to the Complainant's medical records, because they were attached to the Complainant's petition and declaration, publicly available, and possessed by Ms. Knight's employer. Those records showed that there was no skull fracture and the Complainant's own declaration did not allege a skull fracture.

140.   Ms. Knight cited no source for her assertion that Mr. Bauer fractured the Complainant's skull.

141.   Ms. Knight's tweets were not privileged. She was not purporting to report on, and never mentioned, the declaration or other filings by the Complainant. Even if she had been reporting on the filings, her references to a "fractured skull" and "cracked skull" would not be fair and accurate reports of those filings.

142.   Ms. Knight's statements were made in the course of, and while acting within the scope of, her employment as a writer covering Major League Baseball and other topics for *The Athletic*.

143.   Ms. Knight exhibited actual malice by ignoring the actual facts showing no skull fracture.

144.   Ms. Knight's malice is shown by her ill will toward Mr. Bauer and repeated desire to harm Mr. Bauer's career, including in the months before the allegations where she repeatedly questioned his character and his signing by the Los Angeles Dodgers.

145.   Following the initial publication of the Article on June 30, Ms. Knight tweeted that she was "too angry" to tweet more about Mr. Bauer. Yet over the next

two days she continued to tweet about Mr. Bauer and the allegations. She reiterated that his "signing never should have happened" and the allegations were "not surprising" because of Mr. Bauer's purported "pattern of abusive behavior online towards women."

146.   These tweets and articles, among others by Ms. Knight, are evidence of her malice toward Mr. Bauer.

147.   Because the false statements by Ms. Knight accused Mr. Bauer of a serious crime and maligned him in his profession, those statements constitute defamation per se and Mr. Bauer's injury is presumed.

148.   The false accusations of fracturing the Complainant's skull have also severely damaged Mr. Bauer's reputation, and caused him anguish, humiliation, embarrassment, and financial loss.

149.   Mr. Bauer is entitled to punitive damages because Ms. Knight published the false tweets with hatred, ill will, and spite, with the intent to harm Mr. Bauer or in blatant disregard of the substantial likelihood of causing him harm. The false tweets were part of a campaign to maliciously target and harass Mr. Bauer.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Trevor Bauer demands judgment against Defendants *The Athletic* and Molly Knight as follows:

i.   An award of compensatory, special and punitive damages in appropriate amounts to be established at trial;

ii.   Plaintiff's reasonable costs and expenses, including attorneys' fees; and

iii.   Such other and further relief as the Court deems just and appropriate to protect Plaintiff's rights and interests.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

1

2     Dated:      January 31, 2023        /s/ *Blair G. Brown*

Blair G. Brown (*pro hac vice*)

3                                     Jon R. Fetterolf (*pro hac vice*)

ZUCKERMAN SPAEDER LLP

4                                     1800 M Street, N.W., Suite 1000

Washington, D.C. 20036

5                                     Tel: (202) 778-1800

Fax: (202) 882-8106

6                                     bbrown@zuckerman.com

jfetterolf@zuckerman.com

7

ZUCKERMAN SPAEDER LLP

8                                     Nell Z. Peyser (*pro hac vice*)

485 Madison Avenue, 10th Floor

9                                     New York, NY 10022

Tel: (212) 704-9600

10                                    Fax: (212) 704-4256

npeyser@zuckerman.com

11

KINSELA WEITZMAN ISER KUMP

12                                   HOLLEY LLP

Shawn Holley (Cal. Bar No. 136811)

13                                    Suann C. MacIsaac (Cal. Bar No. 205659)

808 Wilshire Boulevard., 3rd Floor

14                                    Santa Monica, CA 90401

Tel: (310) 566-9800

15                                    Fax: (310) 566-9873

sholley@kwikhlaw.com

16                                    smacisaac@kwikhlaw.com

17                                    *Attorneys for Plaintiff*

18

19

20

21

22

23

24

25

26

27

28

         FIRST AMENDED COMPLAINT