KINSELLA WEITZMAN ISER KUMP HOLLEY LLP
Shawn Holley (Cal. Bar No. 136811)
Suann C. MacIsaac (Cal. Bar No. 205659)
11766 Wilshire Boulevard, Suite 750
Los Angeles, CA 90025
Tel: (310) 566-9800
Fax: (310) 566-9873
sholley@kwikhlaw.com
smacisaac@kwikhlaw.com

ZUCKERMAN SPAEDER LLP
Blair G. Brown (admitted *pro hac vice*)
Jon R. Fetterolf (admitted *pro hac vice*)
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 882-8106
bbrown@zuckerman.com
jfetterolf@zuckerman.com

ZUCKERMAN SPAEDER LLP
Nell Z. Peyser (admitted *pro hac vice*)
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: (212) 704-9600
Fax: (212) 704-4256
npeyser@zuckerman.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| TREVOR BAUER,<br><br>              Plaintiff,<br><br>   v.<br><br>THE ATHLETIC MEDIA COMPANY and MOLLY KNIGHT,<br><br>              Defendants. | Case No. 2:22-cv-02062-MWF-AGR<br>Assigned for all purposes to the Hon. Michael W. Fitzgerald<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>Hearing Date: March 27, 2023<br>Hearing Time: 10:00 a.m.<br>Department: 5A<br><br>Action Filed: March 29, 2022 |

# TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................ 2

      A.   Bauer Is Falsely Accused Of Sexual Assault. .................................... 2

      B.   *The Athletic* Reports Falsehoods Related To The Accusation Without Even Minimal Diligence. ............................................................................ 3

      C.   Knight And Other News Outlets Amplify The Article's Inaccurate Implication That Bauer Fractured L.H.'s Skull. ................................. 4

      D.   After Multiple Demands From Bauer's Counsel, *The Athletic* Publishes An Insufficient And Inaccurate Correction. ........................ 5

      E.   Bauer Files This Lawsuit And Defendants Move To Strike. .............. 6

III.  THE ANTI-SLAPP STATUTE IS INAPPLICABLE BECAUSE IT CONFLICTS WITH THE FEDERAL RULES. ................................. 6

IV.   BAUER SUFFICIENTLY PLEADS A CLAIM FOR DEFAMATION. ........ 7

      A.   Bauer Pleads Compliance With California's Retraction Statute And Pleads Special Damages. ............................................................ 7

      B.   Bauer's Pleaded Implication Has Already Proven Itself Reasonable. ........... 11

      C.   Bauer Alleges Falsity. .................................................................... 13

      D.   The Article Is The Opposite Of A Fair And True Report Of L.H.'s Petition. ......................................................................................... 16

      E.   Bauer Alleges Actual Malice. ........................................................ 18

V.    CONCLUSION ........................................................................................... 20

CERTIFICATE OF COMPLIANCE ....................................................................... 22

i

# TABLE OF AUTHORITIES

**Cases**

*Baral v. Schnitt*,
  1 Cal. 5th 376 (2016) ........................................................................................11

*Bently Rsrv. LP v. Papaliolios*,
  218 Cal. App. 4th 418 (2013) ..........................................................................16

*Chavez v. Mendoza*,
  94 Cal. App. 4th 1083 (2001) .............................................................................9

*Condit v. Nat'l Enquirer, Inc.*,
  248 F. Supp. 2d 945 (E.D. Cal. 2002) ..............................................................12

*Corinna Warm & Studio Warm LLC v. Innermost Ltd.*,
  2022 WL 1585753 (C.D. Cal. Apr. 6, 2022) .......................................................6

*Crane v. Arizona Republic*,
  972 F.2d 1511 (9th Cir. 1992) ....................................................................17, 18

*Curtis Publishing Co. v. Butts*,
  388 U.S. 130 (1967)..........................................................................................18

*Erlich v. Etner*,
  224 Cal. App. 2d 69 (1964) ..............................................................................11

*Freedom Newspapers, Inc. v. Superior Court*,
  4 Cal. 4th 652 (1992) ..........................................................................................7

*Gallagher v. Philipps*,
  563 F. Supp. 3d 1048 (S.D. Cal. 2021)........................................................16, 18

*Gaprindashvili v. Netflix, Inc.*,
  2022 WL 363537 (C.D. Cal. Jan. 27, 2022)................................................12, 19

*Geiser v. Kuhns*,
  13 Cal. 5th 1238 (2022) ......................................................................................9

*Gilbert v. Sykes*,
  53 Cal. Rptr. 3d 752 (2007) ..............................................................................14

ii

*Healthsmart Pac., Inc. v. Kabateck*,
   7 Cal. App. 5th 416 (2016) ........................................................................18

*Heller v. NBCUniversal, Inc.*,
   2016 WL 6583048 (C.D. Cal. June 29, 2016).........................................11

*Jezzini v. Adolf*,
   2019 WL 4668008 (Cal. Ct. App. Sept. 25, 2019)..................................16

*Kaelin v. Globe Commc'ns Corp.*,
   162 F.3d 1036 (9th Cir. 1998) ...............................................................12

*Kanarek v. Bugliosi*,
   108 Cal. App. 3d 327 (1980) ..................................................................11

*Mann v. Quality Old Time Serv., Inc.*,
   120 Cal. App. 4th 90 (2004) ..................................................................11

*Manzari v. Associated Newspapers, Ltd.*,
   830 F.3d 881 (9th Cir. 2016) ...........................................................13, 19

*Martin v. Wells Fargo Bank*,
   2018 WL 6333688 (C.D. Cal. Jan. 18, 2018).........................................11

*McGuffin v. Maurer*,
   99 Cal. App. 2d 183 (1950) ....................................................................10

*Milkovich v. Lorain J. Co.*,
   497 U.S. 1 (1990)....................................................................................19

*Murray v. Bailey*,
   613 F. Supp. 1276 (N.D. Cal. 1985).......................................................19

*Overhill Farms, Inc. v. Lopez*,
   119 Cal. Rptr. 3d 127 (2010) .................................................................18

*Pierce v. San Jose Mercury News*,
   214 Cal. App. 3d 1626 (1989) ...............................................................10

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   890 F.3d 828 (9th Cir. 2018) ....................................................................6

*Reese v. BP Exploration (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ....................................................................7

*Tiedemann v. Superior Ct.*,
    83 Cal. App. 3d 918 (1978) .....................................................................17

*Tiwari v. NBC Universal Inc.*,
    2011 WL 5079505 (N.D. Cal. Oct. 15, 2011) ..................................15, 18

*Weller v. Am. Broad. Companies, Inc.*,
    232 Cal. App. 3d. 991 (1991) .................................................................9, 12

*Wynn v. Chanos*,
    75 F. Supp. 3d 1228 (N.D. Cal. 2014) ....................................................13

**Statutes**

Cal. Civ. Code § 48a(b) ..............................................................................10

Cal. Civ. Code § 48a(a) ...........................................................................7, 10

Cal. Civ. Code § 48a(d)(2) ..........................................................................10

## I.    INTRODUCTION

The amendments to Trevor Bauer's First Amended Complaint ("FAC") show that: (i) he complied with California's retraction statute; (ii) *The Athletic*'s Article defamed him by implying that he fractured a woman's skull when the woman's own medical records made clear that he did not; and (iii) the authors of the Article knew and intended to convey that false implication or had reckless disregard for the easily ascertainable truth.

In mid-2021, a woman referred to herein as L.H. falsely accused Bauer of sexual assault. She filed a petition for a domestic violence restraining order supported by her declaration and medical records. Two days later, Defendant *The Athletic* published the Article accusing Bauer of fracturing L.H.'s skull during the sexual encounter, despite the medical records attached to L.H.'s petition showing this was false. A false accusation of a crime is textbook defamation per se.

None of the arguments in *The Athletic*'s motion to strike support dismissal for failure to state a claim. First, it argues that Bauer failed to comply with California's retraction statute because Bauer sent his multiple requests for correction to the Managing Editor, Chief Content Officer, and Chief Legal Officer instead of the "publisher." But the FAC pleads that *The Athletic* publicly identified those individuals as the appropriate ones with whom to correspond about corrections and that those individuals responded to Bauer's correction request, which shows that they had been delegated authority from the "publisher" to do so. A media behemoth like *The Athletic* cannot insulate itself from defamation liability in California by refusing to publicly identify anyone as the "publisher" and then arguing that a defamation plaintiff like Bauer did not comply with the retraction statute because he addressed his correction requests to the individuals whom the elusive "publisher" delegated authority to address corrections.

Second, *The Athletic* argues that the implication that Bauer fractured L.H.'s skull is substantially true because whether Bauer fractured L.H.'s skull during their

1

rough sexual encounter would not alter the average reader's opinion of him as a matter of law. But that cannot be resolved as a matter of law on the face of these pleadings. The FAC alleges that the Article materially altered the narrative around Bauer by accusing him of a different crime—a violent physical assault involving enough force to crack a human skull—in addition to what L.H. accused him of—a consensual rough sexual encounter that veered into limited non-consensual territory and resulted in bruising.

Finally, *The Athletic* misreads L.H.'s medical records from a follow-up visit, at which L.H. received an MRI for residual jaw pain, to argue that the FAC does not sufficiently allege malice. But the follow-up records do not create any uncertainty about whether L.H. suffered a skull fracture and do not support the Article's implication that she had. Courts in this Circuit have consistently held that actual malice can be inferred where a journalist publishes a defamatory statement despite having hard evidence that it is untrue. That is what Bauer alleges here.

## II.    STATEMENT OF FACTS

### A. Bauer Is Falsely Accused Of Sexual Assault.

In June 2021, Bauer was falsely accused of sexual assault by L.H. FAC ¶ 1. On June 28, 2021, L.H. filed a petition for a restraining order against Bauer based on her false allegations. *Id*. ¶ 34. The petition alleged that Bauer and L.H. engaged in consensual rough sex, including consensual choking, but that Bauer had exceeded the scope of her consent by using more force than she had consented to. ECF No. 58-2 at 28–36. The petition also contained a declaration from L.H. alleging that she was given a CT scan because of "signs of a basilar skull fracture." FAC ¶ 34. However, her medical records conclusively found from the CT scans that she did not suffer a skull fracture. *Id*. These medical records were *attached* to her petition. *Id*. A California judge would later confirm that L.H.'s sexual encounter with Bauer was consensual. *Id*. ¶¶ 34, 90–92.

OPP'N TO MOT. TO STRIKE

**B.** *The Athletic* **Reports Falsehoods Related To The Accusation Without Even Minimal Diligence.**

On June 30, 2021, two days after L.H. filed the petition, *The Athletic* published the Article about it titled "Graphic details, photos emerge in restraining order filed against Dodger pitcher Trevor Bauer." *Id*. ¶ 35. The Article, written by *The Athletic*'s employees Brittany Ghiroli and Katie Strang (the "Journalists"), stated that *The Athletic* had obtained a copy of L.H.'s "67-page ex parte document." *Id*. This included L.H.'s declaration and exhibits with copies of her medical records, including CT scan results. *Id*. L.H.'s declaration made clear that the CT scan results, which were attached as Exhibit 6, were part of her petition. *Id*. ¶ 38. The CT scan definitively concluded that L.H. had "no acute fracture." *Id*. ¶ 37. The declaration also attached Exhibit 12, which contained "progress notes" of a follow-up appointment at a different medical facility approximately two weeks later. *Id*. ¶ 39. At that follow-up appointment, in response to L.H. referencing some residual pain while masticating (chewing) and opening her mouth, a physician ordered an MRI of L.H.'s face and head to rule out an undetected fracture of the jaw. *Id*. The notes in Exhibit 12 also repeatedly and clearly stated that the previous CT scan had already found no acute fracture of the skull. *Id*. ¶ 40.

Nevertheless, in the second paragraph of the Article, *The Athletic* reported that L.H.'s declaration stated that "medical notes" stated "that there were signs of a basilar skull fracture" following her sexual encounter with Bauer. *Id*. ¶ 36. *The Athletic* did not refer to the negative CT scan results in the Article, although it possessed them. *Id*. ¶ 42. Moreover, *The Athletic* and the Journalists knew that L.H. had CT scans because the Article *said so*. *Id*. ¶ 43. By ignoring the negative results of the CT scan, the Article gave the clear—but false—impression that Bauer had fractured L.H.'s skull. *Id*. ¶ 41.

Thus, either the Journalists reviewed the medical records attached to L.H.'s petition and deliberately knew their reporting was false, or they had reckless

3

disregard for the truth by writing the Article detailing serious and potentially career-ending allegations against Bauer without reading the full petition. *Id*. ¶¶ 44, 59–62. Either way, by omitting the negative results of the CT scan, the Journalists knowingly or recklessly intended for the Article to give the clear—but false—impression that Bauer had fractured L.H.'s skull. *Id*.

### C. Knight And Other News Outlets Amplify The Article's Inaccurate Implication That Bauer Fractured L.H.'s Skull.

Knight was a reporter for *The Athletic* at the time the Article was published. *Id*. ¶ 11. After *The Athletic* published the Article, Knight issued three tweets to her over 100,000 followers amplifying the false accusation that Bauer fractured L.H.'s skull. *Id*. ¶¶ 50–52. She tweeted: "Not possible to consent to a fractured skull;" "There seems to be some confusion surrounding the issue of consent but here is some clarity: it's not possible to consent to a cracked skull;" "Saying you'd like to engage in rough sex that involves slapping or choking does not equal consent to a cracked skull." *Id*. ¶¶ 51–52. These tweets illustrate the Article conveyed the falsity that Bauer fractured L.H.'s skull. *Id*. ¶ 53.

Not only did Knight understand the Article to accuse Bauer of fracturing L.H.'s skull, other news outlets had the same understanding of the Article. *Id*. ¶ 56. *Sports Illustrated*, *Beyond the Box Score*, *Fox News*, and *InsideHook* published articles citing to the Article and repeating the Article's false implication of the skull fracture. *Id*. ¶¶ 56–58. Those outlets subsequently corrected their reporting, clarifying that the CT scans found no skull fracture. *Id*. In its correction, *Fox News* described the CT scan's findings of no fracture as "contrary to what was first reported." *Id*. at ¶ 58. *InsideHook* included in its correction: "In the medical documents supplied by the woman in her petition, there is a CT scan included that **clearly states she does NOT have a skull fracture.**" *Id*.

4

**D. After Multiple Demands From Bauer's Counsel, *The Athletic* Publishes An Insufficient And Inaccurate Correction.**

After the Article was published, Bauer promptly contacted *The Athletic*'s Managing Editor (MLB) Emma Span, explaining that L.H.'s own medical records attached to her declaration showed no skull fracture. *Id*. ¶ 65; FAC, Ex. C. *The Athletic* refused the request to correct the Article. *Id*. ¶ 66; FAC, Ex. C. Bauer also sent *The Athletic*'s Chief Content Officer Paul Fichtenbaum and Span a letter describing the defamatory portion of the Article, demanding a correction, and recommending that the letter be provided to *The Athletic*'s legal advisor. *Id*. ¶¶ 67–68; FAC, Ex. D. The following day, Span responded and noted that she forwarded the letter to *The Athletic*'s General Counsel/Chief Legal Officer, David Ortenberg. *Id*. ¶ 69. Ortenberg then responded to Bauer, reaffirming *The Athletic*'s position that the Article was accurate. *Id*.; FAC, Ex. E.

Bauer served his retraction demand on Span and Fichtenbaum because *The Athletic*'s publicly accessible editorial guidelines identify "the appropriate managing editor and/or Chief Content Officer" as the agents of The Athletic Media Company to whom it delegated the authority to respond and make decisions about retraction and correction requests. *Id*. ¶ 71. This authority is further evinced by Ortenberg's response, which stated in part that *The Athletic* had updated the Article, presumably after Ortenberg had consulted with Span and Fichtenbaum. *Id*. ¶ 72. At the time Bauer served his retraction demand, *The Athletic* did not publicly designate anyone as its "publisher." *Id*. ¶ 73. However, *The Athletic* designated the authority to edit and revise its stories to several employees. And *The Athletic* used the publishing platform WordPress, which gives many employees access to publish, retract, and revise its content. *Id*. ¶ 74.

Ultimately, *The Athletic* did not correct the Article. *Id*. ¶ 70. Instead, it issued an inadequate and nearly invisible comment that added the following parenthetical: "(Update: After publication, Trevor Bauer's representatives emphasized that medical

5

records showed that while the woman was initially diagnosed with signs of a basilar skull fracture, a subsequent CT scan found no acute fracture.)" *Id*. This was insufficient and inaccurate because there was no "diagnos[is]" of signs of a skull fracture. *Id*. ¶ 76. Instead, an ER physician observed that L.H. presented with indications of a possible skull fracture—ruled out only by CT scans. *Id*.

**E. Bauer Files This Lawsuit And Defendants Move To Strike.**

On March 29, 2022, Bauer filed this lawsuit against *The Athletic* and Knight for defamation per se based on the Article and the tweets. ECF No. 1. On May 31, 2022, Defendants filed a motion to strike. ECF No. 20. On December 5, 2022, the Court granted Defendants' motion to strike Count I against *The Athletic* with leave to amend and denied the motion as to Count II against *The Athletic* and Knight. ECF No. 45. On January 31, 2023, Bauer filed an amended complaint. ECF No. 50. On February 14, 2023, *The Athletic* filed the instant motion to strike Count I of the FAC. ECF No. 58.

**III.   THE ANTI-SLAPP STATUTE IS INAPPLICABLE BECAUSE IT CONFLICTS WITH THE FEDERAL RULES.**

Although this Court is bound by Ninth Circuit precedent applying California's anti-SLAPP statute with modifications in federal diversity cases, Bauer preserves his objection to this Court's consideration of *The Athletic*'s anti-SLAPP motion. "The applicability of the anti-SLAPP statute in federal court has been questioned" including by judges on the Ninth Circuit. *Corinna Warm & Studio Warm LLC v. Innermost Ltd.*, 2022 WL 1585753, at *4 (C.D. Cal. Apr. 6, 2022) (Fitzgerald, J.). Although *The Athletic* nods to the Rule 12(b)(6) standard (MTS at 6), it explicitly invokes the state law "probability of prevailing on the merits" standard as the basis for striking the FAC. MTS at 7. Under an ordinary application of Rules 8 and 12, to which this Court must adhere, Bauer's FAC is sufficient to state a claim. *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833–35 (9th

OPP'N TO MOT. TO STRIKE

Cir. 2018) (second prong of anti-SLAPP motion is reviewed under Rule 12(b)(6) standard).

## IV.  BAUER SUFFICIENTLY PLEADS A CLAIM FOR DEFAMATION.

Under Rule 12(b)(6), the Court must accept as true all well-pled factual allegations and must construe them in the light most favorable to Bauer. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).

### A. Bauer Pleads Compliance With California's Retraction Statute And Pleads Special Damages.

The FAC pleads facts that sufficiently satisfy the requirements of California's Retraction Statute. Section 48a is "not intended to impose a technical barrier to recovery when the purposes designed to be served by section 48a are satisfied." *Freedom Newspapers, Inc. v. Superior Court*, 4 Cal. 4th 652, 658 (1992). Section 48a(a) requires a plaintiff to "serve upon the publisher" a correction demand "within 20 days after knowledge of the publication," or the plaintiff "shall only recover special damages." Cal. Civ. Code § 48a(a). Generally, the term "publisher," as used in Section 48a(a) "refers to the owner or operator of the newspaper . . . rather than the originator of the defamatory statements." *Freedom Newspapers, Inc.*, 4 Cal. 4th at 656. As the California Supreme Court explained:

> the requirements of section 48a[[a]) are satisfied when the demand for correction is (1) served upon the publisher, (2) served upon a person designated by the publisher to receive such notices, or (3) served upon someone employed at the newspaper other than the publisher or the publisher's designee *and* the publisher acquires actual knowledge of the request for correction within the time limit set forth in the statute.

*Id.* at 658.[1] Here, the FAC alleges that Bauer timely served his Retraction Demand Letter, which explained how the Article was defamatory, on July 2, 2021. FAC ¶ 67.

---

[1] *The Athletic* does not challenge the receipt or content of the Retraction Demand Letter. It only quibbles with whether the Letter was properly addressed to the "publisher," while conspicuously failing to identify to whom the Letter should have been addressed.

OPP'N TO MOT. TO STRIKE

The Letter was served on three different agents of the publisher that each had authority to receive such notices, namely, Span (Managing Editor MLB), Fichtenbaum (Chief Content Officer), and Ortenberg (Chief Legal Officer). FAC ¶¶ 67, 71. Facts that indicate these agents were delegated the requisite authority are also specifically alleged. *Id.* ¶¶ 71–74. Furthermore, even if that were not the case—which, as alleged, it is—Bauer also alleges that the "publisher" received actual knowledge of the request for correction after the Letter was served on the three employees. *Id.* ¶ 75.

### a.  Bauer seeks a correction from the publisher.

*The Athletic* argues Bauer did not seek correction from the "publisher," but it ignores key allegations and the *Freedom Newspapers* standard. The publisher of *The Athletic* is The Athletic Media Company. FAC ¶ 71. Based on information Bauer had available when the Letter was sent, The Athletic Media Company designated Span, Fichtenbaum, and Ortenberg the authority to respond to and make decisions regarding correction requests. *Id.* The designation of this authority is well-demonstrated. First, *The Athletic*'s publicly accessible editorial guidelines identify "the appropriate managing editor and/or the Chief Content Officer" as the representatives with whom writers should confer regarding corrections. *Id.* Second, authority is evinced by Ortenberg's response to the Letter, which was sent after conferring with Span and Fichtenbaum and stated, "we have updated our article to highlight your client's concerns." *Id.* ¶ 72. Finally, at the relevant time period, *The Athletic* used the publishing platform WordPress, which gives its employees access to retract and revise content. *Id.* ¶ 74.

A media organization cannot avoid defamation liability by failing to identify anyone as its "publisher." And Section 48a does not require dismissal simply because the Letter did not include the word "publisher" in the recipient field. This would be a "technical barricade[] to recovery" prohibited by *Freedom Newspapers*. It is

unclear what Bauer could possibly have done to more thoroughly ensure that *The Athletic*'s mystery "publisher" received the retraction demand—which it did.

*The Athletic* seeks not only to be protected, but also to be rewarded for gamesmanship. According to *The Athletic*, it is under no obligation to publicly identify a "publisher," and when a party makes a good faith, diligent effort to demand retraction from identified individuals who any reasonable person would conclude have the authority to correct a false story or to convey the request to whoever does, it can escape litigation and collect attorney's fees. It would be hard to wander further from the purpose of the anti-SLAPP statute than to award fees to a large media organization as a reward for not identifying a "publisher." *See Geiser v. Kuhns*, 13 Cal. 5th 1238, 1242–43 (2022) ("in the paradigmatic SLAPP suit, a well-funded developer limits free expression by imposing litigation costs on citizens who protest, write letters, and distribute flyers in opposition to a local project."). That would be an abuse of the anti-SLAPP statute.[2]

### b. *The Athletic* does not correct the Article.

*The Athletic* did not adequately correct its defamatory statement and its "Update" was not sufficiently conspicuous. FAC ¶ 70. "For a correction to be legally sufficient and effective, it must be full and complete and cannot be evasive or equivocal, nor partial or hesitant, and it cannot contain any insinuations." *Weller v. Am. Broad. Companies, Inc.*, 232 Cal. App. 3d. 991, 1010 (1991). "An equivocal or incomplete retraction obviously serves no purpose." *Id.* at 1011 Where a defendant issues a noncorrective subsequent statement, a plaintiff has still satisfied Section 48a(a). *See McGuffin v. Maurer*, 99 Cal. App. 2d 183, 185 (1950).

---

[2] Filing a lawsuit is an exercise of a party's constitutional right of petition. *Chavez v. Mendoza*, 94 Cal. App. 4th 1083, 1087 (2001). It would be perverse to use the anti-SLAPP statute to punish Bauer for bringing a lawsuit based on a highly technical, supposed failure to comply with the Retraction Statute, given that there is a protected right to bring the action.

The update was incomplete and inadequate. It incorrectly stated that L.H. was "diagnosed with signs of a basilar skull fracture." FAC ¶ 70. But there was no "diagnosis." *Id*. ¶ 76. The purpose of the CT scan was to make or rule out a diagnosis given the possibility of a head injury. *Id.  The Athletic*'s use of the term "diagnosis" continued to leave the impression that L.H. sustained a skull fracture. FAC, Ex. E. This failure was explicitly communicated to *The Athletic*. *Id.* For the reasons discussed *infra*, the Article—including the later published "Update"—was not substantially true and changed the gist of L.H.'s petition.

Furthermore, any correction must be published "in substantially as conspicuous a manner" as the original defamatory statement.  Cal. Civ. Code § 48a(b). *The Athletic*'s update failed this requirement. The original Article was viewed and tweeted many times and relied on for other articles. A true correction should have been at the top of the Article, noted in subsequent Twitter posts, and brought to the attention of other media publications "in substantially as conspicuous a manner" as possible. *Id.* Whether the update was "in substantially as conspicuous a manner" as the original Article is a question of fact for the jury. *Pierce v. San Jose Mercury News*, 214 Cal. App. 3d 1626, 1628 (1989) ("the issue of whether a retraction is sufficiently conspicuous is a material, triable issue of fact for the jury").

### c.  Bauer pleads special damages.

The FAC alleges Bauer suffered special damages as a result of the defamatory Article. Special damages are those to a "business, trade, profession, or occupation." Cal. Civ. Code § 48a(d)(2). Bauer alleges he suffered special damages in the form of "loss of earnings from certain brand partners who disassociated with Bauer following the Article, the loss of a renewed contract with another brand partner and the related loss of earnings from access to the sports memorabilia market, and a decreased demand for Bauer's merchandise and professional branding." FAC ¶ 129. Additionally, Bauer alleged special damages in the form of fees paid to

OPP'N TO MOT. TO STRIKE

professionals—including attorneys and media experts—who worked to remediate the Article's falsehoods. *Id.*

Bauer is not required, at this stage, to provide the name of every lawyer and representative on his team, nor those of the multiple business partners that cut ties with him following the Article. *Kanarek v. Bugliosi*, 108 Cal. App. 3d 327, 337 (1980) ("Plaintiff's pleading of a reduction in the number of new clients and a loss of clients is a sufficient pleading of special damages for purposes of Civil Code section 48a."). The cases *The Athletic* cites provide no basis to conclude otherwise. *See, e.g., Erlich v. Etner*, 224 Cal. App. 2d 69, 73–74 (1964) (explaining "in the usual case, that the plaintiff must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived" only after a trial on the merits was conducted, not at the pleading stage); *Martin v. Wells Fargo Bank*, 2018 WL 6333688, at *2 (C.D. Cal. Jan. 18, 2018) (plaintiff generally alleged "his lowered credit score, his raised interest rates, loss of business opportunity" without explaining what those business opportunities were); *Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90, 109 (2004) (explaining plaintiff "may not rely on a general decline in business arising from the falsehood"), *disapproved of* by *Baral v. Schnitt*, 1 Cal. 5th 376 (2016).

Finally, *The Athletic* argues that Bauer failed to allege that the defamatory statements in the Article caused his special damages. This simply ignores the crystal-clear inference from the FAC's allegations. *See* FAC ¶ 129 (alleging special damages were incurred following the Article and "to remediate" "the falsehoods in the Article").

### B. Bauer's Pleaded Implication Has Already Proven Itself Reasonable.

For a defamation by implication claim, Bauer must show that his interpretation is reasonably susceptible to a defamatory implication. *Heller v. NBCUniversal, Inc.*, 2016 WL 6583048, at *4 (C.D. Cal. June 29, 2016) (Fitzgerald, J.). This is a low bar. The Ninth Circuit has explained that even if an innocent interpretation is possible, all

11

a plaintiff must show is one reasonable defamatory interpretation to meet its burden. *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040 (9th Cir. 1998) ("Even assuming that [an innocent] reading is reasonably possible, … [s]o long as the publication is reasonably susceptible of a defamatory meaning, a factual question for the jury exists."); *see also Condit v. Nat'l Enquirer, Inc.*, 248 F. Supp. 2d 945, 965 (E.D. Cal. 2002) (same); *Weller v. Am. Broad. Companies, Inc*., 283 Cal. Rptr. 644, 651 (1991) (same).

Here, Bauer alleges that the Article conveyed the false implication that L.H. suffered a skull fracture by stating that L.H. "had signs of a basilar skull fracture" and that she had received CT scans, but omitting the results of those scans. FAC ¶ 5. Surely, one reasonable interpretation of the Article's language, coupled with the omission of the CT scan results, is that L.H. suffered a skull fracture. Any lay person would expect that if the CT scan results were any different than the initial "signs," the Article would state that.

*The Athletic* argues that any lay person would *not* understand the Article to mean that L.H. suffered a skull fracture because having signs of a particular condition does not mean that was the final diagnosis. MTS at 13. But even if the Court were to entertain this potential reading of the Article, it still may not strike Bauer's claim because susceptibility to just one defamatory meaning is all that is required at the pleadings stage. Moreover, there is already proof that Bauer's reading is the better one. The Court need not speculate how a lay person would understand the Article because Bauer pled that Knight and other news outlets read the Article and *did* understand it to imply that L.H. suffered a skull fracture. *Gaprindashvili v. Netflix, Inc*., 2022 WL 363537, at *7 (C.D. Cal. Jan. 27, 2022), *appeal dismissed*, 2022 WL 18635797 (9th Cir. Oct. 4, 2022) ("Plaintiff further alleges that viewers did in fact attribute a defamatory meaning to the Line. Such evidence, while not dispositive, supports how a 'reasonable' viewer might have understood the Line.").

OPP'N TO MOT. TO STRIKE

Take Knight, for example. Following publication of the Article, Knight tweeted: "[N]ot possible to consent to a fractured skull." FAC ¶ 51. This Court has already ruled that Knight's tweets "are premised on the baseline assumption that L.H. suffered a cracked skull." Order at 30. As an employee of *The Athletic*, it is plausible—particularly under a Rule 12(b)(6) standard—that Knight's understanding that L.H. suffered a cracked skull came from the Article published by her own employer.[3] FAC ¶¶ 50, 53–54. Not only did Knight understand the Article to imply the skull fracture, various news outlets had that same understanding too. *Id*. ¶¶ 56–58; *supra* § II.C. *See Manzari v. Associated Newspapers, Ltd.*, 830 F.3d 881, 890 (9th Cir. 2016) ("The clarity of the implication is all the more apparent given how news spreads across the Internet.").

Because one reasonable interpretation of the Article is that Bauer fractured L.H.'s skull, demonstrated by the allegation that others understood it that way, this is a factual question for a jury. *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1233 (N.D. Cal. 2014) ("if 'the statement is susceptible of both an innocent and a libelous meaning,' the question should be presented to the trier of fact").

**C. Bauer Alleges Falsity.**

To determine substantial truth, the law "overlooks minor inaccuracies" and the inquiry is whether the defamatory statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." Order at 18. As alleged in the FAC, whether Bauer fractured L.H.'s skull during their sexual

---

[3] There is nothing in the FAC or Knight's tweets suggesting her understanding came from a *USA Today* article tagged in an earlier post in the Twitter thread to which she responded. *See* Order at 19 (mentioning that initial tweet in the thread included *USA Today* article). Knight responded directly to another user, Rusty Firewater, who was responding to yet another user, Bob Nightengale (journalist for *USA Today*), who tagged *USA Today* in his original post. *Id*. at 30. There is no basis for inferring that Knight even read the *USA Today* article, much less concluding as a matter of law that her tweet was based on that rather than the Article in *The Athletic*. The fact that she was an employee of *The Athletic*, focusing on baseball reporting, makes it plausible under a Rule 12(b)(6) standard that Knight read the Article over any other article about L.H.'s petition. FAC ¶¶ 53–55.

OPP'N TO MOT. TO STRIKE

encounter is far more than a minor inaccuracy and substantially changes the gist of the Article. *Cf. Gilbert v. Sykes*, 53 Cal. Rptr. 3d 752, 765 (2007) (slight discrepancy in timeframe is a "minor inaccuracy").

L.H.'s petition detailed a consensual sexual encounter that L.H. alleged veered into limited non-consensual territory, resulting in bruising that was determined by her medical professionals to not require any medical treatment. ECF No. 58-2 at 28–36, 71–79. L.H. alleged that she first traveled to Bauer's home in April 2021, where the two engaged in consensual rough sex, including consensual choking. *Id*. at 29, ¶¶ 6–8. She alleged, however, that Bauer exerted a level of force that exceeded her consent. *Id*. Notwithstanding that, L.H. alleged that she voluntarily traveled back to Bauer's home in May 2021 and the two again engaged in consensual rough sex. *Id*. at 30–31, ¶ 13. This time, she alleged that they agreed upon a safe word of her choosing and discussed what was off limits. *Id*. L.H. further alleged that, although Bauer did not engage in any behavior that they had discussed was off limits, the encounter was significantly rougher than she had expected. *Id*. at 31, ¶¶ 14–16. She made no mention of whether she ever uttered the safe word, but she alleged that Bauer immediately ceased the sexual activity when she began crying and shaking. *Id*. Finally, she alleged that because of the swelling and bruising from the rough sexual encounter, she sought medical attention. *Id*. at 32–33, ¶¶ 19–20. She attached her medical records to the petition, which showed that she did sustain bruising and swelling, but did not sustain injuries requiring any medical treatment. *Id*. at 71–79.

The FAC makes additional allegations that demonstrate the significance of the skull fracture implication. Rough sex is increasingly common among millennials and younger generations. FAC ¶¶ 47–48. Consensual rough sex is marked by choking, hitting, and other agreed-upon aggressive physical acts. *Id*. It does not include force that would fracture a skull. *Id*. L.H.'s petition made clear that she and Bauer *did* discuss rough sex and *did* agree to consensual choking prior to the encounter. ECF No. 58-2 at 29, ¶¶ 7–8. Thus, L.H.'s petition was naturally poised to spark debate

14

about the scope of rough sex and consent, including how young people should navigate discussing boundaries of consensual risky behavior beforehand to ensure a meeting of the minds. FAC ¶¶ 47–48.

The Article's false implication changed the gist of the story by definitively ruling out consent. FAC ¶ 48. Rather than accurately reporting on an encounter involving two young people who had discussed rough sex beforehand and had agreed upon admittedly *consensual* choking, but ultimately may have had different understandings of what rough sex meant, the Article invited an immediate vilification of Bauer based on a horrifically violent act that he did not commit and a level of force to which no one could consent. FAC ¶ 48. Allegations of a consensual rough sexual encounter that became too forceful and resulted in bruising are vastly different than allegations of a non-consensual sexual encounter that resulted in a *broken skull*. That was precisely the point of Knight's tweets.

*The Athletic* contends that this is akin to *Tiwari v. NBC Universal Inc.*, where in *To Catch A Predator*, NBC stated that the defendant was convicted of "lewd and lascivious acts with a child," but the defendant was actually convicted of "attempting to communicate with a girl under 14 years of age for the purpose of persuading and luring, or transporting, the girl away from home without parental consent." 2011 WL 5079505, at *14 (N.D. Cal. Oct. 15, 2011). But in *Tiwari*, the court held that it would not affect the viewer whether Tiwari was convicted of one crime involving a minor girl versus a different crime involving a minor girl, particularly as the show filmed him attempting to have inappropriate contact with that minor. *Id*. at *15.[4] Unlike *Tiwari*, here the Article implied a skull fracture when there was no fracture (and no other serious medical consequences) at all.

---

[4] The rest of *The Athletic*'s authority to this effect fares no better. MTS at 14 n. 12. In those cases, the articles merely used more colorful language than the underlying court proceedings they were purporting to describe, but did not report anything false.

OPP'N TO MOT. TO STRIKE

In a more comparable case, a court declined to strike a complaint where an article falsely stated that the plaintiff was arrested and charged with 10 counts of financial felonies when, in fact, the plaintiff had paid $500,000 through a civil forfeiture consent judgment. *Jezzini v. Adolf*, 2019 WL 4668008, at *6 (Cal. Ct. App. Sept. 25, 2019). The court reasoned: "We simply cannot conclude, as a matter of law, that the forfeiture of $500,000 has the same effect on the reader as a prosecution for ten counts of felony money structuring and money laundering." *Id*.[5] Like *Jezzini*, this Court cannot conclude as a matter of law that bruising and swelling resulting from consensual choking and allegedly non-consensual roughness have the same effect on a reader as a skull fracture.

In any event, "whether a statement is true or substantially true is normally considered to be a factual one" and "whether statement is defamatory is for jury in close cases." *Bently Rsrv. LP v. Papaliolios*, 218 Cal. App. 4th 418, 435 (2013).[6]

**D. The Article Is The Opposite Of A Fair And True Report Of L.H.'s Petition.**

The fair and true report privilege is inapplicable because the Article implied *the exact opposite* of what the medical records—an indispensable part of the petition—say. MTS at 16–17.

*The Athletic* contends that the privilege should be broadly applied and doubts should be resolved in favor of finding privilege, citing to a 1978 case involving

---

[5] *See also Gallagher v. Philipps*, 563 F. Supp. 3d 1048, 1088 (S.D. Cal. 2021) (firing "a firearm ... at noncombatants" could have a different effect on the average reader than "spraying civilian neighborhoods in Iraq with rockets and heavy machine gun fire").

[6] On March 1, 2023, a court in the Southern District of New York dismissed a defamation claim brought by Bauer against *Deadspin*, finding three challenged statements were substantially true/privileged under New York law. Opinion/Order, *Bauer v. Baud,* No. 22-cv-1822 (S.D.N.Y. Mar. 1, 2023). Judge Crotty expressly refused to rely on this Court's previous opinion because it did not apply New York law and is on partial appeal. *Id.* at p. 7, n. 6. Similarly, this Court should not rely on that decision because it applied New York law to three unique statements in a different article. That opinion could not inform what effect the Article has on an average reader, particularly where there are allegations in this case that other news outlets and Knight read the skull fracture as critically important to consent.

16

whether an informant's statements to the IRS regarding possible tax fraud were privileged. MTS at 16–17 (citing *Tiedemann v. Superior Ct.*, 83 Cal. App. 3d 918, 925 (1978)). However, *Tiedemann* stated that the policy reason behind its broad construction of the privilege was to "afford litigants freedom of access to the courts" and "promote the unfettered administration of justice;" it had nothing to do with allowing media behemoths to misstate court filings. *Tiedemann*, 83 Cal. App. 3d at 925.

A newspaper report is fair and true if it reflects "the substance, the gist, the sting of the libelous charge." *Crane v. Arizona Republic*, 972 F.2d 1511, 1519 (9th Cir. 1992). *The Athletic*'s reporting on L.H.'s petition does not fall within the privilege because the petition definitively concludes that Bauer *did not* fracture L.H.'s skull. *Infra* § IV.E (medical notes conclusively state "no acute fracture"). And the implication of a skull fracture is not only factually false, but it injects a heightened level of violence into L.H.'s petition that is simply not there. *Supra* § IV.C. *The Athletic* contends that the actual results of the CT scan do not matter because L.H. alleged in her petition a diagnosis of acute head injury and manual strangulation, which is close enough. MTS at 13, 15. But L.H.'s own petition makes clear that she *consented* to choking (rendering the diagnosis of manual strangulation hardly surprising), and that her *only* physical injuries were superficial bruising and swelling that required no medical treatment. ECF No. 58-2 at 28–36, 71–79. The force required to *crack a human skull* is leagues beyond the injuries alleged in the petition.

*The Athletic* also contends that because the defamatory statement is a verbatim quote from L.H.'s petition, it is a fair and true report. MTS at 17. Not so. A selective verbatim quote is not "fair and true" if it has an entirely different meaning when read in isolation than when read in the context of the entire court filing. *Crane*, 972 F.2d at 1522–23 (jury could find article altered gist of underlying proceeding where it implied that two statements were contradictory by reporting on them faithfully but in the wrong order). Here, *The Athletic* misleadingly used selective language from the

OPP'N TO MOT. TO STRIKE

petition to push its preferred narrative. This does not insulate it from liability for its choice to ignore other parts of the record. *Overhill Farms, Inc. v. Lopez*, 119 Cal. Rptr. 3d 127, 141 (2010) (no protected opinion for "statements [that] do not fully and accurately disclose the facts" or "full story").

Ultimately, *The Athletic*'s invocation of the fair and true report privilege fails because whether the Article captures the "gist" of the petition is a question for the jury. Only when "there is no dispute as to what occurred in the judicial proceeding reported upon or as to what was contained in the [petition], the question is one of law." *Healthsmart Pac., Inc. v. Kabateck*, 7 Cal. App. 5th 416, 431 (2016), *as modified* (Jan. 10, 2017); *Tiwari*, 2011 WL 5079505 (where no dispute over what occurred in underlying proceeding, court decided whether privilege applied as matter of law). Here, there *is* a dispute over what was contained in L.H.'s petition because, as the Court noted, the conclusiveness of the CT scan results is a "factual uncertainty," Order at 17, with Bauer contending they are conclusive and *The Athletic* contending the opposite. *Infra* § IV.E.

Moreover, "whether the report of the official proceedings itself is 'fair and true,' provided reasonable minds could disagree as to the effect of the communication on the average reader or listener, is a question of fact for the jury." *Healthsmart Pac., Inc.*, 7 Cal. App. at 431; *Crane*, 972 F.2d at 1519 (same); *Gallagher*, 563 F. Supp. 3d at 1083 (same). Drawing all inferences in favor of Bauer, it is plausible that a jury could find that the false accusation of the skull fracture has a different effect on the average reader than a faithful report of the petition would have.

**E. Bauer Alleges Actual Malice.**

The Supreme Court has held that public figures must prove actual malice to recover in a defamation action. *Curtis Publishing Co. v. Butts,* 388 U.S. 130 (1967). Actual malice requires one of two things: knowledge of falsity or reckless disregard for the truth. Order at 16 (citing *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990)).

At this stage, Bauer need only "establish a *probability* that he … can produce such clear and convincing evidence" proving actual malice. *Manzari*, 830 F.3d at 889.

The Court expressed concern that the original complaint did not specifically allege that the Journalists knew the Article's implications were false. Order at 16–17. The FAC does specifically allege that the Journalists knew the medical records showed no skull fracture, yet deliberately included the defamatory implication anyway. FAC ¶¶ 59–60. The Journalists even referenced the "67-page ex-parte document" in the Article, dispelling any doubt that they had knowledge of the entire petition including the medical records. FAC ¶ 35; ECF No. 58-2 at 9.

A court in this district recently found that a plaintiff met her burden of pleading malice because the very inclusion of an allegedly defamatory line in a popular television program was easily proven false by "[a]ny simple Google search" and "the information was readily available on multiple common websites." *Gaprindashvili*, 2022 WL 363537, at *10. Similarly, here, Bauer alleges that the truth was at the Journalists' fingertips, and the deliberate omission of the CT scan results evinces that they knew or had a reckless disregard that readers would come away with the defamatory implication. *Murray v. Bailey,* 613 F. Supp. 1276, 1285 (N.D. Cal. 1985) (where author had seen "hard evidence" rebutting his allegations, question of malice could be submitted to jury).

The Court also expressed concern that actual malice could not be inferred since there is "factual uncertainty" in L.H.'s petition as to whether the CT scan results were conclusive. Order at 17. The Court's concern stemmed from medical records from a follow-up visit that the Court characterized as "indicat[ing] a doctor's doubts as to the conclusion of the CT scans, resulting in an order of an MRI to rule out the possibility of an 'undetected fracture.'" *Id*. However, Bauer clarified in the FAC there is no such uncertainty. The purpose of the CT scans in the first visit was to rule out the possibility of a skull fracture, which the scans did. FAC ¶ 37. L.H. had a follow-up visit at a different medical facility two weeks later, where she complained of

residual pain while chewing and opening her mouth. *Id*. The physician ordered an MRI of her face and head to rule out an undetected fracture *of the jaw*. *Id*. ¶ 39. The MRI was not to rule out an undetected fracture of the skull. *Id*. ¶ 40. The notes from the follow-up visit repeatedly state that the previous CT scan had ruled out a skull fracture. *Id*.; ECF No. 58-2 at 94, 95, 99.

*The Athletic* accuses Bauer of misleadingly quoting the medical records, arguing that the phrase "jaw" is an insertion by Bauer and not contained in the follow-up visit records. MTS at 20–21. But it is *The Athletic* that is misleading the Court. The medical records, *in bold*, state: "**Jaw pain, non-TMJ.**" ECF No. 58-2 at 94. In a bullet point underneath that bold heading, the records state that, due to pain with mastication (chewing) and opening mouth, an MRI will rule out an undetected fracture. *Id*. There is simply nothing in the follow-up visit records that cast doubt on the CT scan results ruling out a skull fracture from the first visit.

Aside from the medical records themselves, Bauer alleges that the CT scans were interpreted conclusively by other media outlets. FAC ¶¶ 56–58 (alleging *InsideHook*'s correction stated: "[i]n the medical documents supplied by the woman in her petition, there is a CT scan included that **clearly states <u>she does NOT have a skull fracture</u>**.").

Finally, *The Athletic* argues that correspondence regarding the purported "correction" shows no actual malice. MTS at 19–20. But the inadequacy of the correction cuts against it. *Supra* § IV.A.b; FAC Ex. E.

## V.   CONCLUSION

The Court should deny the motion.

OPP'N TO MOT. TO STRIKE

Dated:      March 3, 2023                    /s/ Blair G. Brown
                                             Blair G. Brown (admitted *pro hac vice*)
                                             Jon R. Fetterolf (admitted *pro hac vice*)
                                             ZUCKERMAN SPAEDER LLP
                                             1800 M Street, N.W., Suite 1000
                                             Washington, D.C. 20036
                                             Tel: (202) 778-1800
                                             Fax: (202) 882-8106
                                             bbrown@zuckerman.com
                                             jfetterolf@zuckerman.com

                                             Nell Z. Peyser (admitted *pro hac vice*)
                                             ZUCKERMAN SPAEDER LLP
                                             485 Madison Avenue, 10th Floor
                                             New York, NY 10022
                                             Tel: (212) 704-9600
                                             Fax: (212) 704-4256
                                             npeyser@zuckerman.com

                                             Shawn Holley (Cal. Bar No. 136811)
                                             Suann C. MacIsaac (Cal. Bar No. 205659)
                                             KINSELLA WEITZMAN ISER KUMP
                                             HOLLEY LLP
                                             11766 Wilshire Boulevard, Suite 750
                                             Los Angeles, CA 90025
                                             Tel: (310) 566-9800
                                             Fax: (310) 566-9873
                                             sholley@kwikhlaw.com
                                             smacisaac@kwikhlaw.com

                                             *Attorneys for Plaintiff Trevor Bauer*

OPP'N TO MOT. TO STRIKE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff Trevor Bauer, certifies that this brief contains 6,999 words, which complies with the word limit pursuant to L.R. 11-6.1.

Dated: March 3, 2023

*/s/ Blair G. Brown*
Blair G. Brown

OPP'N TO MOT. TO STRIKE